IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:03-CV-204-BO

SEALED

FILED

MAR 20 2003

DAVID W. DANIEL, CLERK
US DIST COURT, E NC
BY _____ DEP. CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **COMPLAINT FOR FORFEITURE** |
| NORTH CAROLINA'S ORIGINAL | : | **IN REM** |
| COPY OF THE BILL OF RIGHTS, | : | |
| | : | |
| Defendant. | : | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, states as follows:

1.    This is a civil action <u>in</u> <u>rem</u> brought to enforce the provision of 18 U.S.C. § 981(a)1(C), providing for the forfeiture of property constituting or derived from proceeds traceable to violations of 18 U.S.C. §§ 2314 and 2315.

2.    This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. Venue in this district is proper by virtue of 18 U.S.C. § 981(h) and 28 U.S.C. § 1395(b).

3.    The defendant is located within the jurisdiction of this Court.

4.    The facts and circumstances supporting the seizure and forfeiture of the defendant are contained in the Affidavit of Charles R. Reavis, United States Marshal, the original of which is attached to an Application and Affidavit for Seizure Warrant

filed on March 13, 2003, having the Docket Number of 5:03-M-103, and is incorporated herein by reference. (A copy is attached hereto as Exhibit A). The facts contained in the affidavit constitute probable cause for the forfeiture of the defendant.

5. The defendant is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)1(C).

WHEREFORE, the United States of America prays that a warrant of arrest in rem issue for the arrest of the defendant; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 20th day of March, 2003.

FRANK D. WHITNEY
United States Attorney

BY: _____
    PAUL M. NEWBY
    Assistant United States Attorney
    Civil Division
    310 New Bern Avenue
    Federal Building, Suite 800
    Raleigh, NC 27601-1461
    Telephone: (919) 856-4530
    Facsimile: (919) 856-4821

2

## VERIFICATION

I, Paul M. Newby, Assistant United States Attorney for the Eastern District of North Carolina, declare under penalty of perjury, as provided by 28 U.S.C. Section 1746, the following:

That the foregoing Complaint for Forfeiture is based on reports and information furnished to me by Charles R. Reavis, United States Marshal, and to the best of my information and belief, is true and correct.

This the ___20th___ day of March, 2003.


_____
PAUL M. NEWBY
Assistant United States Attorney
Civil Division

3

# United States District Court

| EASTERN | DISTRICT OF | NORTH CAROLINA |

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

Original copy of Bill of Rights (North Carolina's copy)
and associated documents

## APPLICATION AND AFFIDAVIT
## FOR SEIZURE WARRANT

CASE NUMBER: 5:03-M-103

I, ___Charles R. Reavis___ being duly sworn depose and say:

I am a(n) ___United States Marshal___ and have reason to believe
                    Official Title

that in the ___Eastern___ District of ___North Carolina___
there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

Original copy of Bill of Rights (North Carolina's copy) and associated letters and
documents, including, but not limited to, two letters from George Washington to Governor
Samuel Johnston, dated June 19,1789 and October 2, 1789.
which is (state one or more bases for seizure under the United States Code)

Stolen Goods
18 U.S.C. 981(a)1(C), 28 U.S.C. 2461(c) and 18 U.S.C. 982

concerning a violation of Title ___23___ United States Code, Section(s) ___15___.
The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

See attached.

Continued on the attached sheet and made a part hereof.  ☒ Yes  ☐ No

*Charles R. Reavis*
Signature of Affiant

Sworn to before me, and subscribed in my presence

___March 13, 2003___ at ___Raleigh, NC___
Date                        City and State

___TERRENCE W. BOYLE, Chief, United States___
Name and Title of Judicial Officer    District Judge
Signature of Judicial Officer

*I certify the foregoing to be a true and correct
copy of the original.
David W. Daniel, Clerk
United States District Court
Eastern District of North Carolina
By*

STATE OF NORTH CAROLINA
COUNTY OF WAKE                              AFFIDAVIT


       I, the undersigned Charles R. Reavis, United States Marshal
for the Eastern District of North Carolina, make the following
statements:

1.    I have been in law enforcement since 1968.  I have served as
a deputy sheriff for about 11 years and as a special agent with
the Drug Enforcement Administration until 2002.  I served as the
resident agent in charge of the Raleigh office from 1999 until
2002.  I am currently the United States Marshal for the Eastern
District of North Carolina, having been appointed in March 2002.
As a seasoned law enforcement officer, I have investigated
numerous crimes and am familiar with the legal standard for
probable cause.

2.    In this affidavit, I am relating information which has been
derived from sources which I find to be reliable.   The
information was provided by the Offices of the Governor and the
Attorney General of North Carolina.

3.    This seizure involves one of the original 13 copies of the
Bill of Rights and associated letters and documents that belonged
to the State of North Carolina and were stolen in 1865.

4.    At the time that the Bill of Rights was enacted, a copy was
transmitted to each state.  The copy given to North Carolina was
eventually put on display in the Office of the Secretary of State
from which it was stolen in 1865 and taken across state lines to
one of the Northern states, believed to be Ohio.  See
Hendersonville, NC Newspaper article, dated May 28, 1991,
attached as Exhibit A.

5.    In 1925, a man by the name of Charles I. Reid, of
Harrisburg, Pennsylvania, wrote a letter to a professor at the
University of North Carolina, indicating that he had come into
possession of North Carolina's original copy of the Bill of
Rights taken from the state house in Raleigh.  Thereafter, Reid
attempted to broker a sale of the document back to the State of
North Carolina.  However, state officials indicated that they
were unwilling to pay taxpayer funds for stolen property, and
asserted that the document should be voluntarily returned.  One
state official noted that,

       So long as it remains away from the official custody of
       North Carolina, it will serve as a memorial of individual
       theft.  Since this fact must be clear to anyone acquainted
       with the history and law, not to mention honor, it is

interesting to note the present whereabouts of the document
and to speculate on how long the joy of illegitimate
possession can hold out against scruples arising from
intelligent consideration of the facts involved.

Letter dated April 7, 1925, attached as Exhibit B, p. 1. <u>See</u>
other correspondence attached as Exhibit B.

6.   Again, in 1995, a seller, through counsel by the name of
John L. Richardson, in Washington, D.C., approached officials for
the State of North Carolina Department of Cultural Resources and
offered to sell the document.  In a letter dated October 24,
1995, Mr. Richardson wrote that the individuals seeking to sell
the document "insist upon anonymity.  We are warned that they are
nervous and, if they believe their identity may be disclosed
against their will, they may act in a manner which will not be in
any of our interest."   In that same letter, Mr. Richardson
indicated that his clients received estimates on the valuation of
the document ranging between $3 million and $10 million dollars.
Letter dated October 24, 1995, attached as Exhibit C.  Again,
state officials indicated that they could not spend taxpayer
funds for stolen property.

7.   Recently, the governor of Pennsylvania contacted the
governor of North Carolina and indicated that a Pennsylvania non-
profit organization, whose aim is to preserve various
antiquities, had been approached about purchasing the North
Carolina original copy of the Bill of Rights.  Knowing the
ownership claim of North Carolina, the organization would not
complete the transaction without the consent of North Carolina.
The organization had agreed to purchase the North Carolina copy
of the Bill of Rights for five million dollars ($5,000,000.00).

8.   It appears that the North Carolina copy of the Bill of
Rights, and associated letters and documents is currently
possessed and offered for sale by Wayne E. Pratt and/or his
agents.  On January 16, 2003, Pratt signed two agreements: one
agreeing to the sale of the document for five million dollars
($5,000,000.00) within a two month period, and the other of the
same date agreeing to pay Peter Tillou and William Reese a
commission of one million dollars ($1,000,000.00) for the sale.
Exhibits D and E.

9.   To facilitate the sale, Pratt, Tillou and Reese, using the
art gallery of Kaller's America Gallery, Inc. provided the
document with associated letters to Documentary History of the
1st Federal Congress, a department of George Washington
University.  Faculty of that department indicated that there were
two authentic letters from George Washington to the governor of
North Carolina, Samuel Johnston.  The conclusion was, "the

document you are researching is without question the North Carolina copy of the Bill of Rights." Exhibit F.

10. By offering the North Carolina copy of the Bill of Rights and associated documents for sale and signing the contracts, it appears that Wayne E. Pratt and/or his associates possess the stolen document. Mr. Pratt is represented by John L. Richardson, the Washington, D.C. attorney who offered the documents for sale in 1995.

11. Accordingly, there is probable cause to believe that Wayne E. Pratt and his associates have violated 18 U.S.C. § 2315. North Carolina's original version of the Bill of Rights which was stolen in 1865 is subject to seizure for forfeiture pursuant to federal statutes (18 U.S.C. §§ 981(a)1(C) and 982 and 28 U.S.C. § 2461 (c). (It will ultimately be returned to the State of North Carolina, its rightful owner).

I declare under penalty of perjury that the foregoing is true and correct. Respectfully submitted this 13th day of March, 2003.

*Charles R. Reavis*

Charles R. Reavis
United States Marshal
Eastern District of N.C.

# Bill of Rights copy visits only state missing theirs

By KIRSTEN B. MITCHELL
NYT Regional Newspapers

As Tar Heels climbed aboard the *HMS Rose* for a glimpse of Rhode Island's copy of the Bill of Rights, some may have wondered about North Carolina's copy of the historic document.

The *HMS Rose*, a 24-gun wooden frigate, visited the Port City last week as part of a 24-city East Coast tour celebrating the 200th anniversary of the ratification of the Bill of Rights.

One of 12 copies of the Bill of Rights known to exist — the Rhode Island copy — is displayed on the ship in a glass-topped wooden case that is fire-proofed and temperature- and humidity-controlled.

Of the 13 original copies of the Bill of Rights — one for each colony — North Carolina's copy is the only one missing. The state's copy disappeared in April 1865 when a soldier in General William T. Sherman's Union Army stole it from the office of the secretary of state in Raleigh, said Dr. William Price, director of the N.C. Division of Archives and History in Raleigh. A reward for its return to the state was never offered.

Price and his colleagues still wonder where North Carolina's copy is but doubt it will ever be found.

Sixty years after it was stolen, state officials had the chance to buy the state's copy of the Bill of Rights, Price said. They refused, however, on the grounds that it was stolen property.

The soldier who stole the docu-

> Of the 13 original copies of the Bill of Rights — one for each colony — North Carolina's copy is the only one missing. The state's copy disappeared in April 1865 when a soldier in General William T. Sherman's Union Army stole it.

ment brought it to his home in Tippecanoe, Ohio, where he sold it, according to a March 25, 1925, letter to R.B. House, then-secretary of the N.C. Historical Commission. No one knows how much the buyer paid for the document, Price said.

"The old gentleman who bought it off the soldier did so in the belief that that it was contraband of war, which may have been the case at that time," wrote Charles I. Reid, a New York City man representing the document's possessor. The man who bought the document from the Union soldier wished to sell North Carolina its copy of the Bill of Rights.

Two years after the document was stolen, the N.C. secretary of state and the treasurer journeyed to Indianapolis to get the document but were convinced by the possessor and Indiana's secretary of state that they could not obtain it, Reid's letter to House says. No other mention is made of how Indiana became involved in the mystery; speculation

is that the person who bought the document from the soldier lived in Indiana.

"The possessor is a very old man and had treasured this manuscript for the past 59 years," the letter says. "I believe the need of money has prompted him to offer it for sale." Reid's letter indicates that the document's possessor would consider "reasonable honorarium" for the document. No price is mentioned in the letter.

"He has certainly preserved the document well and it would return home in about the same condition in which it left," Reid said.

In a response to Reid's letter, House wrote April 7, 1925, that the document "though clearly the property of the State of North Carolina, is not important enough to engage in controversy over."

"So long as it remains away from the official custody of North Carolina, it will serve as a memorial of individual theft," continued House. Later, he wrote, "It is interesting to ... speculate on how long the joy of illegitimate possession can hold out against scruples arising from the intelligent consideration of the facts involved."

Sixty-six years later, the document's possessor, perhaps an heir of the person who bought the document from Gen. Sherman's soldier, is still holding out.



GOVERNMENT
EXHIBIT
4

April 7th, 1925.

Mr. Charles I. Reid,

    767 St. Nicholas Avenue,

      New York, N. Y.

Dear Sir:

      I acknowledge your letter of March 25th. The document you are attempting to sell, though clearly the property of the State of North Carolina, is not important enough to engage in controversy over. So long as it remains away from the official custody of North Carolina, it will serve as a memorial of individual theft. Since this fact must be clear to anyone acquainted with history and law, not to mention honor, it is interesting to note the present whereabouts of the document and to speculate on how long the joy of illegitimate possession can hold out against scruples arising from intelligent consideration of the facts involved.

      Very truly yours,

      Secretary.



GOVERNMENT
EXHIBIT
B

CHARLES I. REID
LECTURE AND CONCERT TOURS
767 ST. NICHOLAS AVENUE
NEW YORK

March 25, 1925.

Mr. R. B. House, Secretary,
The North Carolina Historical Commission,
Raleigh, North Carolina.

Dear Sir:

Many thanks for your letter of March 24.

The original copy of the bill of rights as submitted to the state of North Carolina was taken, according to my information, from the office of the secretary of state at Raleigh by a soldier of Sherman's army, who carried it home with him to Tippecanoe, Ohio and there sold it to the present posessor in 1866.

I do not know, after the opinion you have given, whether any private title could exist. The old gentleman who bought it of the soldier did so in the belief that it was contraband of war, which may have been the case at that time. About two years afterwards the secretary of state and treasurer of the state of North Carolina journeyed to Indianapolis to obtain posession of the document but were convinced by the posessor and the secretary of state of Indiana that they could not obtain it.

The posessor is a very old man and has treasured this manuscript for the past 59 years. I believe a need of money has prompted him to offer it for sale. In view of the fact that, as you say, it has a sentimental value, aside from any personal value he may attach to it, only in the state of North Carolina and is a public document, I believe he would be disposed to consider and accept any reasonable honorarium for any equity, real or imaginary, he may have in it, and I would so recommend to him. He has certainly preserved the document well and it would return home in about the same condition in which it left.

Very truly yours,

*[signature]*

March 24th, 1925.

Mr. Charles I. Reid,

   767 St. Nicholas Avenue,

      New York, N. Y.

Dear Sir: --

A letter written by you on March 16th to General Julian S. Carr, of Durham, has been referred to me by the private secretary of General Carr's estate. It appears that you are seeking a purchaser of the original of the bill of rights as submitted to the State of North Carolina. I, of course, donot know the history of this document since its disappearance from North Carolina, but it was stolen from the State Capitol in 1865 and therefore the title to it has never passed from the State of North Carolina to any individual. I rely upon your interpretation of these circumstances to take what action you think right in the matter. I am sure, however, that no person in the State of North Carolina would be willing to purchase the documents under such conditions, and thus give commercial standing to such an act as its being taken under the circumstances attending its disappearance. The document, of course, is entirely of sentimental value, as part of the original records of the State.

Very truly yours,

March 18th, 1895.

Mr. Chas. L. Reid,
767 St. Nicholas Ave.,
New York, N. Y.

My Dear Sir:-
                    Your letter of the 18th addressed to
the late Gen. J. S. Carr, was placed in my post
office box.

                    Gen. Carr died April 25th, 1895.
        I have referred your letter to
                    Col. Fred A. Olds,
                    State Historical Society,
                    Raleigh, N. C.,

        and he may write you.

                    Yours very truly,

                    Thos. P. Gorman
                Private Secy., Late Julian S. Carr.



**Julian S. Carr**
SOUTHERN SECURITIES·
AND INVESTMENTS·
**Durham, N.C.**

PRESIDENT
FIRST NATIONAL BANK
OF DURHAM
CAPITAL $100,000.00
SURPLUS $250,000
DEPOSITS $3,200,000.00

March 19th, 1925.

My Dear Friend:-

      The enclosed letter and my reply,
I refer to you, and if y u see fit, you can write
the party.

      It appears to me that the document re-
ferred to ought to be, by rights, returned to the
State Archives, at this time, without any reward, bu
but, there are folks and folks.

      Yours very truly,

      Thos. M. Gorman

To
  Col. Fred A. Olds,
  Raleigh, N. C.

CHARLES I. REID
LECTURE AND CONCERT TOURS
767 ST. NICHOLAS AVENUE
NEW YORK

March 16, 1925.

Julian S. Carr, Esq.,
Durham, N.C.

Dear Sir:

The present owner of the ducument described in the enclosed sheets, known as the Bill of Rights of the People, bearing the first ten amendments to the constitution of the United States as transmitted by the first congress of the United States to the state of North Carolina, has commissioned the writer to find a purchaser for it.

This parchment has, so far as I know, never before been available for purchase and has been in the possession of the present owner since 1866.

It is thought that you might be interested in a first opportunity to obtain this most important of historical documents, for your private collection or for presentation to the state of North Carolina. I am prepared to obtain prompt consideration of an offer.

Very truly yours,

Feb. 9, 1925.

My dear Mr. Reid:

The only accounts of any
length concerning the entrance of the Union
troops into the city of Raleigh in 1865 are
to be found in Mrs. Spencer's "Last Ninety
Days of the War in North Carolina", (now out
of print and very difficult to be obtained),
and a much briefer account in my "Reconstruc-
tion in North Carolina."

You are mistaken as to the
sacking of the city. The State House was pretty
thoroughly rummaged over and looted to some ex-
tent, but there was a notable absence of that
sort of thing in the case of the city.

Might I suggest that since the
document in your possession is the property of
the State of North Carolina, and so judged in a
recent case by the Supreme Court of the United
States, that it would be a very graceful and ap-
preciated act on your part to follow the example
of numerous other persons in the North, into
whose possession documents with a similar history
have come, and restore it to the State of North
Carolina? Mr. R. B. House, North Carolina Hist-
orical Commission, Raleigh, N.C., is officially
empowered to receive such documents. I can assure
you that such action will be highly appreciated in
the State.

Very truly yours,


J.C. deRoulhac Hamilton.


Mr. Charles I. Reid,
Harrisburg, Pa.

DEPARTMENT OF HISTORY AND GOVERNMENT

Feb. 9, 1925.

Dear House:

Enclosed is a copy of a letter received by me, and also a copy of my reply, sent for your information.

It would not be worth suing the man, and there are some objections to making an official claim to it, but at the same time, I hate for these damned rascals to get away with it. You can take such action as you think wise.

With best wishes,

Very truly yours,

J. G. deRoulhac Hamilton

T.

February 13th, 1925.

Dr. J. G. deR. Hamilton,

Chapel Hill, N. C.

Dear Dr. Hamilton:

I have received your letter and a
copy of the letter written by you on February 9th to
Mr. Charles I. Reid of Harrisburg, Pa.

I think you have made clear to him
what he ought to do in the matter of returning the
manuscripts to the State of North Carolina, and I think
it would be wise to give him a little time to do the
right thing, if he wants to. I am glad that you called
my attention to the matter.

I will have a check for you within a
few days.

Very truly yours,

Secretary.

COPY.

REID EDITORIAL SERVICE
Harrisburg, Pennsylvania

February 6, 1925.

Prof. J. D. De Roulhac Hamilton,
University of North Carolina,
Chapel Hill, North Carolina.

Dear Sir:

The writer has attempted to find,
in your History of North Carolina, detailed
information about the incidents connected
with the entrance of the Union Army into
the city of Raleigh, the sacking of the city
and the state house.

I have recently come into possession
of the original copy of the first thirteen
amendments to the Constitution of the United
States given to the state of North Carolina as
one of the thirteen states by the first Congress
which met at New York in 1789.  This document
was taken from the state house at Raleigh by
one of the Union soldiers who came from Ohio.
I am greatly interested in obtaining any de-
tails of the events surrounding the incident.
Any suggestion would be greatly appreciated.

Very truly yours,

(Signed) Chas. I. Reid.

INFORMATION CONCERNING THE DOCUMENT HAVING INSCRIBED
UPON IT THE FIRST TEN AMENDMENTS TO THE CONSTITUTION
OF THE UNITED STATES, POPULARLY KNOWN AS THE BILL OF
RIGHTS OF THE PEOPLE, TRANSMITTED TO THE STATE OF
NORTH CAROLINA BY THE FIRST CONGRESS OF THE UNITED
STATES OF AMERICA WHICH MET IN NEW YORK CITY IN 1789

---

This historical document, bearing the signatures of
John Adams, Vice President of the United States and
President of the Senate, Frederich Augustus Muhlenberg,
Speaker of the House of Representatives and Sam. A. Otis,
Secretary of the Senate, was taken from a vault in the
office of the Secretary of State of North Carolina by
a soldier of Sherman's Army on the march from Georgia
to the sea. This soldier was one of a company who went
through the state house, helping themselves to whatever
they found. The soldier took the document home with
him to Tippecanoe, Ohio.

---

The document has been kept with very little exposure to
the light and is still in splendid condition. It is a
remarkable piece of penmanship and every line of it is
almost as legible as when first written.

# VEDDER, PRICE, KAUFMAN, KAMMHOLZ & DAY

A PARTNERSHIP INCLUDING VEDDER, PRICE, KAUFMAN & KAMMHOLZ

2121 K STREET, N.W.
7TH FLOOR
WASHINGTON, D.C. 20037
202/496-1200
FACSIMILE: 202/496-1212

JOHN L. RICHARDSON
202/496-1234

VEDDER, PRICE, KAUFMAN & KAMMHOLZ
222 NORTH LA SALLE STREET
CHICAGO, ILLINOIS 60601-1003
416 LONGWOOD STREET
ROCKFORD, ILLINOIS 11101-4264
312/462-5100

VEDDER, PRICE, KAUFMAN, KAMMHOLZ & D
805 THIRD AVENUE
NEW YORK, NEW YORK 10022-2205
212/407-7700

October 24, 1995

CONFIDENTIAL - VIA FACSIMILE

The Honorable Betty McCain
Secretary of Cultural Resources
State of North Carolina
109 East Jones Street
Raleigh, North Carolina 27601-2807

Dear Ms. McCain:

It was good to talk with you last week.  I look forward to a mutually satisfactory arrangement which will bring us all to a very positive result.

At the outset, please let me emphasize again how important it is that we proceed quickly and with maximum confidentiality. As I told you, I have no direct relationship with the people who have the article, and there are at least three intermediaries between me and those people.  Given this separation, some obvious problems arise.  While we can develop an appropriate process to overcome most of them, others will persist.  Most prominently, we are constantly encouraged to "move faster," and we are reminded that the people who have the article have alternatives available to them.  Unfortunately, we have no way of knowing how much of this is posturing and how much is real.  We have also been told repeatedly that the people insist upon anonymity.  We are warned that they are nervous and, if they believe their identity may be disclosed against their will, they may act in a manner which will not be in any of our interests.  Again, we have no idea about the extent to which any of these warnings should be taken seriously but, to the extent we can maintain a high level of confidentiality and expedite the process, we can minimize any potential adverse impact.

With the need for secrecy and expedition clearly understood, we propose a transaction under which the two sides will agree to convey the article to a party you would identify for an amount equal to the article's appraised value.  To complete such a transaction, the article must be authenticated; its value must be determined; the purchase funds must be raised; and the operative documents must be agreed upon.  Once we agree on the basics of the transaction, all four of these activities can and should proceed at the same time.


GOVERNMENT
EXHIBIT

Although we are confident about the authenticity of the article, we know that you will need independent assurances in this regard.  We propose that you identify a person or a group, independent of the State of North Carolina, who would serve as your authenticator.  Assuming that person is acceptable to our side, we would make the article available for inspection under appropriately controlled conditions.

We would propose to complete the valuation process in a similar fashion.  Both sides would agree upon five independent appraisers and ask each of them to appraise the article independently.  We would strike the highest and lowest appraisals and consummate the transaction on the basis of the average of the remaining three.  The experts would be instructed that their appraisal would not be effected by questions of ownership, but it would consider the condition of the article.

It seems to us that a necessary part of the valuation process would involve the establishment of both a floor and a ceiling on the purchase price.  If the appraisers indicate that the value was below a certain amount, our people reasonably would not go forward.  Similarly, we assume that if the appraisal resulted in a valuation over a certain amount, you would not be able or willing to proceed.  As discussed last week, at this point, you should proceed on the assumption that the article will be valued at an amount in excess of $3 million.  We have received estimates ranging up to $10 million, and we are not aware of any under $3 million.

Although the fund-raising process is certainly your responsibility, we would strongly recommend that we agree on some system where the transaction can be consummated without waiting for the completion of a major fund-raising campaign.  To assure maximum confidentiality and expedition, it would be best if one qualified person or small group of people would agree to fund or underwrite the transaction.  It would not be reasonable to expect the people who now have the article to wait while a broad-based fund-raising effort is publicized and completed.

We are still developing our thoughts with respect to the actual transfer transaction.  Since our client does not have the article, it views itself as a facilitator in this process. Nevertheless, under appropriate circumstances, it might be able to be a "seller" to whatever "purchaser" you determine appropriate.  You may be more concerned than we about the actual form of transaction we choose, but certainly with respect to representations, warranties, indemnification and confidentiality, a sales transaction would appear to be the best form to follow.

    Please consider all this and let me have your thoughts.  As
indicated above, we continue to hear stories of impatience and
threats of pursuing alternative courses of action attributed to
the present possessors of the article.  We believe it is
important to proceed as fast as possible, and we assure you we
are prepared to move forward at whatever pace you find
appropriate.

    I look forward to hearing from you.

                        Best regards,

                        John L. Richardson

January 16, 2003

Peter Tillow and William Reese
have a two-month option to
sell the Bill of Rights, at a
price agreed to by me, Wayne E. Pratt
at five million dollar

_Wayne E. Pratt_

Wayne E. Pratt

GOVERNMENT
EXHIBIT
D

January 16, 2003

Peter Tillou and William Reese will receive a net commission of $1 million from the sale of the Bill of Rights when sold for $5 million.

Wayne C. Pratt

GOVERNMENT
EXHIBIT
E

# DOCUMENTARY HISTORY of the 1ST FEDERAL CONGRESS

The George Washington University, Washington, D.C. 20052

(202) 676-6777

**CO-EDITOR AND DIRECTOR:**
Charlene N. Bickford

**CO-EDITOR:**
Kenneth R. Bowling

**ASSOCIATE EDITOR:**
Helen E. Veit

**ASSOCIATE EDITOR:**
William C. diGiacomantonio

★

**ADVISORY BOARD**
Chairman
Linda Grant DePauw

Charles McC. Mathias
Robert C. Byrd
Richard H. Kohn
Linda B. Salamon
George S. Wills

★

Sponsored by the
National Historical
Publications and
Records Commission
and
The George Washington
University

Published by
The Johns Hopkins
University Press,
Baltimore and London

12 February 2003

Mr. Seth Kaller
Kaller's America Gallery, Inc.
44 Wall Street
Suite 1237
New York, New York 10005

Dear Mr. Kaller,

Enclosed please find the dockets from two letters from George Washington to Samuel Johnston [Governor of North Carolina]. They are dated 19 June and 2 October 1789. These dockets were included among the sample dockets that you provided to the Constitution Center, though as you know neither is specifically identified. The one dated 2 October is on the verso of the letter in which Washington enclosed North Carolina's copy of the Bill of Rights.

As you will see, the docketing on the two letters noted above is the same handwriting (and format) as the docketing on the verso of the Bill of Rights manuscript. Look in particular at the "7" in 1789, the final "s", and the word "the" with the high "h" and the crossed line running through the letters "th". Consequently the document you are researching is without question the North Carolina copy of the Bill of Rights.

Sincerely yours,

Kenneth R. Bowling

GOVERNMENT EXHIBIT