FILED

SEP 1 0 2003

DAVID W. DANIEL, CLERK
US DISTRICT COURT, EDNC
BY_____ DEP. CLK

UNITED STATES OF AMERICA     :
    :
      v.     :     No. 5:03-CV-204-BO
    :
NORTH CAROLINA'S ORIGINAL     :
COPY OF THE BILL OF RIGHTS     :     September 9, 2003

## OBJECTION TO PLAINTIFF'S MOTION TO DISMISS THE CLAIM OF ROBERT MATTHEWS

### I. Summary of Objection

Without any supporting documentation, the plaintiff asserts that Matthews' had no ownership interest in the defendant, but rather had only a generalized ownership interest in the WPI company. In other words, the plaintiff seems to argue that Matthews is like a general unsecured creditor of a corporation from whom specific assets have been seized. This assertion, however, flies in the face of the verified statement of interest filed by Matthews, and his deposition testimony. Matthews Deposition attached as Exhibit A-1.

As set forth below, the purchase of the defendant was a joint venture between Pratt and Matthews. Both Pratt and Matthews traveled to Indiana to inspect the defendant, and both men agreed to pay for ½ of the purchase price. As had been there practice in the past in making purchases of antiques, Pratt was given the job of brokering the actual purchase and sale of the defendant, and it was their intent that subsequent to the sale of the defendant each would share in ½ the proceeds. While Matthews never

75

physical possessed the defendant, he had a considerable financial stake in it—a stake now worth over $15,000,000.00, if the plaintiff's estimates are correct.

## II. The Legal Requirement of Standing

In a forfeiture case, there are two elements to standing: 1) statutory standing which is satisfied through the filing of a timely verified statement of interest; and 2) Article III standing through a showing that a justiciable controversy exists. See Baker v. Carr, 369 U.S. 186 (1962).

In the present case, the requirements of statutory standing have been met as demonstrated by the court record showing that a statement was filed by Matthews. The issue, then, is whether the Article III requirements have been fulfilled. The U.S. Supreme Court held that the fundamental inquiry under Article III is whether the party "alleged such a personal stake in the outcome of the controversy as to ensure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker, 369 U.S. 186.

The hurdle for establishing standing is low. Courts have held that an allegation of ownership and some evidence of ownership are together sufficient to establish standing to contest a civil forfeiture. United States v. $38,570, 950 F.2d. 1108, 1113 (5th Cir. 1992)("a claimant is required to submit some additional evidence of ownership along with his claim in order to establish standing to contest the forfeiture"). "[T]he claimant

need not prove the full merits of her underlying claim. All that need to be shown is a facially colorable interest in the proceedings sufficient to satisfy the case and controversy requirement and prudential considerations defining and limiting the role of the court." U.S. v. Emerson Street, 942 F.2d 74, 78 (1st Cir. 1991).

The standing inquiry is informed by whether "the interest sought to be protected by the complainant is within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." ADP v. Camp, 397 U.S. 150, 153 (1970). "The legislative history of forfeiture law indicates that a rather expansive zone of interests are protected by the innocent owner provision. See 21 USC Section 881(a)(6).... The Congressional record indicates that Congress intended this provision to "be broadly interpreted to include any person with a recognizable legal or equitable interest in the property seized. Joint Explanatory Statement of Titles II and III, 95th Cong., 2d Sess. (1978)." US v. $81,000,189 F.3d 28, 34 (1999).

Unlike this case, the usual target of a standing challenge is a "straw owner". A straw owner is someone who can demonstrate legal title, but in reality merely holds title to the property for somebody else. Such owners do not themselves suffer an injury sufficient to satisfy Article III. See USA v. 500 Delaware Street, 113 F.3d 310, 312 (2d Cir. 1997). On the other hand, as in this case, where a party can demonstrate an actual financial interest in property, a justiciable controversy exists. Bastek v. Federal Crop Insurance, 145 F.3d 90, 92 n.1 (2d Cir), cert. denied, 142 L.Ed 2d 448 (1998); See also

U.S.A.v. Cambio Exacta, 166 F3d 522 (1999)(economic injury is "plainly the type of injury for which parties may seek redress in federal court").

With respect to personal property, the question of ownership, when challenged, is always a mixed question of law and fact. Bullman v. Edney, 232 N.C. 465 (1950). It is also "a well settled principle that where, on the purchase of property, the conveyance of legal estate is taken in the name of one person, but the purchase money is paid by another at the same time or previously, and as part of one transaction, a trust results in favor of him who supplies the purchase money. Bullman, 234 N.C. at 467 (citing Beam v. Bridgers, 108 N.C. 276). In Bullman, the Court held that one who provides the purchase money for personal property may bring an action against another who tries to convert the property, even if that property is held in the name of another.

### III. Matthews Has Standing Through His Financial Stake In The Defendant

Matthews is hardly a straw owner, or an unsecured creditor of WPI. Like the plaintiff in Bullman, Mathews provided the purchase money for the defendant and should have the right to challenge any conversion or forfeiture of it.

As is set forth in the attached deposition, Matthews inspected the defendant prior to purchase and invested $100,000 in the purchase. If the defendant is forfeited, he loses at the very least his $100,000 investment without recourse to any other party. Moreover, Matthews had a defined 50% interest in the proceeds of any sale. Given this interest, he has more than $15,000,000 at stake if the item is returned to him.

4

While it is true that Matthews never signed any purchase/sale agreements, this was standard joint venture practice between him and Pratt. Moreover, these types of items would only be indirect evidence of his financial stake. The direct issue re: standing is whether Matthews has something to lose if the defendant is not returned. Based on Matthews direct testimony, he clearly has a large amount to lose. The lack of purchase and sale agreements, and personal possession of the defendant do nothing to lessen Matthews' economic stake in the defendant.

Finally, the dismissal of this case on the basis of Matthews' lack of standing would raise grave due process concerns. The forfeiture laws give the government enormous powers, and as such the courts should be extremely careful to provide true due process of law as was Congresses' intent as set forth above.

.       Wherefore there motion to dismiss should be denied.

Respectfully Submitted,

Michael A. Stratton
Stratton Faxon
59 Elm Street
New Haven, CT
(203) 624-9500 P
(203) 624-9100 F

Samuel T. Currin
State Bar No. 6104
20 Market Plaza
Raleigh, NC 27601
Tel: (919) 833-0888
Fax: (919) 833-8171
Local Rule Counsel

6

## CERTIFICATE OF SERVICE

I hereby certify that on this day I have served a copy of the foregoing

Memorandum and Motion in the above captioned action upon counsel for all parties by

facsimile to the following addresses:

Hugh Stevens
C. Amanda Martin
Everett Gaskins Hancock & Stevens, LLP
P.O. Box 911
Raleigh, N.C. 27602

Thomas Dwyer
Michael Galvin
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210-2211

Frank Whitney
Paul Newby
U.S. Attorney's Office
Civil Division
310 New Bern Avenue
Federal Building, Suite 800
Raleigh, NC 27601-1461

Grayson Kelley
W. Dale Talbert
North Carolina Attorney General's Office
P.O. Box 629
Raleigh, NC 27602

Michael A. Stratton

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No.: 5:03-CV-204-BO

UNITED STATES OF AMERICA,       ]
                                 ]
       Plaintiff,           ]
                                 ]
       v.                   ]
                                 ]
NORTH CAROLINA'S ORIGINAL    ]
COPY OF THE BILL OF RIGHTS,    ]
                                 ]
       Defendant.       ]
. . . . . . . . . . . . . . . . . . . . .

DEPOSITION

OF

ROBERT VIRES MATTHEWS

RALEIGH, NORTH CAROLINA

*CAROLYN Y. HALL & ASSOCIATES*



SEPTEMBER 4, 2003 - 3:01 P.M.

REPORTED BY: KIMBERLY L. CRAWFORD

## APPEARANCES

FOR THE
PLAINTIFF:

> PAUL M. NEWBY, ESQ.
> ROBERT J. HIGDON, JR., ESQ.
> RUDY A. RENFER, ESQ.
> ASSISTANT UNITED STATES ATTORNEYS
> UNITED STATES ATTORNEY'S OFFICE
> THIRD FLOOR CONFERENCE ROOM
> TERRY SANFORD FEDERAL BUILDING
> 310 NEW BERN AVENUE
> RALEIGH, NORTH CAROLINA 27601
>
> TELEPHONE: (919) 856-4530
> FACSIMILE: (919) 856-4821

FOR INTERESTED
PARTIES:

> MICHAEL A. STRATTON, ESQ.
> STRATTON FAXON
> CONNECTICUT'S FIRM FOR TRIAL LAW
> 59 ELM STREET
> NEW HAVEN, CONNECTICUT 06510
>
> TELEPHONE: (203) 624-9500
> FACSIMILE: (203) 624-9100



MICHAEL B. GALVIN, ESQ.
DWYER & COLLORA, LLP
600 ATLANTIC AVENUE
BOSTON, MASSACHUSETTS 02210-2211

TELEPHONE: (617) 371-1075
FACSIMILE: (617) 371-1037

## APPEARANCES

### (Continued)

HUGH STEVENS, ESQ.
EVERETT, GASKINS, HANCOCK & STEVENS, LLP
PROFESSIONAL BUILDING, SUITE 600
127 WEST HARGETT STREET
RALEIGH, NORTH CAROLINA 27602

TELEPHONE: (919) 755-0025
FACSIMILE: (919) 755-0009


FOR THE
DEFENDANT:

GRAYSON G. KELLEY, ESQ.
SENIOR DEPUTY ATTORNEY GENERAL
W. DALE TALBERT, ESQ.
ASSISTANT ATTORNEY GENERAL
NORTH CAROLINA DEPARTMENT OF JUSTICE
114 WEST EDENTON STREET
RALEIGH, NORTH CAROLINA 27602

TELEPHONE: (919) 716-6900
FACSIMILE: (919) 716-6763

**ALSO PRESENT:**

STUART GEORGE, VIDEOGRAPHER
STUART GEORGE COMMUNICATIONS
11108 BREMERTON COURT
RALEIGH, NORTH CAROLINA 27613-6800

TELEPHONE: (919) 349-4123

# TABLE OF CONTENTS

## EXAMINATION INDEX

WITNESS                                                        PAGES

ROBERT VIRES MATTHEWS - SEPTEMBER 4, 2003

DIRECT EXAMINATION BY MR. NEWBY                               13-71

CROSS-EXAMINATION BY MR. GALVIN                               72-95

CROSS-EXAMINATION BY MR. STRATTON                            95-101

---

## EXHIBITS INDEX

| NUMBER | DESCRIPTION | INTRODUCED |
|--------|-------------|------------|
| EXH. 1 | LETTER DATED JUNE 23, 1995, TO WAYNE E. PRATT FROM JOHN L. RICHARDSON; LETTER DATED FEBRUARY 17, 2003 TO PETER TILLOU FROM WAYNE E. PRATT; LETTER DATED FEBRUARY 6, 2003, TO WAYNE E. PRATT FROM JOHN L. RICHARDSON WITH PAGE OF ATTACHED FIGURES; LETTER DATED JANUARY 11, 2000, TO WAYNE E. PRATT FROM JOHN L. RICHARDSON; TWO ARTICLES "GOLD IN THE SOFA CUSHION" AND "IT'S BUNK" (9 PAGES) | 17 |
| EXH. 2 | COPY OF CHECK NUMBER 12548, FIRST NEW HAVEN CAPITAL CORP, MATTHEWS RELATED ENTITIES | 30 |



GENERAL DISBURSEMENT ACCOUNT
59 ELM STREET
NEW HAVEN, CONNECTICUT 06510
DATED JUNE 2, 1999, PAYABLE TO
WAYNE PRATT, INC., 346 MAIN
STREET, SOUTH, WOODBURY, CT 06798
FOR $150,000.00
(1 PAGE)

*CAROLYN Y. HALL & ASSOCIATES*

## EXHIBITS INDEX

| <u>NUMBER</u> | <u>DESCRIPTION</u> | <u>INTRODUCED</u> |
|---|---|---|
| EXH. 3 | FLEET - STATEMENT OF WIRE ACTIVITY<br>ACCOUNT # 936136570000101<br>WAYNE PRATT, INC. IN AMOUNT OF<br>$50,000.00 - CHARLES G. REEDER TRUST<br>AC-91166454<br>(1 PAGE) | 41 |
| EXH. 4 | BILL OF SALE $200,000.00<br>DATED 15 DAY OF FEBRUARY, 2000<br>WITH ATTACHED NOTARY CERTIFICATES<br>BATES NO. JR-00082 - JR-00084<br>(3 PAGES) | 43 |
| EXH. 5 | FLEET - STATEMENT OF WIRE ACTIVITY<br>ACCOUNT # 936136570000121<br>WAYNE E. PRATT, INC. IN AMOUNT OF<br>$150,000.00 - CHARLES G. REEDER<br>AC-75045182<br>(1 PAGE) | 46 |
| EXH. 6a | LETTER DATED MARCH 14, 2003<br>TO JOHN L. RICHARDSON, ESQ., FROM<br>STEPHEN J. HARMELIN<br>(1 PAGE) | 54 |
| EXH. 6b | BILL OF SALE FROM WAYNE E. PRATT<br>TO NATIONAL CONSTITUTION CENTER<br>IN AMOUNT OF $5,000,000.00<br>DATED MARCH 2003<br>(1 PAGE) | 54 |
| EXH. 6c | ASSIGNMENT OF OPTION TO SELL AND<br>RELATED COMMISSION FROM WILLIAM | 54 |

REESE, ASSIGNOR, TO NATIONAL
CONSTITUTION CENTER, ASSIGNEE,
DATED 14TH DAY OF MARCH, 2003
(1 PAGE)

EXH. 6d    HANDWRITTEN NOTE DATED JANUARY 16,    54
2003, RE: OPTION TO PETER TILLOU
AND WILLIAM REESE TO SELL BILL OF
RIGHTS FOR FIVE MILLION DOLLARS,
FROM WAYNE E. PRATT
(1 PAGE)

## EXHIBITS INDEX

| NUMBER | DESCRIPTION | INTRODUCED |
|---|---|---|
| EXH. 6e | HANDWRITTEN NOTE DATED JANUARY 16, 2003, RE: NET COMMISSION OF $1 MILLION TO PETER TILLOU AND WILLIAM REESE WHEN BILL OF RIGHTS IS SOLD FOR $5 MILLION, SIGNED BY WAYNE E. PRATT (1 PAGE) | 54 |
| EXH. 6f | HANDWRITTEN NOTE ON LETTERHEAD OF PETER H. TILLOU - WORKS OF ART TO "DEAR BILL" FROM PETER TILLOU ASSIGNING SHARE OF ANY OPTION TO PURCHASE THE MANUSCRIPT DRAFT OF THE BILL OF RIGHTS OWNED BY WAYNE PRATT. (1 PAGE) | 54 |
| EXH. 6g | BILL OF SALE FROM WAYNE E. PRATT, SELLER, TO NATIONAL CONSTITUTION CENTER, BUYER, FOR GROSS PURCHASE PRICE OF $5,000,000 WITH $1,000,000 COMMISSION TO BE PAID TO PETER TILLOU AND WILLIAM REESE, DATED MARCH 2003 (1 PAGE) | 54 |
| EXH. 6h | GENERAL POWER OF ATTORNEY FROM WAYNE E. PRATT, OF WAYNE E. PRATT, INC., TO JOHN L. RICHARDSON OF CRISPIN & BRENNER, DATED 17TH DAY MARCH, 2003, WITH COLORADO NOTARY (2 PAGES) | 54 |
| EXH. 6i | RECEIPT EXECUTED 18TH DAY OF MARCH, | 54 |



2003, FROM JOHN L. RICHARDSON OF
CRISPIN & BRENNER, P.L.L.C., COUNSEL
FOR WAYNE E. PRATT, ACKNOWLEDGING
RECEIPT OF $4,000,000 FROM NATIONAL
CONSTITUTION CENTER AS PAYMENT FOR
ORIGINAL AND AUTHENTIC MANUSCRIPT
OF THE BILL OF RIGHTS
(1 PAGE)

## EXHIBITS INDEX

| <u>NUMBER</u> | <u>DESCRIPTION</u> | <u>INTRODUCED</u> |
|---|---|---|
| EXH. 6j | FIRST UNION OFFICIAL CHECK NUMBER 880243719 TO CRISPIN AND BRENNER, PLLC, IN AMOUNT OF FOUR MILLION DOLLARS AND 00 CENTS FOR ACQ. OF BILL OF RIGHTS (1 PAGE) | 54 |
| EXH. 6k | NOTE ON CRISPIN & BRENNER, P.L.L.C. LETTERHEAD, DATED MARCH 18, 2003, "TO WHOM IT MAY CONCERN: JOHN L. RICHARDSON IS DULY AUTHORIZED TO ACCEPT DELIVERY OF A CHECK MADE PAYABLE TO CRISPIN & BRENNER" SIGNED BY WILLIAM H. CRISPIN (1 PAGE) | 54 |
| EXH. 6l | REPRESENTATIONS AND WARRANTIES OF THE PARTIES IN CONNECTION WITH THE PURCHASE AND SALE OF A MANUSCRIPT COPY OF THE BILL OF RIGHTS DATED THIS 18TH DAY OF MARCH, 2003 (2 PAGES) | 54 |
| EXH. 6l.1 | BILL OF SALE, BETWEEN WAYNE E. PRATT, SELLER, AND NATIONAL CONSTITUTION CENTER, BUYER, BY: JOHN L. RICHARDSON, ESQ. ATTORNEY-IN-FACT FOR WAYNE E. PRATT (1 PAGE) | 54 |
| EXH. 6m | REDACTED INDEMNIFICATION AGREEMENT | 54 |

IN CONNECTION WITH SALE BY WAYNE E.
PRATT TO THE NATIONAL CONSTITUTION
CENTER AND CLAIMS THAT MAY BE ASSERTED
AGAINST SELLER BY OR ON BEHALF OF
MESSRS. PETER TILLOU, WILLIAM REESE
OR SETH KALLER OF OTHER GOVERNMENTAL
INSTRUMENTALITY
(1 PAGE)

## EXHIBITS INDEX

| NUMBER | DESCRIPTION | INTRODUCED |
|--------|-------------|------------|
| EXH. 6n | ASSIGNMENT OF OPTION TO SELL AND RELATED COMMISSION BY WILLIAM REESE, ASSIGNOR, TO NATIONAL CONSTITUTION CENTER, ASSIGNEE, GRANTED TO ASSIGNOR BY WAYNE E. PRATT, DATED THE 14TH DAY OF MARCH, 2003 (1 PAGE) | 54 |
| EXH. 6o | HANDWRITTEN NOTE DATED JANUARY 16, 2003, RE OPTION TO PETER TILLOU AND WILLIAM REESE TO SELL BILL OF RIGHTS FOR FIVE MILLION DOLLARS, FROM WAYNE E. PRATT (1 PAGE) | 54 |
| EXH. 6p | HANDWRITTEN NOTE DATED JANUARY 16, 2003, RE NET COMMISSION OF $1 MILLION TO PETER TILLOU AND WILLIAM REESE WHEN BILL OF RIGHTS IS SOLD FOR $5 MILLION, SIGNED BY WAYNE E. PRATT (1 PAGE) | 54 |
| EXH. 6q | HANDWRITTEN NOTE ON LETTERHEAD OF PETER H. TILLOU - WORKS OF ART TO "DEAR BILL" FROM PETER TILLOU ASSIGNING SHARE OF ANY OPTION TO PURCHASE THE MANUSCRIPT DRAFT OF THE BILL OF RIGHTS OWNED BY WAYNE PRATT. (1 PAGE) | 54 |

*CAROLYN Y. HALL & ASSOCIATES*

SIGNATURE PAGE FOR DEPONENT                           102

CERTIFICATE                                           103

## STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES TO THIS ACTION:

(1)        ON MOTION OF COUNSEL FOR THE PLAINTIFF, UNITED STATES OF AMERICA, THE DEPOSITION OF ROBERT VIRES MATTHEWS MAY BE TAKEN BEGINNING AT OR AROUND 3:01 P.M. ON SEPTEMBER 4, 2003, AT THE OFFICES OF THE UNITED STATES ATTORNEY FOR THE EASTERN DISTRICT OF NORTH CAROLINA, THIRD FLOOR CONFERENCE ROOM, TERRY SANFORD FEDERAL BUILDING, 310 NEW BERN AVENUE, RALEIGH, NORTH CAROLINA, BEFORE KIMBERLY L. CRAWFORD, A NOTARY PUBLIC.

(2)        SAID DEPOSITION SHALL BE TAKEN FOR THE PURPOSE OF DISCOVERY OR FOR USE AS EVIDENCE IN THIS ACTION, OR FOR BOTH PURPOSES, OR FOR ANY OTHER PURPOSE PERMITTED BY THE FEDERAL RULES OF CIVIL PROCEDURE.

(3)        ANY OBJECTION OF ANY PARTY HERETO AS TO NOTICE OF THE TAKING OF SAID DEPOSITION OR AS TO THE TIME OR PLACE THEREOF, OR AS TO THE COMPETENCY OF THE PERSON BEFORE WHOM THE SAME SHALL BE TAKEN, ARE HEREBY WAIVED.

(4)        THE FEDERAL RULES OF CIVIL PROCEDURE SHALL CONTROL THE TAKING OF SAID DEPOSITION AND THE USE THEREOF IN COURT.

(5)        OBJECTIONS TO QUESTIONS AND MOTIONS TO STRIKE ANSWERS NEED NOT BE MADE DURING THE TAKING OF THIS DEPOSITION, BUT MAY BE MADE

FOR THE FIRST TIME DURING THE PROGRESS OF THE TRIAL OF THIS CASE, OR AT ANY PRETRIAL HEARING HELD BEFORE ANY FEDERAL COURT JUDGE FOR THE PURPOSE OF RULING THEREON, OR AT ANY OTHER HEARING OF SAID CASE AT WHICH SAID DEPOSITION MIGHT BE USED, EXCEPT THAT AN OBJECTION AS TO THE FORM OF A QUESTION MUST BE MADE AT THE TIME SUCH QUESTION IS ASKED OR OBJECTION IS WAIVED AS TO THE FORM OF THE QUESTION.

(6)    THAT THE SIGNATURE OF THE WITNESS TO THE TRANSCRIPT OF HIS TESTIMONY IS HEREBY REQUIRED.

(7)    EXCEPT AS WAIVED BY THESE STIPULATIONS, THE PROVISIONS OF THE FEDERAL RULES OF CIVIL PROCEDURE SHALL APPLY TO THE TAKING OF SAID DEPOSITION AND AS TO ITS SUBMISSION TO THE RESPECTIVE DEPONENT, CERTIFICATION, AND FILING WITH THE APPROPRIATE NOTICING ATTORNEY.

———————————————

1  WHEREUPON,

2    ROBERT VIRES MATTHEWS,

3  HAVING FIRST BEEN DULY AFFIRMED,

4  WAS EXAMINED AND TESTIFIED AS

5  FOLLOWS:

6  ───────────────────

7  MR. STRATTON: WE ARE PROCEEDING TODAY PURSUANT TO THE FEDERAL

8  RULES OF CIVIL PROCEDURE, AND WE WILL ALLOW ANY QUESTIONS TO

9  BE ASKED OF MR. MATTHEWS AS LONG AS THEY ARE LIMITED TO THE

10  ISSUE OF JURISDICTION WHICH IS PRESENTLY IN FRONT OF THE COURT.

11  MR. GALVIN: I HAVE A QUESTION ABOUT THAT LIMITATION. IS THE

12  LIMITATION PURSUANT TO THE COURT'S ORDER THAT WAS ISSUED LAST

13  WEEK?

14  MR. STRATTON: YES.

15  MR. GALVIN: THE COURT'S ORDER INDICATES THAT THE SCOPE OF THE

16  SEPTEMBER 11TH HEARING BE BROADER THAN JURISDICTION.

17  MR. STRATTON: WELL, I DON'T THINK SO.

18  MR. GALVIN: IT INDICATES THAT IT WILL ADDRESS OTHER ISSUES THAT

19  ARE – THAT HAVE BEEN RAISED BY THE PARTIES PRIOR TO THE HEARING.

20  MR. STRATTON: HE SAID IT WILL ADDRESS ALL ISSUES WHICH – THAT

21  ALL ISSUES WHICH ADDRESS THE THRESHOLD QUESTION OF

22  JURISDICTION.

```
 1              MR. GALVIN: DO WE HAVE A COPY OF THE—

 2              MR. NEWBY: I'LL GO GET IT.

 3              MR. GALVIN: THANK YOU.

 4              MR. NEWBY: GO OFF THE RECORD.

 5                        (THEREUPON, A BREAK WAS TAKEN

 6                        FROM 3:05 P.M. TO 3:08 P.M.)

 7                        (THEREUPON, THERE WAS AN

 8                        OFF-THE-RECORD DISCUSSION

 9                        WHICH WAS NOT REPORTED

10                        BY THE COURT REPORTER.)

11              MR. STRATTON: I JUST WANTED TO POINT OUT FOR THE RECORD THAT

12       WE'RE GOING TO ALLOW ANY QUESTIONS TO BE ASKED OF

13       MR. MATTHEWS AS LONG AS THEY ARE PERTINENT TO JUDGE BOYLE'S

14       AUGUST 29, 2003, ORDER WHICH SAYS THAT THE ISSUES THAT ARE

15       GOING TO BE ADDRESSED AT THE HEARING WILL INCLUDE ANY

16       THRESHOLD JURISDICTIONAL ISSUES BROUGHT FORWARD BY THE

17       PARTIES.  AND I THINK THAT THE ISSUE STANDING IS WITHIN – IS A

18       JURISDICTIONAL ISSUE, AND CERTAINLY THAT IS SOMETHING THAT –

19       WHICH CAN BE INQUIRED INTO.

20              MR. GALVIN: WITH THAT CLARIFICATION, I'M FINE WITH THIS.

21              MR. STRATTON: OKAY.

22              MR. NEWBY: MR. MATTHEWS, MY NAME IS PAUL NEWBY.  I'M AN
```

1       ASSISTANT UNITED STATES ATTORNEY. WE'RE HERE TO TAKE YOUR

2       DEPOSITION. IS THERE ANY REASON THAT YOU KNOW WE SHOULDN'T GO

3       FORWARD AT THIS TIME?

4       WITNESS: NOT THAT I KNOW OF.

5       MR. NEWBY: MR. MATTHEWS, I'M GOING TO ASK YOU A SERIES OF

6       QUESTIONS. IF YOU ANSWER THOSE QUESTIONS, I WILL ASSUME THAT

7       YOU UNDERSTOOD THEM. IS THAT FAIR?

8       WITNESS: THAT SEEMS FAIR TO ME.

9       MR. NEWBY: OKAY. IF YOU DON'T UNDERSTAND A QUESTION, PLEASE

10      TELL ME, AND I'LL REPHRASE IT.

11      WITNESS: OKAY.

12      DIRECT EXAMINATION BY MR. NEWBY:

13      Q.    NOW, HAVE YOU EVER GIVEN A DEPOSITION BEFORE?

14      A.    I JUST DID A GRAND JURY DEPOSITION, KIND OF—

15      Q.    BUT YOU'VE NEVER GIVEN A DEPOSITION—

16      A.    —AND I'VE DONE A—

17      Q.    —IN A CIVIL CASE?

18      A.    —DEPOSITION, I THINK – OH, ONCE IN A – YES. I DID ONE ONCE ON

19      A LAWSUIT.

20      Q.    OKAY. SO, YOU'RE SOMEWHAT FAMILIAR WITH THIS PROCESS

21      THEN?

22      A.    YES.

1        Q.     JUST STATE YOUR NAME AND ADDRESS FOR THE RECORD,

2  PLEASE.

3        A.     IT'S ROBERT VIRES MATTHEWS, 115 LOWER CHURCHILL ROAD,

4  AND THAT'S WASHINGTON DEPOT, CONNECTICUT.

5        Q.     AND WHAT DO YOU DO FOR A LIVING, MR. MATTHEWS?

6        A.     I HAVE A FEW COMPANIES, ONE OF WHICH IS MATTHEWS

7  VENTURES HOLDINGS, AND I AM A -- I DO INVESTING. MY PRIMARY BUSINESS IS

8  REAL ESTATE. I HAVE A CONSTRUCTION COMPANY. I HAVE A SOFTWARE

9  COMPANY DOWN IN FLORIDA IN TIME AND ATTENDANCE -- SORT OF AN

10  ENTREPRENEUR.

11        Q.     NOW, WHEN DID YOU FIRST LEARN ABOUT THE DOCUMENT THAT'S

12  THE DEFENDANT IN THIS CASE?

13        A.     I GUESS I SHOULD JUST STATE FOR THE RECORD, BECAUSE I

14  THINK IT'S IMPORTANT THAT YOU GUYS UNDERSTAND, THAT I WAS ILL FOUR

15  YEARS AGO, TODAY IN FACT, AND WAS IN A COMA AND IN MASS GENERAL FOR

16  FORTY-FIVE DAYS AND WAS OUT OF WORK FOR ABOUT EIGHT AND A HALF

17  MONTHS. AND, THANKFULLY, I HAD OPEN LUNG SURGERY, AND I WAS IN A

18  WHEELCHAIR AND ON OXYGEN AND ALL THAT FUN STUFF; LOST ABOUT FIFTY

19  POUNDS. AND, SO, IT'S AFFECTED MY MEMORY, SO SOME OF THE THINGS I'M

20  GOING TO SAY I'M NOT REALLY SURE. I REALLY JUST AM NOT SURE, JUST SO

21  YOU UNDERSTAND THAT.

22        WITH THAT STATED, I THINK THE FIRST TIME I HEARD ABOUT IT WAS

1     SOMETIME '96, '97 – SOMETIME BEFORE WAYNE AND I ACTUALLY PURCHASED IT.

2     I HAD HEARD ABOUT WAYNE WORKING WITH A GENTLEMAN BY THE NAME OF

3     JOHN RICHARDSON.

4         Q.    OKAY.  AND WHAT HAD YOU LEARNED AT THAT POINT?

5         A.    I – I THINK I KNEW AT THAT POINT THAT THEY THOUGHT IT WAS

6     EITHER PENNSYLVANIA'S, NEW YORK'S – THERE WAS A STORY ABOUT A GUY IN

7     UPSTATE NEW YORK, OR UPSTATE VERMONT, THAT IT MIGHT HAVE – THAT THIS

8     PARTICULAR ONE MIGHT HAVE RUN THROUGH THAT FAMILY.  AND THE THIRD ONE

9     WAS THAT IT WAS NORTH CAROLINA'S BILL OF RIGHTS, AND WAS – THOSE ARE

10    THE THREE THAT I THINK I KNEW AT THAT TIME.  I'VE SUBSEQUENTLY LEARNED

11    THERE WERE OTHER STATES MISSING THEM, BUT—

12        Q.    AND YOU SAID THIS WAS IN AROUND 1997?

13        A.    YEAH.  AND IT COULD HAVE BEEN EARLIER.  I COULD HAVE HEARD

14    ABOUT IT AS EARLY AS WHEN – YOU KNOW, SOME OF IT – I'VE READ THESE

15    RECORDS AFTER THE BILL OF RIGHTS WAS SEIZED, SO I READ SOME OF THESE

16    RECORDS, AND IT COULD HAVE BEEN EARLIER THAN THAT, BUT I'M – I THINK IT

17    WAS AROUND THAT TIME.  I – THE FIRST THING I REMEMBER WAS WAYNE WAS

18    WORKING WITH JOHN, AND I THINK I KNEW IT AT THAT TIME, AND THAT WAS

19    ABOUT TRYING TO SELL IT TO NORTH CAROLINA OR DO SOME DEAL WITH NORTH

20    CAROLINA.  THAT'S REALLY KIND OF THE FIRST THING I REMEMBER ABOUT IT.

21        Q.    AND BY "THESE RECORDS," YOU'RE REFERRING TO THE

22    DOCUMENTS THAT YOU PRODUCED PURSUANT TO THE SUBPOENA YOU RECEIVED

1     IN THIS CASE. IS THAT CORRECT?

2         A.     YES. I GOT THOSE DOCUMENTS, I THINK, TWO DAYS AFTER

3   WAYNE PRATT CALLED ME FROM HIS SKI TRIP, FROM MARY BETH KEENE.

4         Q.     OKAY. WELL, YOU'VE GIVEN US TWO SETS OF DOCUMENTS. LET'S

5   BACK UP JUST A MINUTE.

6         A.     WELL, EVERYTHING BUT THE CHECK. I'M SORRY—

7         Q.     OKAY.

8         A.     —I MEAN, THOSE DOCUMENTS.

9         Q.     OKAY. BY "THOSE DOCUMENTS" – AND WE'RE GOING TO GO

10   AHEAD AND HAVE THESE MARKED – THERE'S LETTERS AND IT LOOKS LIKE A

11   HANDWRITTEN MEMO WITH FINANCIAL FIGURES ON THEM. WE'RE GOING TO

12   HAVE – AND MAYBE A NEWSPAPER ARTICLE, TOO – BUT WE'RE GOING TO HAVE

13   THAT MARKED AS "MATTHEWS DEPOSITION EXHIBIT 1."

14                 (THEREUPON, THE DOCUMENT REFERRED

15                 TO BELOW WAS MARKED AS PLAINTIFF'S

16                 EXHIBIT NO. 1 - ROBERT V. MATTHEWS

17                 DEPOSITION - FOR IDENTIFICATION.)

18         Q.     AND WHEN DID YOU SAY YOU RECEIVED THOSE DOCUMENTS?

19         A.     I THINK IT WAS TWO DAYS AFTER WAYNE CALLED ME FROM

20   WHENEVER THE – WHENEVER IT WAS SEIZED FROM PHILADELPHIA. I DON'T KNOW

21   THE DATE.

22         Q.     OKAY. SO, WHEN WE'RE TALKING 1997, CERTAINLY AT THAT

1    POINT, THESE DOCUMENTS DON'T MEAN ANYTHING; THEY HAD NOT EITHER BEEN

2    CREATED OR YOU DIDN'T KNOW ABOUT THEM?

3          A.      NO. I DIDN'T KNOW ABOUT THEM. I DID KNOW THAT HE HIRED

4    JOHN RICHARDSON TO, YOU KNOW, REPRESENT HIM IN THIS CASE, AND—

5          Q.      WHEN DID YOU—

6          A.      —SUPPOSEDLY—

7          Q.      —WHEN DID YOU LEARN THAT?

8          A.      WELL, HE TOLD ME EARLY ON, FROM THE BEGINNING, I KNOW,

9    BEFORE HE BOUGHT IT, THAT HE HIRED JOHN RICHARDSON—

10         Q.      UH-HUH (YES).

11         A.      —IN THE VERY BEGINNING.

12         Q.      OKAY. NOW, ALSO YOU PRODUCED A CHECK PURSUANT TO THE

13   SUBPOENA. WERE THERE ANY OTHER DOCUMENTS THAT YOU KNOW OF THAT

14   YOU POSSESS OR THAT HAVE TO DO WITH YOUR CLAIM IN THIS CASE WHICH YOU

15   HAVE NOT PRODUCED TODAY?

16         MR. STRATTON: JUST FOR THE RECORD, THERE ARE — THE OTHER

17                  DOCUMENTS THAT WERE PRODUCED BY MR. MATTHEWS ARE ALL

18                  LETTERS AND THINGS WHICH I SENT HIM WHICH RELATE TO THIS

19                  CASE, SO THEY ARE ATTORNEY/CLIENT PRIVILEGED. THERE ARE

20                  OTHER DOCUMENTS THAT MR. MATTHEWS HAS IN HIS RECORDS—

21         MR. NEWBY: UH-HUH (YES).

22         MR. STRATTON: —BUT THEY ARE DRAFTS OF MOTIONS, THAT SORT OF

1              THING.

2      DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

3              Q.      BUT IN TERMS – MR. MATTHEWS, OTHER THAN THE

4      ATTORNEY/CLIENT PRIVILEGED DOCUMENTS, DRAFT OF MOTIONS, THAT TYPE OF

5      THING, DO YOU KNOW OF ANY OTHER RECORDS IN THIS CASE WHICH SUPPORT

6      YOUR CLAIM?

7              A.      YES.

8              Q.      AND WHAT WOULD THAT BE?

9              A.      THERE WAS ANOTHER PIECE OF PAPER THAT MARY BETH EITHER

10     HANDED ME, OR I SAW THE NIGHT WHEN I WENT OVER THERE, THAT SHE HAS A

11     COPY OF THAT SAID – I BELIEVE THE TI – I BELIEVE THE HEADING WAS

12     "DOCUMENT PURCHASE," OR SOMETHING "DOCUMENT."  AND IT SAID, "BOB

13     MATTHEWS, A HUNDRED AND FIFTY THOUSAND; WAYNE PRATT, A HUNDRED AND

14     FIFTY THOUSAND" – WAYNE – "BOB MATTHEWS, FIFTY PERCENT, A HUNDRED

15     AND FIFTY THOUSAND; WAYNE PRATT, FIFTY PERCENT, A HUNDRED AND FIFTY

16     THOUSAND," AND – OR IT SAID, "BOB MATTHEWS, A HUNDRED THOUSAND;

17     WAYNE PRATT, A HUNDRED THOUSAND" – YOU KNOW, FIFTY PERCENT AND FIFTY

18     PERCENT.  AND I DON'T REMEMBER WHICH WAY IT WAS BECAUSE I ORIGINALLY

19     THOUGHT WE WERE BUYING THE DOCUMENT FOR A HUNDRED AND – FOR THREE

20     HUNDRED THOUSAND.  SO, WHEN I GAVE HIM THE CHECK FOR THREE HUNDRED,

21     SUBSEQUENTLY IT WAS BOUGHT FOR TWO HUNDRED THOUSAND.

22             Q.      DID YOU BRING THAT WITH YOU TODAY?

1          A.      NO. I – NO, I DON'T HAVE IT.  SHE MAY HAVE GIVEN IT TO ME, BUT

2     MARY – I KNOW MARY BETH HAS IT.  IT'S A DOCUMENT THAT I SAW THAT SHE

3     HAS.  I DON'T HAVE IT.  IF I HAD IT, I WOULD HAVE BROUGHT IT.

4          Q.      OKAY.  SO, AGAIN, MY QUESTION IS DO YOU HAVE ANY OTHER

5     NOTES, MEMORANDUM, CORRESPONDENCE, CANCELED CHECKS, PICTURES,

6     RECORDINGS – OTHER WRITINGS OR EVIDENCE OF ANY KIND WHICH SUPPORT,

7     DIRECTLY OR INDIRECTLY, THE CLAIM THAT YOU'VE FILED IN THIS CASE?

8          A.      THE ONLY OTHER THING THAT I HAVE IS – AND I DIDN'T – MY

9     E-MAIL – I GOT A VIRUS, AND I LOST MY HARD DRIVE, BUT I CAN GET A COPY – IS I

10    E-MAILED TO MICHAEL GALVIN BETWEEN THREE AND SIX WEEKS AGO A – AN

11    AGREEMENT WHEREAS I WANTED TO HAVE AN OPTION TO BUY WAYNE'S

12    FORTY-FIVE PERCENT OF THE BILL OF RIGHTS, IF HE WAS NEVER INDICTED – I

13    MEAN, I'M GOING TO – I'M GOING BY MEMORY, BUT BASICALLY THIS IS THE

14    DEAL – FOR UP TO A MILLION ONE OF BASIS AND LEGAL FEES.  SO, IF HE PAID A

15    HUNDRED THOUSAND FOR IT AND HE GOT WHATEVER HIS LEGAL FEES WERE –

16    WHATEVER – A HALF A MILLION DOLLARS – THEN UP TO A MILLION ONE, I HAD

17    THE – I CALLED UP WAYNE – AND MR. GALVIN DIDN'T WANT TO HAVE IT IN

18    WRITING – AND I RECORDED A CONVERSATION WITH WAYNE THAT SAID THAT

19    AGREEMENT ORALLY; AND I FAXED IT TO WAYNE PRATT.

20         Q.      SO, IT'S YOUR UNDERSTANDING THAT MR. PRATT HAS ACCEPTED

21    OR AGREED TO THIS OPTION?

22         A.      YES–

Q.      AND—

A.      —NOT IN WRITING, SIR.

Q.      RIGHT.  AND WHAT CONSIDERATION WAS GIVEN TO MR. PRATT FOR THIS OPTION?

A.      I THINK IT WAS ONE – I THINK THE OPTION PROBABLY SAID, I THINK – MY ATTORNEY DID – I THINK IT SAID TEN DOLLARS AND OTHER VALUABLE CONSI – I DON'T KNOW.  I DON'T REMEMBER WHAT IT SPECIFICALLY SAID.

Q.      SO, WHAT, IN FACT, DID YOU GIVE MR. PRATT TO EXERCISE THIS OPTION?

A.      I HAVEN'T EXERCISED IT.  I HAVEN'T—

Q.      WHAT, IN FACT—

A.      —EXERCISED THE OPTION.

Q.      —WHAT, IN FACT, DID YOU GIVE TO MR. PRATT TO ACQUIRE THIS OPTION?

A.      I DID IT OVER THE PHONE, SO I DON'T THINK I HANDED HIM ANY MONEY OR ANYTHING, IF THAT'S WHAT YOU'RE SAYING.

Q.      DID YOU GIVE HIM ANY OTHER – ANYTHING OF VALUE FOR THE OPTION?

A.      WELL, I THINK THE VALUE WAS THAT I WOULD PAY HIS – OH, I KNOW.  WE WERE ALSO TALKING ABOUT IF IT GOT DONATED, THAT I'D BE ABLE TO USE THE TAX BENEFIT, SO WAYNE WOULD BE ABLE TO PAY – HELP HIM PAY HIS – WELL, PAY HIS LEGAL FEES, UNLESS THEY WERE PAST A MILLION ONE.

1    Q.    PRESENTLY, HAVE YOU GIVEN MR. PRATT ANYTHING OF VALUE

2  FOR THE OPTION?

3    MR. STRATTON:  TO THIS DATE, HAVE YOU GIVEN HIM ANY MONEY—

4    WITNESS:  NO. I—

5    MR. STRATTON:  —ANY PROPERTIES?

6    WITNESS:  —JUST I THINK THE FACT THAT I WOULD PAY HIS LEGAL FEES.

7          I THINK THAT'S THE ONLY THING THAT HE WAS GETTING OUT OF

8          IT.

9    MR. STRATTON:  BUT ONLY IF YOU EXERCISED THE OPTION?

10   WITNESS:  RIGHT.

11 DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

12   Q.    NOW, YOU SAID THAT YOU RECORDED THAT CONVERSATION.  IS

13 THAT CORRECT?

14   A.    YES.

15   Q.    AND DID YOU PRODUCE A COPY OF THAT RECORDING?

16   A.    I ACTUALLY READ YOUR THING.  I READ YOUR THING THAT SAID

17 RECORDING.  I BELIEVE THE ONE THAT YOU GAVE ME DIDN'T SAY "RECORDING,"

18 AND IT DIDN'T REALLY TRIGGER IT, AND I TOLD MY — I TOLD MY LAWYER ABOUT IT

19 AT NINE-THIRTY LAST NIGHT, AND WE LEFT AT LIKE FOUR O'CLOCK.

20   Q.    OKAY.

21   A.    SO, I KNOW IT'S IN MY OFFICE.  I TOLD MY BROTHER TO TRY TO

22 FIND IT.  IT WAS ON ONE OF THOSE LITTLE—

1       Q.    HAND-HELD DICTAPHONES?

2       A.    --HAND-HELD DEVICES. AND I HAVEN'T CALLED HIM TO SEE IF HE

3  FOUND IT YET, BUT--

4       Q.    OKAY. IF--

5       A.    --UNLESS HE RECORDED OVER IT, IT WAS THERE.

6       Q.    --IF, IN FACT, IT DOES EXIST, WE WOULD REQUEST THAT YOU

7  OVERNIGHT IT--

8       A.    NO PROBLEM.

9       Q.    --TO ME AT THIS OFFICE.

10    MR. STRATTON: HOLD ON A SECOND. WE WILL DO THAT, BUT I DO NOT

11           BELIEVE THAT YOU -- DON'T HAVE THE PROPER DOCUMENT

12           REQUEST IN ORDER TO GET THAT. IT'S OUTSIDE THE

13           DOCUMENT REQUEST.

14    MR. NEWBY: BUT YOU'RE GOING TO DO IT ANYWAY?

15    MR. STRATTON: I MAY DO IT--

16    MR. NEWBY: WELL, THE--

17    MR. STRATTON: --I DON'T THINK IT MATTERS.

18    MR. NEWBY: --THE REQUEST ITSELF SAYS "RECORDINGS"--

19    MR. STRATTON: UH-HUH (YES).

20    MR. NEWBY: --"THAT DIRECTLY OR INDIRECTLY SUPPORT THE CLAIM."

21    MR. STRATTON: IT DOESN'T.

22    MR. NEWBY: WELL, CERTAINLY IF, IN FACT, MR. MATTHEWS IS CLAIMING

1       A FIFTY PERCENT OWNERSHIP, AND THAT HE HAS IN THE PAST

2       TRANSACTED OR IN THE -- IN HIS WAY OF DOING BUSINESS WITH

3       MR. PRATT IS THROUGH ORAL AGREEMENTS, THEN THIS WOULD,

4       IN FACT, BE ANOTHER ORAL AGREEMENT THAT WOULD SUPPORT

5       HIS CLAIM THAT THIS IS THE WAY HE DOES BUSINESS WITH HIM.

6   MR. STRATTON: THEN WE'RE NOT PRODUCING IT. YOU CAN GET AN

7       ORDER FROM THE COURT.

8   MR. NEWBY: OKAY.

9   DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

10      Q.      SO, YOU FIRST LEARNED ABOUT THE EXISTENCE OF THIS

11  DOCUMENT IN 1997 --

12      A.      APPROXIMATELY. IT COULD HAVE BEEN EARLIER OR IT COULD

13  HAVE BEEN LATER.

14      Q.      AT SOME POINT IN TIME, YOU UNDERSTOOD THAT

15  MR. RICHARDSON AND MR. PRATT WERE TRYING TO SELL IT TO THE STATE OF

16  NORTH CAROLINA. AT WHAT POINT WERE YOU APPROACHED, OR DID YOU

17  APPROACH SOMEONE, ABOUT BECOMING AN INVESTOR IN THE PROJECT?

18      A.      I WROTE THE CHECK IN JUNE OF '99, AND I THINK WE LEGALLY

19  BOUGHT IT IN LIKE 2000, IN MARCH OR SOMETIME IN 2000. MARY BETH KEENE

20  HAS A TIME FRAME ON THIS WHOLE THING. AND I BELIEVE HE PROBABLY

21  CONTACTED ME A COUPLE YEARS BEFORE '99, AND FIRST IT WAS ABOUT HE

22  WAS -- YOU KNOW, HE WAS GOING TO TRY TO SELL IT BEFORE HE ACTUALLY

1   BOUGHT IT, AND THAT COULD HAVE BEEN IN '95. I DON'T REMEMBER. BUT I WAS

2   PROBABLY APPROACHED IN, I'M GOING TO GUESS, '98, AND MAYBE IT WAS

3   EARLIER, TO ACTUALLY PARTICIPATE IN IT. AND HE APPROACHED ME AND ASKED

4   IF I WANTED TO BUY HALF OF THE BILL OF RIGHTS. AND I FLEW DOWN TO INDIANA

5   AT SOME POINT AND LOOKED AT IT BECAUSE I DIDN'T KNOW IF IT WAS REAL OR

6   IT WASN'T REAL.

7           Q.      WHEN DID YOU FLY TO INDIANA?

8           A.      I APPARENTLY WENT DOWN TWICE, ALTHOUGH I REALLY

9   REMEMBER ONE TIME. IT ONCE WAS IN A PILATUS, AND ONCE WAS IN A TWIN

10  ENGINE. AND I FLEW DOWN AND LOOKED AT THE DOCUMENT. IT WAS IN A BANK.

11  I DON'T KNOW THE DATES. MARY BETH SAID THAT SHE HAS THEM, AND YOU

12  GUYS COULD GET THEM. BUT I DON'T HAVE THE TRAIN -- I MEAN, THE PLANE

13  RECORDS THAT I THINK SHE HAS. SO, WE CAN FIND OUT WHAT THE DATES WERE.

14  I FLEW DOWN AND LOOKED AT IT. IT WAS IN A BANK VAULT. I WENT WITH AN

15  ATTORNEY. I KNOW THE ATTORNEY'S NAME, IF YOU GIVE ME A SECOND. I CAN'T

16  BELIEVE I CAN'T THINK OF THE ATTORNEY'S NAME. I KNOW THE ATTORNEY'S

17  NAME.

18                  (THEREUPON, THE WITNESS

19                  AND MR. STRATTON CONFER)

20          A.      NO. IT WAS AN ATTORNEY DOWN THERE. I KNOW HIS NAME. I

21  KNOW -- HE ASKED ME TODAY, AND I SAID THE NAME. I CAN'T THINK OF HIS

22  NAME.

1   BUT IT'S IN THE PAPERS THAT YOU GUYS GAVE ME LAST TIME IN THE

2   CIVIL CASE.  HIS NAME WAS IN IT, AND IT MADE ME THINK OF HIS NAME –

3   REEDER – CHARLIE REEDER – CHARLIE REEDER.  I MET CHARLIE REEDER, AND I

4   THINK THERE WAS A GUY THERE.  IN MY MIND, I REMEMBER A GUY LIKE IN HIS

5   FORTIES THAT I THOUGHT WAS THE SON OF THESE TWO LADIES, THESE

6   MYTHICAL LADIES.

7           SO, WE WENT – THEY PUT IT IN A – WE WENT INTO A ROOM.  WAYNE

8   LOOKED AT IT.  HE LOOKED AT THE WRITING, AND HE COMMENTED THAT IT WAS

9   KIND OF FADED, AND IT WAS KIND OF IN A CRAPPY LITTLE FRAME.  THAT WAS –

10  THAT'S WHAT I REMEMBER OF THE TRIP.

11          Q.      (BY MR. NEWBY)  YOU MADE THE – YOU USED THE PHRASE,

12  "MYTHICAL LADIES."  WHAT DO YOU MEAN BY THAT?

13          A.      WELL, I HAD HEARD OF THESE LADIES.  I MEAN, I'VE NEVER MET

14  THE LADIES, BUT I HEARD THERE WAS THESE LADIES THAT OWNED IT, OR SOME

15  SISTERS OR SOMETHING.  I'M NOT REALLY SURE TO THIS DATE WHO REALLY

16  OWNED IT, BUT I KNEW THAT THE LAWYER REPRESENTED THEM.  AND I THOUGHT

17  EITHER THEIR SON OR THEIR HUSBAND.  SOMEBODY ELSE WAS THERE AT THAT

18  MEETING, AND I DON'T REMEMBER WHO IT WAS.

19          Q.      AND WHAT TRANSPIRED AT THAT MEETING?

20          A.      JUST WHAT I SAID.  WE WENT INTO A VAULT.  THEY WENT BACK

21  AND PUT THE FRAMED DOCUMENT IN A ROOM, AND WE WENT IN AND LOOKED AT

22  IT.  AND WAYNE SORT OF EXAMINED IT AND WAS LOOKING AT THE LETTERS ON

1    THE FRONT OF IT. THE BACK WAS COVERED WITH CARDBOARD AT THAT TIME,

2    AND IT WAS IN A SKINNY – I THINK IT WAS IN A LITTLE SKINNY WOOD FRAME

3    AND I REMEMBER THINKING, I DON'T – YOU KNOW, I DON'T KNOW IF IT'S REAL OR

4    IT'S NOT REAL. I WAS RELYING ON WAYNE – YOU KNOW, WHAT IT WAS.

5         Q.     DID YOU MAKE AN OFFER, OR DID YOU AND MR. PRATT MAKE AN

6    OFFER TO PURCHASE AT THAT TIME?

7         A.     I DON'T – I – THE WAY I REMEMBER IT IS THEY STARTED OUT

8    ASKING ONE NUMBER, AND I'M MAKING THE NUMBER UP, ALTHOUGH IT COULD BE

9    THE NUMBER. I THOUGHT THEY STARTED OUT AT LIKE A HALF A MILLION OR A

10   MILLION DOLLARS – SOME NUMBER. AND IT MAY BE FIVE HUNDRED OR FOUR

11   HUNDRED OR SIX HUNDRED. AND, OVER TIME, THE NUMBER DROPPED DOWN.

12   AND, YOU KNOW, I – YOU KNOW, LIKE WAYNE WOULD RETURN THE GUY'S

13   CALL AND, YOU KNOW, THEN – YOU KNOW, THE NEXT TIME IT WAS, SAY,

14   FOUR-FIFTY. WHEN I ACTUALLY BOUGHT IT, I THOUGHT WE WERE BUYING IT FOR

15   THREE HUNDRED. SO, I DON'T REMEMBER ANY SPECIFICS ON THAT TIME OF, YOU

16   KNOW, OR ANY PRICES OR ANYTHING THAT WERE MENTIONED.

17        Q.     DID YOU AT THAT POINT EVER EXPRESS TO MR. REEDER THAT YOU

18   WERE NOT INTERESTED IN THE DOCUMENT?

19        A.     AT ONE TIME LATER ON – AND I THINK IT WAS AFTER I WAS SICK –

20   WAYNE WAS TRYING TO NEGOTIATE THE PRICE DOWN, AND I THINK HE KIND OF

21   USED THIS LEVERAGE THAT, YOU KNOW, JOHN RICHARDSON'S WIFE WAS PEG

22   RICHARDSON AND, YOU KNOW, HE'S A BIG LAWYER AND ALL THAT STUFF, AND

*CAROLYN Y. HALL & ASSOCIATES*

1    THAT I WAS IN THE <u>NEW YORK TIMES</u> ABOUT THREE DAYS BEFORE I WENT INTO A

2    COMA WITH THE PRESIDENT – PRESIDENT CLINTON AND HIS WIFE –

3    MY DAUGHTER, AND MY WIFE. I HAD DONE A FUND-RAISER FOR THE IRELAND

4    FUND. AND I THINK, YOU KNOW, WAYNE SORT OF, YOU KNOW, WANTED TO USE

5    THAT – YOU KNOW, IT WAS LIKE, OH, WELL, THE – YOU KNOW, BOB IS ONE OF MY

6    INVESTORS AND, YOU KNOW, GEEZ, YOU KNOW, AREN'T WE IMPORTANT AND

7    THAT KIND OF A THING.

8            Q.      AT SOME POINT, DID YOU EXPRESS TO ANYONE – MR. REEDER OR

9    ANYONE ASSOCIATED WITH THE SALE – THAT YOU WERE NO LONGER

10   INTERESTED?

11           A.      WAYNE, AT ONE – AT ONE OF THE TRIPS, AND I THINK IT WAS

12   THAT ONE, WHERE WAYNE SAID, YOU KNOW, BOB – AND I WASN'T SURE OF

13   BUYING IT. REMEMBER, I JUST SAW THIS THING. I'M SORT OF RELYING ON

14   WAYNE, AND HE HADN'T DONE A LOT OF DOCUMENT PURCHASING, THAT I KNEW

15   ABOUT; AND AT ONE TIME I GENERALLY – YOU KNOW, AT ONE TIME, I REALLY

16   DIDN'T KNOW IF I WANTED TO DO THE DEAL. BUT I THINK WHAT YOU'RE TALKING

17   ABOUT IS WAYNE WANTED TO USE IT TO TRY TO BE ABLE TO GET THE PRICE

18   DOWN – LOOK, BOB WON'T BE ABLE TO INVEST. BUT I SINCERELY BELIEVE THAT

19   THE REASON THE PRICE WENT DOWN WAS OVER TIME THEY WANTED TO SELL IT,

20   AND WAYNE JUST KIND OF PUT THEM OFF OVER A NUMBER OF YEARS.

21           Q.      DID YOU, AT ANY POINT IN TIME, EXPRESS TO MR. REEDER, OR TO

22   ANYONE ELSE, THAT YOU WERE NO LONGER INTENDING TO INVEST—

1         A.      I DON'T – I DON'T RECALL IF I ACTUALLY SAID IT OR WAYNE TOLD

2  THEM THAT. I REALLY DON'T REMEMBER.

3         Q.      BUT SOMEONE MAY HAVE TOLD, OR TO YOUR KNOWLEDGE,

4  SOMEONE DID TELL MR. REEDER THAT YOU WERE NO LONGER INTERESTED. IT

5  COULD HAVE BEEN YOU; IT COULD HAVE BEEN MR. PRATT?

6         A.      YEAH. I DON'T THINK I EVER TOLD MISTER – I DIDN'T NEGOTIATE

7  FOR THE DOCUMENT, JUST SO YOU UNDERSTAND. I WENT. I LOOKED AT IT. I

8  INVESTED A HUNDRED THOUSAND DOLLARS ($100,000.00) TO DO THE DEAL, BUT I

9  DIDN'T GO NEGOTIATE THE DEAL WITH ANYBODY.

10             (THEREUPON, THE DOCUMENT REFERRED

11               TO BELOW WAS MARKED AS PLAINTIFF'S

12               EXHIBIT NO. 2 - ROBERT V. MATTHEWS

13               DEPOSITION - FOR IDENTIFICATION.)

14         Q.      NOW, AT WHAT POINT IN TIME DID YOU GIVE WAYNE PRATT THIS

15  CHECK FOR A HUNDRED AND FIFTY THOUSAND DOLLARS ($150,000.00)?

16         A.      I ASSUME WHEN IT'S DATED, JUNE 2ND – IN 1999.

17         Q.      SO, CERTAINLY BY JUNE 2ND, YOU HAD DECIDED THAT YOU

18  WANTED TO BE A PART OF THIS TRANSACTION?

19         A.      YEAH. I LOOKED AT IT, AND I HAD HEARD THAT ORIGINAL

20  DECLARATION OF INDEPENDENCE HAD SOLD FOR EIGHT MILLION DOLLARS, AND I

21  THOUGHT FOR THREE HUNDRED – AT THIS TIME, AGAIN, THE CHECK IS FOR

22  A HUNDRED AND FIFTY THOUSAND, SO I THOUGHT WE WERE BUYING IT FOR A

1    HUNDRED AND -- FOR THREE HUNDRED. AT THIS TIME, I WAS TAKING KIND OF A

2    LONG SHOT. I DIDN'T KNOW -- I REALLY DIDN'T KNOW IF IT WAS REAL OR IT

3    WASN'T REAL, BUT I TOOK A LONG SHOT.

4         Q.    WITH -- AFTER YOUR CONVERSATIONS WITH MR. REEDER, WERE

5    YOU CONVINCED THAT -- OR WERE YOU TOLD THAT THIS WAS NORTH CAROLINA'S

6    ORIGINAL COPY OF THE BILL OF RIGHTS?

7         A.    NO. I WAS TOLD -- WELL, I DON'T -- I DON'T THINK MR. REEDER

8    TOLD ME ANYTHING. I MEAN, HE MAY HAVE, BUT I DON'T REMEMBER HIM

9    TALKING TO ME. I REMEMBER WAYNE SAYING THAT HE THOUGHT -- I HAD ASKED

10   ABOUT IT, AND HE THOUGHT THAT IT EITHER CAME FROM UPSTATE NEW YORK OR

11   UPSTATE VERMONT, AND THE OTHER THING IT COULD HAVE COME FROM NORTH

12   CAROLINA. THAT WAS ONE OF THE PLACES MENTIONED THAT THEY WERE

13   MISSING THEIR -- I THINK THERE ARE FOUR OR FIVE STATES MISSING THEIR BILL

14   OF RIGHTS.

15        Q.    TELL ME ABOUT FIRST NEW HAVEN CAPITAL CORPORATION.

16        A.    IT'S JUST A -- MY CHECK. IT -- I RUN MY PERSONAL STUFF

17   THROUGH IT SO I DO DRAW, AND I RUN ALL MY COMPANIES, EXCEPT FOR THE

18   SOFTWARE COMPANY, THROUGH THERE. IT'S THE MAIN ACCOUNT.

19        Q.    OKAY. WHEN DID FIRST NEW HAVEN CAPITAL CORPORATION

20   COME INTO EXISTENCE?

21        A.    I DON'T KNOW. I COULD LOOK IT UP BACK HOME, BUT I DON'T

22   KNOW.

1       Q.    IN THE EIGHTIES, IN THE SEVENTIES, IN THE NINETIES?

2       A.    I THINK WE USED TO HAVE ALL SEPARATE CHECKBOOKS, AND THE

3 ACCOUNTANT THOUGHT IT WOULD MAKE IT EASIER FIVE OR EIGHT YEARS AGO IF

4 WE USED ONE AND THEN SEPARATED IT OUT.

5       Q.    OKAY.  WHO ARE THE OFFICERS OF FIRST NEW HAVEN CAPITAL

6 CORPORATION?

7       A.    I'M SURE I'M AN OFFICER.  I'M NOT REALLY SURE WHO ELSE IS.

8 MAYBE -- MAYBE MY CONTROLLER.  I'M NOT REALLY SURE

9       Q.    WHERE ARE THE CORPORATE OFFICES LOCATED?

10      A.    IN 59 ELM STREET.

11     Q.    IN NEW HAVEN, AS IT SAYS ON THE CHECK HERE?

12     A.    YEAH.  IT'S JUST A GENERAL DISBURSEMENT ACCOUNT.  IT'S NOT

13 A REAL --

14     Q.    WHO IS THE CORPORATE TREASURER?

15     A.    OH, I DON'T KNOW.  I DON'T KNOW.  I MIGHT BE THE C.E.O. AND

16 TREASURER.  I DON'T KNOW.  I'D HAVE TO LOOK IT UP.

17     Q.    WHO ELSE WOULD BE OFFICERS OF THE CORPORATION?

18     A.    I HAVE NO IDEA.  I HAVE JUST LIKE THIRTEEN CORPORATIONS.  I

19 DON'T KNOW WHO IT IS.  I CAN LOOK IT UP HERE, BUT I DON'T KNOW.

20     Q.    SO, ARE YOU SAYING THAT FIRST NEW HAVEN CAPITAL

21 CORPORATION IS THE HOLDING COMPANY FOR THE OTHER THIRTEEN

22 CORPORATIONS?

1        A.     I'M SAYING THAT MY ACCOUNTANT WANTED TO DO ONE

2   DISBURSEMENT ACCOUNT TO RUN IT THAT WAY; OTHERWISE, TALK TO MY

3   ACCOUNTANT. I DON'T KNOW. THAT'S HOW HE WANTED TO DO IT TO MAKE IT

4   SIMPLER, AND WE DID IT A LONG TIME AGO.

5        Q.     WHO WOULD HAVE CORPORATE RECORDS FOR FIRST NEW HAVEN

6   CAPITAL CORPORATION?

7        A.     ONE OF MY ATTORNEYS WOULD HAVE THE RECORDS.

8        Q.     AND, BY ONE OF YOUR ATTORNEYS, WHO WOULD THAT BE?

9        A.     WELL, ONE -- EITHER ROGIN NASSAU, OR FREDDIE DONNARUMMA,

10  OR JOHN BECK. ONE OF THE ATTORNEYS THAT WE USE AT THE OFFICE WOULD

11  HAVE IT.

12       Q.     AND ARE THOSE ALL LOCATED IN NEW HAVEN, CONNECTICUT?

13       A.     NO. TWO ARE IN HARTFORD. ONE IS IN NEW HAVEN. I THINK ONE

14  IS IN WATERBURY.

15       Q.     WHO ARE THE SHAREHOLDERS OF FIRST NEW HAVEN--

16       A.     THAT WOULD BE ME.

17       Q.     --CAPITAL CORPORATION? OF ONE HUNDRED PERCENT OF THE

18  SHARES?

19       A.     YES.

20       Q.     AND WHAT IS THE BUSINESS OF FIRST NEW HAVEN CAPITAL

21  CORPORATION?

22       A.     FIRST NEW HAVEN CAPITAL CORPORATION IS REALLY JUST A

1   DRAW – IT DOESN'T HAVE – IT DOESN'T HAVE ANY SEPARATE ENTITY TO DO
2   ANYTHING. IT'S A CORP SET UP JUST TO BE THE GENERAL DISBURSEMENT
3   ACCOUNT. I DON'T KNOW HOW TO SAY IT ANY CLEARER.
4           Q.      WELL, ISN'T IT TRUE THAT YOU HAVE PERSONAL ACCOUNTS?
5           A.      OH, YEAH. I HAVE SOME PERSONAL ACCOUNTS, BUT I RUN MOST
6   OF MY PERSONAL STUFF THROUGH FIRST NEW HAVEN CAPITAL.
7           Q.      SO, YOU HAVE A PERSONAL CHECKING ACCOUNT?
8           A.      OH, I HAVE – I'M SURE MY WIFE HAS ONE. I HAVE ONE. YEAH. I
9   HAVE ONE DOWN IN PALM BEACH. I HAVE PERSONAL ACCOUNTS. BUT THIS IS
10  WHERE THE – FOR EXAMPLE, THE BILLS COME IN AND THEY GO THROUGH HERE
11  FOR MY HOUSE, AND THAT WOULD BE A DRAW—
12          Q.      WHO—
13          A.      —THE STUFF I WOULD, YOU KNOW, BUY FROM WAYNE WOULD RUN
14  THROUGH HERE.
15          Q.      DO YOU KNOW WHO THE CORPORATE AGENT FOR FIRST NEW
16  HAVEN CAPITAL CORPORATION WOULD BE?
17          A.      I HAVE NO IDEA.
18          Q.      AND PERHAPS YOU ANSWERED THIS, BUT IS IT YOUR
19  UNDERSTANDING THAT FIRST NEW HAVEN CAPITAL CORPORATION IS THE
20  HOLDING CORPORATION FOR THE OTHER ENTITIES—
21          A.      NO. THERE'S A—
22          Q.      —THAT YOU HAVE?

Case 5:03-cv-00204-BO   Document 75   Filed 09/10/03   Page 47 of 109

1    A.    —COMPANY CALLED MATTHEWS VENTURES HOLDINGS, L.L.C.

2    THAT'S A HOLDING COMPANY. THIS IS JUST A CHECKBOOK GENERAL

3    DISBURSEMENT ENTITY. IT DOESN'T DO ANYTHING ELSE.

4    Q.    AND WHERE DOES IT RECEIVE ITS FUNDS? FROM WHOM DOES IT

5    RECEIVE ITS FUNDS?

6    A.    WHERE DOES IT RECEIVE – LET ME TRY – ITS – I'LL TRY IT AGAIN. I

7    HAVE DIFFERENT COMPANIES. OKAY. FOR EXAMPLE, YOU'RE A TENANT. YOU'RE

8    YALE. YOU PAY ME RENT. OKAY. IT RUNS THROUGH FIRST NEW HAVEN CAPITAL

9    ACCOUNT. OKAY. YOU'RE STROMBERG, MY COMPANY IN FLORIDA. YOU PAY ME

10   A DIVIDEND. IT RUNS THROUGH FIRST NEW HAVEN CAPITAL. IT'S JUST A

11   GENERAL, SORT OF THE MELTING POT, COMPANY THAT JUST THE FUNDS RUN

12   THROUGH.

13   Q.    SO, EACH OF THE INDIVIDUAL COMPANIES WOULD HAVE THEIR

14   OWN CHECKING ACCOUNTS?

15   A.    NO. I'M SAYING THEY DON'T HAVE THEIR OWN CHECKING

16   ACCOUNTS.

17   Q.    SO, NONE OF YOUR INDI – INDI – LET ME BACK UP. HOW MANY

18   INDIVIDUAL COMPANIES DID YOU SAY THERE WERE?

19   A.    I DON'T KNOW. WELL, THEY MIGHT BE LLC'S, SO COMPANIES

20   MIGHT HAVE BEEN THE WRONG WORD.

21   Q.    RIGHT.

22   A.    THERE'S DIFFERENT LLC'S. I MEAN, FOR EXAMPLE, IF YOU SAID

1      HOW MANY TAX RETURNS DO YOU FILE WITH THE DIFFERENT LLC'S – LIKE FIFTEEN

2      OR SOMETHING.

3            Q.      OKAY. AND ALL OF THOSE FIFTEEN LLC'S WOULD USE NEW

4      HAVEN – FIRST NEW HAVEN CAPITAL CORPORATION FOR THEIR DEPOSITS AS

5      WELL AS THEIR DISBURSEMENTS?

6            A.      EXCEPT FOR THE SOFTWARE COMPANY. THEY RUN THEIR OWN

7      CHECKING ACCOUNT DOWN IN FLORIDA.

8            Q.      OKAY. NOW, YOU MADE THIS CHECK PAYABLE TO WAYNE PRATT,

9      INC. WAS IT YOUR UNDERSTANDING THAT THE ENTITY, WAYNE PRATT, INC., WAS

10      GOING TO PURCHASE FROM THESE LADIES IN INDIANA THE DEFENDANT IN THIS

11      CASE?

12            MR. STRATTON: OBJECTION. JUST TO THE – JUST TO THE EXTENT THE

13            QUESTION IS VAGUE AND AMBIGUOUS; BUT YOU CAN ANSWER.

14            A.      I – I DIDN'T KNOW IF WAYNE WAS GOING TO BUY IT IN HIS NAME

15      OR THE COMPANY; BUT, I MEAN, I KNEW HE WAS GOING TO BUY IT. I ASSUMED IT

16      WOULD BE IN THE COMPANY, BUT I DIDN'T – I DIDN'T KNOW FOR A FACT.

17            Q.      (BY MR. NEWBY) DO YOU KNOW OR DID YOU INSTRUCT MR. PRATT

18      AS TO WHERE HE SHOULD DEPOSIT THIS SUM OF MONEY?

19            A.      NO.

20            Q.      DID YOU RECEIVE A MONTHLY STATEMENT INDICATING THAT HE

21      HAD SET UP AN ESCROW OR ANY TYPE OF SEPARATE ACCOUNT—

22            A.      NO—

1          Q.      --FOR THIS MONEY?

2          A.      --WE DIDN'T HAVE A RELATIONSHIP LIKE THAT.

3          Q.      WELL, WHY DON'T YOU TELL ME ABOUT THE RELATIONSHIP THAT

4   YOU HAD WITH MR. PRATT.

5          A.      WELL, IT WAS -- I'VE KNOWN WAYNE FOR TWENTY-FIVE YEARS.

6   I'M THE GODFATHER TO HIS SON. I'VE KNOWN HIM SOCIALLY. I'M ONE OF HIS

7   COLLECTORS. I'M PROBABLY A MID-SIZED COLLECTOR. HE'S DONE PROBABLY

8   NINETY-NINE PERCENT OF THE PURCHASES IN MY HOUSES FOR ANTIQUES --

9   AMERICAN ANTIQUES -- I BOUGHT FROM HIM STARTING WHEN I WAS

10  TWENTY-FIVE, SO, TWENTY YEARS AGO.

11         I'VE DONE OTHER DEALS WITH WAYNE WHERE -- I DON'T KNOW HOW

12  MANY. MAYBE WE DID FOUR, MAYBE THREE, MAYBE FIVE WHERE WAYNE WOULD

13  SAY, OH, I HAVE A HIGHBOY; IT'S A GREAT DEAL; YOU CAN BUY IT FOR A HUNDRED

14  THOUSAND DOLLARS ($100,000.00); YOU PUT UP FIFTY THOUSAND; I'LL PUT UP

15  FIFTY THOUSAND; AND HE WOULD RESELL IT. WE'D BE FIFTY/FIFTY PARTNERS.

16  HE WOULD RESELL IT BECAUSE HE WAS THE EXPERT. I DON'T KNOW ABOUT

17  HIGHBOYS. AND HE WOULD GIVE ME TWENTY-FIVE THOUSAND DOLLARS

18  ($25,000.00), AND HE WOULD HAVE TWENTY-FIVE THOUSAND DOLLARS

19  ($25,000.00).

20         AND I KNOW ONCE I REMEMBER THAT WE DID IT WHERE THERE WAS A

21  LIST OF ITEMS, MAYBE TWELVE ITEMS, AND THEN HE WOULD SAY THAT -- WHAT

22  HE THOUGHT THE MARKET VALUE WAS AND THEN WHAT WE ACTUALLY SOLD

1   THEM FOR; SO, THE TARGET, WHAT YOU WOULD SELL IT FOR, AND THEN WHAT

2   YOU PAID FOR IT—

3          Q.      SO—

4          A.      —BEFORE I DID THAT DEAL, HE – I REMEMBER THAT ONE  HE SAID,

5   WELL, THIS HIGHBOY, I THINK, IS WORTH SEVENTY-FIVE THOUSAND, AND WE'RE

6   PAYING FIFTY THOUSAND FOR IT, YOU KNOW, AND HE GAVE ME SORT OF TARGET

7   THINGS.  SO, IT WAS NEVER IN AN ESCROW ACCOUNT OR ANYTHING FORMAL LIKE

8   THAT.  WAYNE IS A FRIEND OF MINE.  I – I'VE – YOU KNOW, I TRUST HIM, AND I

9   CAN'T IMAGINE HIM NOT HONORING HIS, YOU KNOW, HANDSHAKE ON THE DEAL.

10         Q.      SO, YOU WOULD GIVE HIM THE MONEY, BUT WITH REGARD TO THE

11  VARIOUS DECISIONS IN THESE TRANSACTIONS, MR. PRATT WOULD NEGOTIATE

12  THE PURCHASE;  HE WOULD HOLD OR DO WHATEVER HE NEEDED TO DO –

13  REFINISH, REFURBISH, MARKET, ULTIMATELY SELL, AND THEN AT SOME POINT IN

14  TIME, HE WOULD GIVE YOU FUNDS?

15         MR. STRATTON:  OBJECTION, COMPOUND.  YOU CAN ANSWER.

16         A.      YES.  HE WAS THE EXPERT IN ANTIQUES.  I'M A – I'M A

17  COLLECTOR.  SO, I RELIED ON HIS EXPERTISE, YES.

18         Q.      (BY MR. NEWBY)  WOULD HE – OKAY.  SO, YOU GAVE HIM THIS A

19  HUNDRED AND FIFTY THOUSAND DOLLARS ($150,000.00).  AFTER YOU DID THAT,

20  WHEN WAS THE NEXT TIME THAT YOU HEARD ANYTHING IN REFERENCE TO THIS

21  DOCUMENT?

22         A.      WELL, LET'S SEE.  THIS IS JUNE OF '99.  SO, NINETY DAYS LATER

1    I'M IN A COMA, SO I'M SURE WE DIDN'T TALK ABOUT IT FOR A WHILE. I MEAN, IF

2    WE DID, I DON'T REMEMBER BECAUSE I WAS ON A HUNDRED AND THIRTY

3    MILLIGRAMS OF PREDNISONE AND – I'M SURE WE DIDN'T TALK ABOUT IT. I

4    FOUND OUT AFTER THE – AFTER THE F.B.I. SEIZED IT WHEN I MET WITH MARY

5    BETH, I FOUND OUT WHEN WE ACTUALLY BOUGHT IT. I DIDN'T EVEN KNOW WHEN

6    WE – I DIDN'T EVEN KNOW WHEN WE BOUGHT IT. I GUESS WE BOUGHT IT, I THINK,

7    IN 2000 SOMETIME, BUT I DIDN'T EVEN KNOW WHEN WE ACTUALLY BOUGHT IT.

8        THE NEXT THING I HEAR – OH, I KNOW. HE WAS GOING TO BRING IT – HE

9    WAS GOING TO HAVE THE LAWYER DRIVE IT UP TO WASHINGTON, D.C. I THINK HE

10   WAS GOING TO HAVE THE LAWYER. HE MAY HAVE HAD HIS DRIVER THAT DOES

11   THE DELIVERIES, BUT I THOUGHT THE LAWYER, CHARLIE REEDER, WAS GOING TO

12   DRIVE IT AND HAVE IT AUTHENTICATED. AND IF IT – I REMEMBER THINKING

13   THAT HE SAID IF IT WAS – YOU KNOW, IF IT WAS CLEAN – HE BROUGHT IT TO

14   SOMEBODY TO LOOK AT. I THINK THEY THOUGHT IT WAS PENNSYLVANIA'S, IN

15   FACT – THAT IF IT WAS, YOU KNOW, ORIGINAL, YOU KNOW, IT WASN'T A FAKE,

16   THEN HE WAS GOING TO PURCHASE IT. AND, LIKE I SAID, I THINK THAT WAS IN

17   MARCH OF 2000 – SOMETIME IN 2000.

18       Q.    DO YOU KNOW AT WHAT POINT IN TIME MR. PRATT OBTAINED AN

19   OPTION TO PURCHASE THIS DOCUMENT?

20       A.    WELL, I NEVER REALLY KNEW IF HE HAD AN OPTION. I DIDN'T

21   KNOW THAT. I KNEW HE HAD SOME DEAL WITH JOHN RICHARDSON A LONG TIME

22   AGO, BUT I DIDN'T REALLY KNOW HE HAD AN OPTION. SO, UNTIL YOU JUST TOLD

1    ME, NO.

2           MR. NEWBY: I'M GOING TO SHOW YOU WHAT WE'RE GOING TO MARK AS

3                  DEPOSITION EXHIBIT 3.

4                         (THEREUPON, THE DOCUMENT REFERRED

5                          TO BELOW WAS MARKED AS PLAINTIFF'S

6                          EXHIBIT NO. 3 - ROBERT V. MATTHEWS

7                          DEPOSITION - FOR IDENTIFICATION.)

8           MR. NEWBY: THIS IS NOT -- LET'S GO OFF THE RECORD A MINUTE.

9           (THEREUPON, THERE WAS AN

10           OFF-THE-RECORD DISCUSSION

11           WHICH WAS NOT REPORTED

12           BY THE COURT REPORTER.)

13           MR. NEWBY: OKAY. WE CAN GO BACK ON.

14    DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

15           Q.     LET'S SEE. I'VE GIVEN YOU DEPOSITION EXHIBIT 3, WHICH IS A

16    WIRE TRANSFER--

17           MR. STRATTON: YOU HAVEN'T GIVEN HIM ANYTHING. YOU'VE GIVEN HIM

18                  AN UNMARKED PIECE OF PAPER.

19           WITNESS: YOU WANT TO SWITCH?

20           MR. STRATTON: YEAH.

21           Q.     --WHICH SHOWS THAT A WIRE TRANSFER OCCURRED ON

22    SEPTEMBER 10, 1997, OF FIFTY THOUSAND DOLLARS ($50,000.00) FROM WAYNE

Case 5:03-cv-00204-BO   Document 73   Filed 08/10/03   Page 53 of 109

1  PRATT, INC, TO CHARLES REEDER'S TRUST. WERE YOU AWARE OF THAT

2  TRANSACTION?

3          A.     NOT UNTIL YOU JUST TOLD ME.

4          Q.     DO YOU REMEMBER WHEN THE TRANSACTION TOOK PLACE?

5          A.     NO. I TOLD YOU THAT I CHECKED AFTERWARDS, AND I FOUND OUT

6  IT WAS IN 2000.

7          Q.     OKAY.

8          MR. STRATTON: WE'RE TALKING ABOUT THE TRANSACTION—

9          MR. NEWBY: TO PURCHASE—

10         MR. STRATTON: —TO PURCHASE THE BILL OF RIGHTS—

11         MR. NEWBY: —THE BILL OF RIGHTS—

12         MR. STRATTON: —BY – OKAY—

13         MR. NEWBY: —BY W.P.I.

14         MR. STRATTON: —BY – AND MR. MATTHEWS.

15         MR. NEWBY: WELL, BY W.P.I.

16         MR. STRATTON: ALL RIGHT.

17         MR. NEWBY: THE – I'M GOING TO MARK – HAVE MARKED EXHIBIT 4.

18                 (THEREUPON, THE DOCUMENT REFERRED

19                 TO BELOW WAS MARKED AS PLAINTIFF'S

20                 EXHIBIT NO. 4 - ROBERT V. MATTHEWS

21                 DEPOSITION - FOR IDENTIFICATION.)

22         MR. NEWBY: WOULD YOU, PLEASE, LOOK AT THAT.

1            (THEREUPON, WITNESS REVIEWS DOCUMENT.)

2    DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

3            Q.      HAVE YOU SEEN THAT DOCUMENT BEFORE?

4            A.      JUST WHEN YOU HANDED IT TO ME A MINUTE AGO.

5    MR. STRATTON: THIS IS A THREE-PAGE--

6    MR. NEWBY: THIS IS--

7    MR. STRATTON: WELL, WHAT IS THIS DOCUMENT? WE'VE GOT -- WE HAVE

8            TWO -- ONE PAGE THAT'S MARKED, TWO PAGES THAT AREN'T

9            MARKED. SO, IF WE CAN JUST FOR THE RECORD INDICATE THIS IS

10           A THREE-PAGE DOCUMENT WHICH HAS BEEN MARKED AS

11           EXHIBIT 4. THE FIRST PAGE ON TOP IS A "BILL OF SALE." THE

12           SECOND PAGE IS A NOTARY IN INDIANA, COUNTY OF MARION, BY A

13           SHELLEY [sic] BRIGHT WITH A FEBRUARY 15, 2000, DATE. THE

14           THIRD PAGE IS ANOTHER NOTARY BY A JUDY HAMBURG [sic] ON

15           JANUARY 7TH OF 2000. SO, WE'VE GOT TWO NOTARIES, TWO

16           DIFFERENT DATES, IN A THREE-PAGE DOCUMENT MARKED AS

17           PLAINTIFF'S EXHIBIT 4.

18   DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

19           Q.      SO, IS TODAY THE FIRST TIME YOU'VE SEEN THAT DOCUMENT?

20           A.      YES.

21           Q.      AND DO YOU HAVE ANY REASON TO BELIEVE THAT THIS IS NOT A --

22   ALTHOUGH REDACTED -- A TRUE COPY OF THE BILL OF SALE FROM THE PEOPLE IN

1    INDIANA FOR THE DEFENDANT IN THIS CASE?

2         MR. STRATTON: I OBJECT TO THE QUESTION AS NOT – NOT REASONABLY

3              CALCULATED—

4    WITNESS: I MEAN, THEY'RE NOT SIGNED. IT COULD HAVE BEEN A DRAFT

5              FORM. I DON'T KNOW. NO ONE SIGNED IT.

6    MR. NEWBY: ALL RIGHT. OKAY.

7    MR. STRATTON: WE'RE NOT STIPULATING TO THE AUTHENTICITY OF A

8              DOCUMENT THAT'S UNSIGNED.

9    MR. NEWBY: ALL RIGHT.

10   DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

11        Q.    IF, IN FACT, THIS IS THE AUTHENTIC BILL – OR A COPY OF THE

12   EXECUTED BILL OF SALE, YOU SEE THAT THE TRANSFER IS TO WAYNE A. PRATT,

13   INC., A CORPORATION ("BUYER"). IS THAT HOW YOU ANTICIPATED THAT THE

14   TRANSACTION WOULD TAKE PLACE?

15        A.    YEAH. I MUST HAVE BECAUSE THAT'S WHY I WROTE THE CHECK.

16        THE ONLY THING I WAS ALWAYS TOLD THAT THE ORIGINAL BILL OF SALE

17   SAID IT HAD TO BE SOLD TO A MUSEUM, JUST FOR THE RECORD.

18   MR. STRATTON: OH, THE—

19   WITNESS: I'M JUST TELLING YOU. THAT'S WHAT I WAS TOLD. SO, I

20              DON'T KNOW IF THAT'S THE RIGHT ONE. I'M JUST TELLING YOU

21              WHAT I WAS TOLD.

22   MR. STRATTON: YEAH. NO. THAT'S—

1    DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

2         Q.    NOW, AS YOU LOOK AT THAT DOCUMENT, YOU DON'T SEE YOUR

3    NAME AS A BUYER ANYWHERE ON THAT DOCUMENT, DO YOU?

4         A.    NO.

5         MR. STRATTON: YOU'RE TALKING ABOUT DOCUMENT NUMBER 4?

6         MR. NEWBY: DOCUMENT NUMBER 4. THAT DOCUMENT IS DATED

7                FEBRUARY 15, 2000.

8         MR. STRATTON: OKAY.

9         MR. NEWBY: AND I'LL SHOW YOU WHAT WILL BE MARKED AS PLAINTIFF'S

10            EXHIBIT 5.

11                (THEREUPON, THE DOCUMENT REFERRED

12                TO BELOW WAS MARKED AS PLAINTIFF'S

13                EXHIBIT NO. 5 - ROBERT V. MATTHEWS

14                DEPOSITION - FOR IDENTIFICATION.)

15         MR. NEWBY: THAT IS, IN FACT, A—

16         WITNESS: OKAY. FEBRUARY 23 – OKAY. THAT—

17             (THEREUPON, WITNESS REVIEWS DOCUMENT

18                AND CONFERS WITH HIS ATTORNEY.)

19         MR. NEWBY: OKAY.

20    DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

21         Q.    PLAINTIFF'S EXHIBIT 5 IS A COPY OF A WIRE TRANSFER FROM

22    WAYNE E. PRATT, INC., TO CHARLES REEDER FOR A HUNDRED AND FIFTY

*CAROLYN Y. HALL & ASSOCIATES*

1    THOUSAND DOLLARS ($150,000.00), DATED FEBRUARY 23, 2000. IS THAT

2    CORRECT?

3         A.    YES.

4         MR. STRATTON: BUT IS – I MEAN, IS THAT IT – IS THAT WHAT THE

5                 DOCUMENT READS OR DOES HE HAVE ANY ABILITY TO

6                 AUTHENTICATE THE DOCUMENT? I DON'T UNDERSTAND THE

7                 QUESTION.

8         MR. NEWBY: I'M ASKING IF THAT'S WHAT THE DOCUMENT READS.

9         MR. STRATTON: OKAY.

10        WITNESS: IT LOOKS – IT LOOKS LIKE A WIRE TO ME.

11        Q.    (BY MR. NEWBY) DO YOU HAVE ANY REASON TO BELIEVE THAT

12   THIS WAS NOT THE FINAL PAYMENT IN CONSUMMATION OF THE TRANSACTION

13   THAT'S EXHIBITED WITH THE BILL OF SALE ON EXHIBIT 4?

14        MR. STRATTON: I JUST OBJECT TO THE QUESTION. IT'S NOT

15                REASONABLY CALCULATED TO LEAD TO DISCOVERY OF

16                ADMISSIBLE EVIDENCE. AND WE'RE NOT GOING TO STIPULATE TO

17                THE AUTHENTICITY OF THIS DOCUMENT; AND NEVER SEEN IT

18                BEFORE.

19        Q.    (BY MR. NEWBY) NOW, ON THOSE – THE DOCUMENTS THAT HAVE

20   BEEN MARKED EXHIBITS 3, 4, AND 5, YOU SEE THE NAME "WAYNE PRATT, INC."

21   DO YOU SEE ON ANY OF THOSE DOCUMENTS YOUR NAME?

22        A.    NO.

Case 5:03-cv-00204-BO   Document 75   Filed 09/10/03   Page 58 of 109

1          MR. STRATTON: THE DOCUMENTS SPEAK FOR THEMSELVES.

2          Q.     (BY MR. NEWBY) NOW, AFTER THE TRANSACTION WAS

3  COMPLETED IN THE NAME OF WAYNE PRATT, INC., CAN YOU TELL ME WHAT NEXT

4  OCCURRED WITH REGARD TO THE DOCUMENT, THE BILL OF RIGHTS?

5          MR. STRATTON: OBJECTION. IT'S A COMPOUND QUESTION, AND

6                  ASSUMES FACTS NOT IN EVIDENCE. DO YOU WANT TO RE-ASK

7                  THE QUESTION?

8          Q.     (BY MR. NEWBY) WHAT HAPPENED – AFTER FEBRUARY 23, 2000,

9  WHAT WAS YOUR NEXT CONTACT EITHER WITH MR. MATTHEWS CONCERNING

10  THE BILL OF RIGHTS OR WITH THE BILL OF RIGHTS ITSELF?

11          MR. STRATTON: MR. PRATT, I'M ASSUMING.

12          MR. NEWBY: I'M SORRY, MR. PRATT.

13          A.     THE NEXT THING THAT I REMEMBER THAT HAPPENED WITH THE

14  BILL OF RIGHTS WAS THAT HE BROUGHT IT TO A FRAME RESTORER TYPE PLACE,

15  AND I REMEMBER HIM TELLING ME THAT HE TOOK THE CARDBOARD OFF THE

16  BACK OF IT, AND THAT THERE WERE SOME LETTERS, AND THEY USED A RAZOR

17  BLADE AND THAT THEY WERE VERY CAREFUL TO LEAVE WHATEVER WRITING WAS

18  ON THE BACK. AND THEY PUT IT IN A FRAME, A NEW FRAME, AND A – MAYBE AN

19  ULTRAVIOLET TYPE FRAME – A NICER FRAME. THAT'S THE NEXT THING THAT I

20  REMEMBER THAT I HEARD FROM WAYNE.

21          Q.     (BY MR. NEWBY) AFTER SEEING THE DOCUMENT IN INDIANA, DID

22  YOU EVER PERSONALLY SEE THE DOCUMENT AGAIN?

1          A.      ONE OTHER TIME

2          Q.      AND WHEN WAS THAT?

3          A.      IT WAS – IT WAS AFTER THAT. HE WAS SHOWING ME. HE HAD IT

4    UPSTAIRS IN HIS OFFICE ON THE THIRD FLOOR, AND HE WAS SHOWING ME HOW

5    HE HAD IT MOUNTED IN A BETTER FRAME AND WITH THIS VERY, YOU KNOW, COOL

6    GLASS – ULTRAVIOLET RAY GLA – WHATEVER IT WAS, SOME KIND OF FANCY

7    GLASS COVER. THAT WAS THE ONLY TIME.

8          Q.      AND WHEN WAS THAT?

9          A.      I DON'T KNOW. BUT IN SOME OF THE DOCUMENTS THAT I GAVE

10   YOU BEFORE, THERE IS A NAME OF A PLACE WHERE I THINK THEY DID IT, AND IT

11   WOULD HAVE A DATE PROBABLY AROUND THE TIME IT WAS – SOMETIME AFTER

12   THAT.

13         Q.      AND AT THAT TIME, DID HE GIVE YOU – DID MR. PRATT GIVE YOU

14   THE DOCUMENT TO TAKE ANYWHERE?

15         A.      NO, NEVER. I NEVER HAD POSSESSION OF THE DOCUMENT.

16         Q.      PRIOR TO THE PURCHASE OF THE DOCUMENT BY WAYNE PRATT,

17   INC., IN INDIANA, DID MR. MATTHEWS CONSULT WITH – MR. PRATT CONSULT

18   WITH YOU IN REFERENCE TO HIS NEGOTIATIONS WITH MR. REEDER?

19         A.      THE ONLY THING I REMEMBER ABOUT THE NEGOTIATIONS WITH

20   REEDER WAS THAT THIS THING HAD DRAGGED OUT OVER A LONG PERIOD OF TIME,

21   AND THAT THE PRICE KEPT DROPPING; LIKE I SAID IN THE BEGINNING OF THE

22   CONVERSATION; THAT PRETTY MUCH OVER TIME – FRANKLY, I THINK IT WAS

Case 5:03-cv-00204-BO   Document 75   Filed 09/10/03   Page 60 of 109

1  LIKE, IF YOU WERE GOING TO BUY A BUILDING AND YOU DIDN'T BUY IT AND IT

2  JUST KEPT DRAGGING, AND THIS SELLER SAID, LOOK, GIVE ME A MILLION, NEVER

3  MIND A MILLION AND A HALF, AND THEY MADE A DEAL. AND THAT'S JUST MY

4  GENERAL FEELING, THAT OVER TIME THE PRICE WAS LESS—

5         Q.     DID—

6         A.     —BECAUSE AT THE TIME I WROTE THE CHECK, I THOUGHT IT WAS

7  OBVIOUSLY THREE HUNDRED THOUSAND, OR I WOULDN'T HAVE WROTE A CHECK

8  FOR A HUNDRED AND FIFTY THOUSAND.

9         Q.     DID MR. PRATT CONSULT WITH YOU REGARDING HIS

10 NEGOTIATIONS WITH MR. REEDER?

11        A.     I'M SURE I MUST HAVE ASKED HIM HOW IT'S GOING, BUT I DON'T

12 SPECIFICALLY REMEMBER A TIME WITH HIM SAYING THIS IS, YOU KNOW, WHAT

13 WE DID OR WHERE IT WAS. HE MUST HAVE TOLD ME AT ONE TIME IT WAS THREE

14 HUNDRED OR I WOULDN'T HAVE WRITTEN THE CHECK FOR A HUNDRED AND FIFTY.

15 BUT I DON'T SPECIFICALLY REMEMBER A TIME WHERE HE SAID, OH, IT'S GOING

16 REALLY GOOD OR IT'S GOING BAD OR, YOU KNOW.

17        Q.     DID MR. PRATT SPECIFICALLY ASK YOUR PERMISSION TO INCLUDE

18 CERTAIN TERMS OR CONDITIONS OF THE PURCHASE?

19        A.     NO.

20        Q.     DID MR. PRATT CONSULT WITH YOU PRIOR TO HIS TAKING THE

21 DOCUMENT TO HAVE ANY RESTORATION WORK DONE ON IT?

22        A.     NO. AS I SAID, I WAS RELYING ON HIS EXPERTISE.

1          Q.     DID MR. PRATT SEEK ANY FINANCIAL CONTRIBUTION FROM YOU

2   WITH REGARD TO ANY COST IN CONNECTION WITH THE RESTORATION OR

3   MAINTENANCE OF THE DOCUMENT?

4          A.     NO. HE ALWAYS WOULD HAVE – JUST LIKE HE DID ON THAT PIECE

5   OF PAPER – HE WOULD HAVE TAKEN IT OFF AT THE END, JUST LIKE HE DID ANY

6   OTHER DEAL. THAT WAS THE EXTRA TWENTY-FIVE HUNDRED DOLLARS ($2,500.00)

7   HE SPENT.

8          Q.     DID MR. PRATT CONSULT WITH YOU PRIOR TO ENTERING INTO ANY

9   AGREEMENTS WITH MR. REESE OR TILLOU REGARDING THE DOCUMENT?

10         A.     HE TOLD ME APPROXIMATELY SIXTY TO NINETY DAYS BEFORE

11   HE – THAT HE WAS WORKING ON A DEAL TO SELL IT AND THAT IT WAS TO THE

12   PHILADELPHIA – THE CONSTITUTION MUSEUM. AND I THOUGHT HE TOLD ME AT

13   THE TIME HE WAS GOING TO SELL IT FOR FIVE OR SIX MILLION DOLLARS. AND I

14   DIDN'T, AT THAT TIME, EVEN KNOW THOSE PEOPLE – I DON'T THINK I EVEN KNEW

15   THEY WERE INVOLVED UNTIL I READ THE STUFF FROM MARY BETH LATER.

16         Q.     SO, AT THE TIME, CONTEMPORANEOUS WITH THE EVENTS,

17   MR. PRATT DID NOT CONSULT WITH YOU BEFORE ENTERING INTO ANY

18   AGREEMENTS WITH MR. TILLOU OR MR. REESE?

19         A.     NO. HE DIDN'T SAY, OH, I'M GOING TO GO – I MEAN, I REMEMBER

20   HE MENTIONED THAT HE WAS GOING TO PAY PETER A COMMISSION OF SOME

21   SORT. I MEAN, I FOUND OUT AT THE END IT WAS A MILLION DOLLARS, BUT

22   I DIDN'T KNOW THAT AT THE TIME. BUT, NO, HE DIDN'T SPECIFICALLY – I LEFT IT

Case 5:03-cv-00204-BO   Document 75   Filed 09/10/03   Page 62 of 109

1    UP TO WAYNE TO MAKE THOSE KIND OF DECISIONS TO SELL IT.

2          Q.    WITH REGARD TO THE PRICE OF FIVE MILLION DOLLARS, DID

3    MR. PRATT CONSULT WITH YOU OR SEEK YOUR CONSENT TO THAT PRICE?

4          A.    I KNOW HE TOLD ME HE WAS GOING TO SELL IT FOR FIVE MILLION

5    DOLLARS OR SIX MILLION DOLLARS; WHAT DO YOU THINK ABOUT THAT.  I SAID, IT

6    SOUNDS GOOD TO ME.  I MEAN, WE DIDN'T HAVE SOME FORMAL BOARD MEETING

7    OR ANYTHING LIKE THAT.  IT WAS HE JUST TOLD ME AT THE END -- BECAUSE HE

8    HAD TRIED TO SELL IT TO A COUPLE OTHER PEOPLE, AND THAT WAS THE LAST

9    DEAL HE WAS ON.

10         Q.    SO, IF MR. PRATT HAD THEN SOLD IT FOR FOUR POINT SEVEN

11   MILLION DOLLARS, WOULD THAT HAVE BEEN WITHIN YOUR UNDERSTANDING OF

12   THE AGREEMENT THAT YOU HAD WITH MR. PRATT?

13         A.    I WOULD HAVE TRUSTED WAYNE TO DO THE RIGHT DEAL.  I MEAN,

14   THAT'S PART OF THE DEAL.

15         Q.    AND HE WOULD NOT HAVE HAD TO CONSULT WITH YOU BEFORE

16   LOWERING THE PRICE?

17         A.    I MEAN, IF IT WAS ONLY TWO HUNDRED AND FIFTY THOUSAND

18   DOLLARS, I THINK HE KNOWS ME WELL ENOUGH I WOULDN'T HAVE BEEN ARGUING

19   FOR AN EXTRA HUNDRED AND TWENTY-FIVE THOUSAND DOLLARS.  WE'RE NOT

20   NICKEL AND DIME KIND OF--

21         Q.    MR. PRATT DID NOT SEEK YOUR CONSENT TO USE BROKERS, IF

22   YOU WILL, OR -- WITH MR. REESE OR MR. TILLOU.  IS THAT CORRECT?

1          A.      NO. I DON'T EVEN KNOW WHO MR. REESE IS. I KNOW HE'S – WAS

2     INVOLVED SOMEHOW, BUT I DIDN'T KNOW HE WAS A BROKER.

3          Q.      WHEN DID YOU FIRST LEARN OF THE POTENTIAL SALE TO THE

4     NATIONAL CONSTITUTION CENTER?

5          A.      LIKE I JUST SAID, I BELIEVE IT WAS A COUPLE MONTHS BEFORE

6     THE WHOLE THING BLEW UP. I DON'T – I DON'T KNOW WHAT THE DATE WAS.

7          Q.      I'M GOING TO SHOW YOU WHAT'S GOING TO BE MARKED

8     GOVERNMENT'S EXHIBIT 6.

9          MR. NEWBY:  AND IF YOU WOULD, IF WE COULD USE 6a THROUGH –

10                  BECAUSE THERE ARE SEVERAL DOCUMENTS THERE – THIS WOULD

11                  BE 6a, 6b, 6c, 6d, 6e, f, g, h, i, j, k.

12                       (THEREUPON, THE DOCUMENTS REFERRED

13                       TO BELOW WERE MARKED AS PLAINTIFF'S

14                       EXHIBITS 6a - 6q - ROBERT MATTHEWS

15                       DEPOSITION - FOR IDENTIFICATION.)

16                       (THEREUPON, WITNESS REVIEWS DOCUMENTS.)

17         MR. STRATTON:  THIS WAS DUPLICATED. THERE'S TWO OF THESE IN

18                  THAT. DID YOU NOTICE THAT?

19         MR. NEWBY:  YEAH, THE – THE – THE REASON THAT IT'S DUPLICATED IS

20                  BECAUSE IT WAS DUPLICATED IN THE FIRST—

21         MR. STRATTON:  DO YOU WANT TO HAVE IT MARKED?

22         MR. NEWBY:  YEAH, THE – THE – THE LETTER – THE ORIGINAL LETTER USES

1       AS EXHIBITS 6a THROUGH -- ALL THE UP UNTIL THE -- THE BILL OF

2       SALE. SO, IT WAS INTENTIONALLY DUPLICATED.

3   MR. STRATTON: WELL, YOU KNOW WHAT, PUT THIS -- THAT -- YEAH, PUT

4       THAT ON THERE BECAUSE THAT'S -- THAT WAS THE ORDER IT WAS

5       IN. YEAH.

6   THESE ARE ALL -- THESE ARE ALL DOCUMENTS FROM STEVE HARMELIN

7       FROM YESTERDAY, THE LAWYER FOR THE CONSTITUTION

8       SOCIETY.

9   WITNESS: IS THAT WHO THIS IS? OH, SO THIS IS HARMELIN. OKAY.

10  MR. STRATTON: YEAH. THEY WERE ALL PRODUCED YESTERDAY.

11  COURT REPORTER: I THINK I'M MISSING -- IS THIS --

12  MR. STRATTON: YEAH, THAT'S ONE DOCUMENT. ALL ONE, YEAH. AND

13      NOW WE GO TO HERE. OKAY.

14  MR. NEWBY: LET ME SEE THE ONES THAT YOU'VE ALREADY DONE AND BE

15      SURE THEY'RE IN THE SAME ORDER AS THE ONES WE'VE GOT.

16  COURT REPORTER: OKAY. THE WITNESS HAS SOME.

17  MR. NEWBY: HE'S GOT SOME.

18  WITNESS: OH, I'M SORRY. I WAS JUST GOING TO READ THEM.

19  MR. NEWBY: YEAH. IF YOU'LL GIVE THEM TO ME AND LET ME BE SURE I'VE

20      GOT THESE IN THE SAME ORDER, IT'LL MAKE THINGS GO MORE

21      SMOOTHLY.

22          (THEREUPON, MR. NEWBY CHECKS EXHIBIT.)

1     MR. NEWBY: OFF THE RECORD.

2                          (THEREUPON, THERE WAS AN

3                          OFF-THE-RECORD DISCUSSION

4                          WHICH WAS NOT REPORTED

5                          BY THE COURT REPORTER

6                          REGARDING EXHIBIT 6.)

7     MR. NEWBY: WE'LL GO ON THE RECORD.

8     WITNESS: I READ THEM ALL.

9     MR. NEWBY: OKAY. LET ME SET IT UP AND YOU—

10    MR. STRATTON: YEAH, THAT'S FINE. THEN WE CAN STIPULATE.

11    MR. NEWBY: OKAY.

12    DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

13         Q.      MR. MATTHEWS, I HAVE HANDED YOU A SET OF EXHIBITS ALL

14    BEGINNING WITH THE NUMBER 6 AND ALPHABETICALLY NUMBERED BEYOND

15    THAT. YOU WERE NOT PRESENT YESTERDAY, BUT THESE WERE DOCUMENTS

16    THAT WERE SUBMITTED BY A MR. HARMELIN, WHO INDICATED THAT THESE

17    DOCUMENTS WERE ALL PART OF A PROPOSED CLOSING THAT – OR SALE, CLOSING

18    THAT WAS TO TAKE PLACE BETWEEN MR. PRATT AND THE NATIONAL

19    CONSTITUTION CENTER. ALL OF THESE DOCUMENTS RELATED TO THAT

20    PROPOSED SALE. MY – MY QUESTION IS, DOES YOUR NAME APPEAR ANYWHERE

21    IN THOSE DOCUMENTS AS A SELLER OF THE DOCUMENT?

22         MR. STRATTON: AND – AND JUST TO MAKE THINGS EASIER, RATHER

1          THAN HAVING MY CLIENT REVIEW ALL THESE DOCUMENTS,

2     I'VE GONE THROUGH THE DOCUMENTS, AND MR. MATTHEWS' NAME DOES NOT

3          APPEAR ON ANY OF THESE DOCUMENTS. WE'RE NOT GOING

4          TO STIPULATE TO THE AUTHENTICITY OF THE DOCUMENTS, BUT

5          WE WILL STIPULATE ABSOLUTELY THAT MR. MATTHEWS' NAME

6          DOES NOT APPEAR ON ANY OF THESE DOCUMENTS, WHICH HAVE

7          JUST BEEN MARKED AS 6a THROUGH WHATEVER.

8          Q.     (BY MR. NEWBY) MR. MATTHEWS, THE FACT THAT YOUR NAME

9     DOES NOT APPEAR ON ANY OF THESE CLOSING DOCUMENTS, IS THAT

10    CONSISTENT WITH YOUR RELATIONSHIP WITH MR. PRATT?

11         A.     YES.

12         Q.     WERE YOU AWARE THAT THE CLOSING WAS TO TAKE PLACE ON

13    MARCH THE 18TH?

14         A.     NO.

15         Q.     WITH REGARD TO YOUR RELATIONSHIP WITH MR. PRATT

16    CONCERNING THE DEFENDANT BILL OF RIGHTS, IS IT TRUE THAT THERE IS NO

17    DOCU -- NO WRITTEN DOCUMENT THAT DEFINES THE TERMS OF YOUR

18    RELATIONSHIP?

19         MR. STRATTON: OBJECTION.

20         A.     NO, THAT'S NOT TRUE.

21         Q.     WHAT WRITTEN DOCUMENT WOULD DEFINE THE TERMS OF YOUR

22    RELATIONSHIP?

1      A.      THE ONE I TOLD YOU ABOUT EARLIER.

2      Q.      IS THAT A DOCUMENT THAT YOU SIGNED?

3      A.      I DON'T THINK I SIGNED IT BECAUSE I THINK IT CAME OFF THE

4    COMPUTER.

5      Q.      IS THAT A DOCUMENT THAT HE SIGNED?

6      A.      I DON'T THINK YOU CAN SIGN A DOCUMENT IF IT'S ON THE

7    COMPUTER. IT'S JUST -- IT WAS A PRINTOUT THAT SAID DOCUMENT,

8    FIFTY PERCENT, BOB MATTHEWS, FIFTY PERCENT, WAYNE PRATT, AND MY CHECK

9    THAT I GAVE THEM TO SHOW THEM THAT I BOUGHT IT. I MEAN, BESIDES THE

10   CHECK AND THAT DOCUMENT AND A TWENTY-YEAR RELATIONSHIP WITH WAYNE

11   PRATT, OTHER THAN THAT, I DON'T THINK THERE'S ANYTHING ELSE THAT SAYS I

12   OWN HALF OF IT.

13     Q.      IS IT TRUE THAT THERE IS NO WRITTEN PARTNERSHIP

14   AGREEMENT WITH YOU AND MR. MATTHEWS?

15     A.      THE ONLY PARTNERSHIP AGREEMENT THAT I'M AWARE OF IS THE

16   ONE THAT SHOWS THE FIFTY PERCENT OWNERSHIP THAT WAS PUT ON THE

17   COMPUTER WHEN I GAVE THE CHECK. AND I DON'T THINK THERE'S ANYTHING

18   ELSE WRITTEN. BUT THE PEOPLE THAT WORK FOR HIM AND HIM, THEY -- THEY

19   ALL KNOW THE DEAL. MARY BETH KNOWS THAT I BOUGHT HALF OF IT. AND HE

20   KNOWS I BOUGHT HALF OF IT.

21     Q.      IS THERE A -- ANY WRITING SIGNED BY BOTH YOU AND

22   MR. MATTHEWS -- MR. PRATT THAT SET FORTH THE TERMS OF YOUR

1   RELATIONSHIP?

2          A.     EXCEPT FOR THAT PIECE OF PAPER THAT I DON'T HAVE.

3          Q.     IS THERE ANY DOCUMENT SIGNED BY YOU AND MR. PRATT THAT

4   SETS FORTH THE TERMS OF YOUR RELATIONSHIP?

5          A.     I DON'T BELIEVE SO, UNLESS THAT ONE'S SIGNED. I DON'T

6   REMEMBER. I ONLY SAW IT BRIEFLY.

7          Q.     DID – DID YOU SIGN IT?

8   MR. STRATTON: WITH – WITH THAT QUALIFICATION, THAT ONLY

9                  QUALIFICATION.

10         A.     OH, I – UNLESS I SIGNED IT WAY BACK. I DON'T THINK IT WAS

11  SIGNED. MY RECOLLECTION IS, IT WASN'T SIGNED.

12         Q.     SO, YOUR RECOLLECTION IS THAT THERE IS NO SIGN – NO

13  DOCUMENT SIGNED BY YOU AND MR. PRATT THAT SETS FORTH THE TERMS OF

14  YOUR RELATIONSHIP?

15         A.     RIGHT. EXCEPT FOR THE CHECK AND THE COMPUTER-GENERATED

16  DEAL, I DON'T THINK THERE'S ANYTHING ELSE.

17  MR. STRATTON: WELL, I'D STIPULATE THAT THOSE ARE MORE INDICIA OF

18                 SOME SORT OF AN AGREEMENT AS OPPOSED TO A PARTNERSHIP

19                 AGREEMENT THAT—

20  MR. NEWBY: THERE—

21  MR. STRATTON: —I – I KNOW WHAT YOU'RE TRYING TO DRIVE AT.

22  WITNESS: I'M TRYING TO ANSWER IT AS BEST I CAN.

```
 1          Q.      (BY MR. NEWBY)  WELL—

 2          MR. STRATTON:  BUT I JUST DON'T WANT TO—WHAT WE DON'T WANT TO

 3                  DO IS, WE DON'T WANT TO AGREE THAT THERE AREN'T INDICIA

 4                  THAT—

 5          Q.      (BY MR. NEWBY)  DID—DID—DID YOU SIGN A PARTNERSHIP

 6  AGREEMENT WITH MR. PRATT?

 7          A.      NO.

 8          Q.      DID YOU AT ANY POINT HAVE A SECURITY AGREEMENT IN

 9  WRITING WITH MR. PRATT OR W.P.I.?

10          A.      NO.

11          Q.      AT ANY POINT IN TIME DID YOU RECEIVE A BILL OF SALE WITH

12  YOUR NAME REGARDING THIS COPY OF THE BILL OF RIGHTS?

13          A.      NO.

14          Q.      YOU PREVIOUSLY TESTIFIED THAT YOUR CHECK CAME FROM FIRST

15  NEW HAV—HAVEN CAPITAL CORPORATION.  WHO WOULD DETERMINE WHAT

16  DEPOSITS AND WHAT WITHDRAWALS WERE ATTRIBUTABLE TO EACH OF YOUR

17  CORPORATIONS?

18          A.      WELL, ULTIMATELY, I WOULD.

19          Q.      DO YOU HAVE A BOOKKEEPER OR AN ACCOUNTANT OR SOMEONE

20  WHO MAKES AN INITIAL DETERMINATION AS TO EACH DEPOSIT AND

21  WITHDRAWAL AS TO WHICH ENTITY TO ATTRIBUTE THAT TO?

22          A.      YEAH.  IN THIS CASE, IT'S VERY EASY.  IT'S AN ANTIQUE, SO IT
```

1    WOULD BE PERSONAL. THERE'S NO QUESTION. IT'S BEEN THAT WAY FOR

2    TWENTY YEARS.

3          Q.    WHO – WHO WOULD BE THE PERSON WHO INITIALLY MAKES THAT

4    DETERMINATION?

5          A.    WELL, I MADE IT. MY BOOKKEEPER KNOWS THAT I BUY ANTIQUES,

6    AND THAT THEY'RE PERSONAL. AND, YOU KNOW, THAT'S WHAT I TOLD THEM AND

7    THAT'S HOW IT'S BEEN FOR TWENTY YEARS.

8          Q.    SO, IS THE BOOKKEEPER A – AN EMPLOYEE OF FIRST NEW HAVEN

9    CAPITAL CORPORATION, OR DOES – DO YOU ALLOW AN ACCOUNTING FIRM TO DO

10   THAT?

11         A.    WELL, I'M NOT SURE I UNDERSTAND THE QUESTION.

12   MR. STRATTON: DO YOU HAVE A BOOKKEEPER THAT YOU EMPLOY?

13         A.    I HAVE A BOOKKEEPER, YES.

14         Q.    (BY MR. NEWBY) AND IS THAT BOOKKEEPER EMPLOYED BY FIRST

15   NEW HAVEN CAPITAL CORPORATION?

16         A.    I BELIEVE HE'S A MATTHEWS VENTURES HOLDINGS EMPLOYEE.

17         Q.    NOW, YOU FILED A VERIFIED STATEMENT OF INTEREST IN THIS

18   CASE, IS THAT CORRECT?

19         A.    YES, IT IS.

20         Q.    AND IN THAT VERIFIED STATEMENT OF INTEREST, DID YOU STATE

21   THAT YOU DENIED THAT IT IS – THAT THE SEIZED DOCUMENT REFERRED TO IN

22   THE CAPTION OF THIS PROCEEDING IS NOW OR EVER HAS BEEN PROPERTY OF THE

```
 1    STATE OF NORTH CAROLINA?

 2          A.      YEAH. I – ACTUALLY, HUBIE SANTOS, MY OTHER ATTORNEY, I

 3    THINK, CALLED ME WHEN THERE WAS A DAY LEFT OR MAYBE TWO DAYS LEFT TO

 4    FILE IF YOU HAD AN INTEREST IN THE DOCUMENT. AND SO I BELIEVE HE CALLED

 5    UP PAUL NEWBY – I BELIEVE HE CALLED UP YOU OR SOMEBODY – I'M NOT SURE –

 6    AND HAD THEM FAX WHAT WAYNE PRATT'S WAS. AND WE PRETTY MUCH AS

 7    COPIED WAYNE'S. WE TOOK IT UP AND I – I MARKED IT UP.

 8          WITNESS: I DON'T THINK I DID IT WITH YOU. I THINK I MARKED IT UP

 9                   WITH EITHER HUBIE—

10          MR. STRATTON: IF YOU'D JUST—

11          WITNESS: —OR MY OTHER LAWYER.

12          MR. STRATTON: ALL RIGHT. I'M GOING TO – I'M GOING TO STOP THE –

13                   STOP THE ANSWER RIGHT NOW BECAUSE YOU'RE GETTING INTO

14                   ATTORNEY-CLIENT PRIVILEGE. I DON'T WANT YOU TO WAIVE THE

15                   ATTORNEY-CLIENT PRIVILEGE.

16          WITNESS: OKAY.

17          MR. STRATTON: OKAY. AND YOU'RE – YOU'RE GETTING CLOSE. BUT YOUR

18                   CONVERSATIONS WITH YOU AND HUBIE, YOU AND OTHER

19                   ATTORNEYS—

20          WITNESS: OKAY.

21          MR. STRATTON: —YOU DON'T – YOU DON'T WANT TO GET INTO THAT.

22          WITNESS: OKAY.
```

1    Q.    (BY MR. NEWBY)  DO YOU STILL DENY THAT THE DOCUMENT NOW

2    OR EVER HAS BEEN THE PROPERTY OF THE STATE OF NORTH CAROLINA?

3    A.    THE BOTTOM LINE IS, I THINK THE STATEMENT, WHEN I WROTE IT,

4    FROM MY KNOWLEDGE, WHICH IS LIMITED – I'M NOT AN EXPERT – I DON'T KNOW

5    WHOSE DOCUMENT IT REALLY IS.  AND THAT'S WHY I WANTED THE COURT TO

6    DECIDE.  I DON'T KNOW IF IT REALLY WAS NORTH CAROLINA'S.

7    I ASKED MARY BETH THE OTHER DAY OFF THE RECORD, "IS THIS REALLY

8    NORTH CAROLINA'S?"  AND SHE SAID, "THERE'S TWO LETTERS THAT SOME

9    EXPERT SAID IT WAS."  BUT IN HER HEART OF HEARTS, SHE DOESN'T BELIEVE IT

10   IS NORTH CAROLINA'S.  SHE THINKS IT'S ANOTHER STATE'S.  SO, I REALLY DON'T

11   KNOW WHOSE IT IS.  I KNOW I LEGITIMATELY TRIED TO BUY HALF OF IT.  AND, YOU

12   KNOW, IN MY MIND, I, YOU KNOW, GAVE A HUNDRED THOUSAND DOLLARS

13   ($100,000.00) AND TOOK A CHANCE.  IT COULD HAVE BEEN A FAKE.  I HAVE NO

14   IDEA.

15   Q.    IF IN OPEN COURT YOUR ATTORNEY INDICATED THAT HE BELIEVED

16   THE DOCUMENT TO HAVE BEEN NORTH CAROLINA'S ORIGINAL COPY OF THE BILL

17   OF RIGHTS, WOULD YOU CONCEDE TO THAT?

18   A.    I MEAN, I WOULDN'T BECAUSE I DON'T THINK MIKE REALLY HAS

19   BEEN INVOLVED.  I MEAN, I TALKED TO THE GUYS THAT SUPPOSEDLY DID A

20   THOUSAND PAGES OF INVESTIGATIVE WORK ON IT, ME AND MARY BETH.

21   SO, I DON'T KNOW IF HE'S – IF HE SAID THAT IN OPEN COURT, IF HE WAS – YOU

22   KNOW, IF HE WAS IN THE HEAT OF THE MOMENT OR WHATEVER, I REALLY DON'T –

1    I DON'T KNOW HOW HE COULD MAKE THE DECISION BECAUSE HE HASN'T LOOKED

2    AT IT. HE'S NOT AN EXPERT. HE'D HAVE TO HIRE AN EXPERT TO LOOK AT IT AND

3    FIGURE IT OUT. I MEAN, I THINK IT'S A LITTLE BIT MORE COMPLICATED.

4         MR. NEWBY: LET'S GO OFF THE RECORD FOR JUST A MINUTE, PLEASE.

5              (THEREUPON, A BREAK WAS TAKEN

6              FROM 4:13 P.M. TO 4:14 P.M.)

7

8         MR. NEWBY: OKAY. I'M READY.

9    DIRECT EXAMINATION BY MR. NEWBY CONTINUES:

10        Q.    WHEN DID YOU FIRST LEARN OF THE ATTEMPTED TRANSACTION

11   ON MARCH THE 18TH?

12        A.    WAYNE PRATT WAS ON A SKI TRIP, AND HE CALLED ME UP AND

13   SAID, BOB, REMEMBER, I TOLD YOU WE WERE GOING TO SELL THAT TO A

14   MUSEUM? WELL, THE F.B.I. CAME IN AND THE -- THE AGENT WASN'T A REAL

15   AGENT. THEY PRETENDED THERE WAS AN INVESTOR, AND THEY JUST SEIZED THE

16   DOCUMENT, WHICH, INCIDENTALLY, IS THE FIRST TIME THAT I REALLY KNEW IN

17   MY HEART THAT THAT WAS AN ORIGINAL BILL OF RIGHTS, ONLY AT THAT POINT.

18        Q.    DO YOU KNOW HOW MANY DAYS AFTER MARCH 18TH THAT WAS

19   THAT YOU RECEIVED THAT PHONE CALL?

20        A.    OH, I THINK IT WAS -- IT COULD HAVE BEEN ON MARCH 18TH, AND

21   IT COULD HAVE BEEN THE NEXT DAY. I THOUGHT IT -- I THOUGHT IT WAS VERY

22   SOON BECAUSE HE SAID IT JUST HAPPENED. SO, I -- MAYBE IT WAS THE NEXT

1    DAY, BUT I ACTUALLY THOUGHT IT MIGHT HAVE EVEN BEEN THAT DAY.

2           Q.    BUT YOU'RE NOT SURE?

3           A.    I'M NOT SURE.

4           Q.    ALL RIGHT.  NOW, THE DOCUMENTS THAT YOU PRODUCED

5    PURSUANT TO THE SUBPOENA—

6           MR. NEWBY:  DID — DID WE MARK THESE ALREADY?

7           VIDEOGRAPHER:  OFF THE RECORD.

8           MR. NEWBY:  YES.

9                        (THEREUPON, THERE WAS AN

10                     OFF-THE-RECORD DISCUSSION

11                     WHICH WAS NOT REPORTED

12                     BY THE COURT REPORTER.)

13           MR. NEWBY:  OKAY.  BACK ON THE RECORD.

14           Q.    (BY MR. NEWBY) OKAY.  WHEN DID YOU COME INTO POSSESSION

15    OF THE DOCUMENTS THAT HAVE BEEN LABELED EXHIBIT 1, THE GROUP OF

16    DOCUMENTS?

17           A.    AS I SAID BEFORE, IT WAS EITHER THE NEXT DAY OR THE DAY

18    AFTER THAT.  IN OTHER WORDS, ONE DAY OR TWO DAYS LATER AFTER THE

19    DOCUMENT WAS SEIZED, I WENT OVER TO MARY BETH AND, YOU KNOW,

20    BASICALLY SAID, "WHAT THE HELL'S GOING ON?"  AND, YOU KNOW, I SAID, "I

21    THOUGHT YOU HIRED THIS GUY, JOHN RICHARDSON, TO MAKE SURE EVERYTHING

22    WAS DONE RIGHT.  HE DID A THOUSAND PAGES OF, YOU KNOW, HOMEWORK ON

1    THIS. AND – AND I'M SURE I WAS UPSET. AND THAT'S WHEN SHE SHOWED ME

2    THESE.

3         Q.    AND GAVE YOU COPIES OF THESE, I ASSUME?

4         A.    YES.

5         Q.    AND CAN YOU IDENTIFY WHAT THE FIRST DOCUMENT IS?

6         A.    IT LOOKS LIKE AN ENGAGEMENT LETTER FROM JOHN RICHARDSON

7    IN '95.

8         Q.    AND DOES YOUR NAME APPEAR ANYWHERE IN THAT DOCUMENT?

9         A.    NO.

10        Q.    AND THE ENGAGEMENT LETTER IS TO WAYNE PRATT OR WAYNE

11   PRATT, INC., IS THAT CORRECT?

12        A.    YES.

13        Q.    THE SECOND DOCUMENT, CAN YOU TELL ME WHAT THAT IS?

14        A.    LOOKS LIKE AN UNSIGNED LETTER FROM WAYNE PRATT.

15        Q.    TO MR. TILLOU?

16        A.    YES.

17        Q.    DOES MR. PRATT MAKE ANY REFERENCES IN THAT LETTER TO YOU

18   BEING INVOLVED IN THE PURCHASE OF THE DOCUMENT?

19        A.    NO.

20        Q.    CAN YOU TELL ME WHAT THE NEXT LETTER IS?

21        A.    LOOKS LIKE A LEGAL BILL FROM JOHN RICHARDSON.

22        Q.    TO MR. PRATT AND WAYNE PRATT, INC.?

1        A.     TRUE.

2        Q.     DOES YOUR -- YOUR NAME APPEAR ANYWHERE IN THAT

3 DOCUMENT?

4        A.     NO.

5        Q.     OKAY. CAN YOU TELL ME WHAT THE NEXT DOCUMENT IS?

6        A.     I DON'T KNOW. IT LOOKS LIKE SOMEBODY WROTE SOME KIND OF

7 AN AGREEMENT ON WHAT WOULD HAPPEN IF IT WAS SOLD.

8        Q.     AND THIS WAS GIVEN TO YOU AT THE SAME TIME ALL THESE

9 OTHER DOCUMENTS WERE GIVEN TO YOU?

10       A.     YES.

11       Q.     BY MARY BETH KEENE?

12       A.     YES.

13       Q.     AND DID SHE REPRESENT TO YOU WHAT THESE FIGURES

14 INDICATED?

15       A.     I MEAN, I THINK WE TALKED ABOUT THE LAWYER. I THINK I WAS

16 PROBABLY GOING ON ABOUT HOW RIDICULOUS I THOUGHT IT WAS THAT THE

17 LAWYER WAS GOING TO MAKE TWO AND A HALF MILLION DOLLARS AND HOW I

18 HOPED THAT HIS THIRTY PERCENT CAME OUT OF WAYNE'S PART AND NOT OUT OF

19 MY -- MY HALF. AND I'M SURE I WAS PROBABLY BITCHING ABOUT PETER TILLOU

20 GETTING A MILLION DOLLARS.

21       Q.     DID SHE AT THAT POINT -- I MEAN, HOW DID THIS DOCUMENT

22 COME TO BE GENERATED?

1    A.    I HAVE NO IDEA.

2    Q.    SO, THIS IS SOMETHING THAT SHE JUST HAD SOMEWHERE AND

3   SHOWED TO YOU?

4    A.    YEAH. SHE HAD IT THERE AND SHE GAVE IT TO ME.

5    Q.    DID SHE GO OVER IT WITH YOU?

6    A.    TO THE EXTENT THAT I WAS COMPLAINING ABOUT RICHARDSON'S

7   FEES.

8    Q.    WHAT'S THE NEXT DOCUMENT?

9    A.    LOOKS LIKE ANOTHER ENGAGEMENT LETTER WHEN JOHN

10   RICHARDSON MOVED FIRMS.

11    Q.    AND GOING BACK TO THE DOCUMENT WITH THE FINANCIAL

12   FIGURES ON IT, DO YOU SEE A BREAKDOWN WITH REGARD TO PERCENTAGES AT

13   THE BOTTOM?

14    A.    NO.

15    Q.    AND THEN THE FINAL TWO DOCUMENTS, WHAT ARE THEY?

16    A.    AN ARTICLE SHE GAVE ME TO TELL ME ABOUT THIS GUY, SETH

17   KALLER, AND THIS WHOLE CONSTITUTION CENTER, WHAT WAS GOING ON.

18    Q.    AND THAT IS THE FIRST TIME YOU'D SEEN ANY OF THESE

19   DOCUMENTS?

20    A.    YES.

21    MR. NEWBY: GO OFF THE RECORD, PLEASE.

22            (THEREUPON, THERE WAS AN

1          (OFF-THE-RECORD DISCUSSION

2          WHICH WAS NOT REPORTED

3          BY THE COURT REPORTER)

4     MR. NEWBY: OKAY. THAT'S ALL FOR THE GOVERNMENT AT THIS POINT.

5     MR. STRATTON: OKAY. ANYBODY ELSE WANT TO GO?

6     MR. KELLEY: I DON'T HAVE ANY QUESTIONS AT THIS TIME, BUT THE

7          STATE WOULD RESERVE THE RIGHT TO DEPOSE MR. MATTHEWS

8          AT A LATER DATE ON ISSUES OUTSIDE THE SCOPE OF THIS

9          DEPOSITION, IF NECESSARY.

10    MR. STRATTON: ABSOLUTELY.

11    MR. GALVIN: I HAVE SOME QUESTIONS BUT I'M DYING TO GO TO THE

12         BATHROOM. CAN WE TAKE TEN-MINUTE BREAK?

13          (THEREUPON, A BREAK WAS TAKEN

14          FROM 4:21 P.M. TO 4:31 P.M.)

15    MR. GALVIN: GOOD AFTERNOON, MR. MATTHEWS. MY NAME IS MICHAEL

16         GALVIN. I'M ONE OF THE ATTORNEYS FOR WAYNE PRATT. JUST A

17         FEW QUESTIONS TO FOLLOW UP WITH MR. NEWBY'S

18         EXAMINATION.

19    CROSS-EXAMINATION BY MR. GALVIN:

20         Q.    MY UNDERSTANDING OF THE BASIS OF YOUR CLAIM IN THIS CASE

21    IS THAT YOU ALLEGE AN OWNERSHIP INTEREST IN THE DEFENDANT, IS THAT

22    CORRECT?

1      A.      YES, A FIFTY PERCENT ONE.

2      Q.      WHAT'S YOUR BASIS FOR THAT?

3      A.      A HUNDRED THOUSAND DOLLARS -- MY BASIS IS A HUNDRED

4   THOUSAND DOLLARS ($100,000.00) THAT I PAID.

5      Q.      ANYTHING OTHER THAN THE HUNDRED THOUSAND DOLLARS

6   ($100,000.00)?

7      MR. STRATTON:  OBJECTION TO THE QUESTION.  IT'S BROAD, AMBIGUOUS.

8      A.      NO, THE -- THE CONSIDERATION WAS THE MONEY, THE HUNDRED

9   THOUSAND DOLLARS ($100,000.00).

10     Q.      (BY MR. GALVIN)  AND IT'S BASED ON -- ON -- ON THIS THAT

11  YOU'RE -- YOU FILED THE VERIFIED STATEMENT OF INTEREST CLAIMING AN

12  OWNERSHIP INTEREST IN THE DOCUMENT, JUST SO I'M CLEAR?

13     A.      YES.

14     Q.      HAVE YOU EVER DENIED THAT YOU HAD AN OWNERSHIP INTEREST

15  IN THIS DOCUMENT?

16     MR. STRATTON:  I OBJECT TO THE QUESTION.  MR. GALVIN, WHAT --

17            WHAT -- ON WHAT PLEADING OR WHAT BASIS--

18     MR. GALVIN:  I'M ASKING A DIRECT QUESTION.

19     MR. STRATTON:  --ARE YOU ASKING THESE QUESTIONS?

20     MR. GALVIN:  I'M ASKING HIM A DIRECT QUESTION.

21     MR. STRATTON:  ON WHAT PLEADING OR BASIS DOES YOUR CLIENT HAVE

22            A RIGHT TO ASK THESE QUESTIONS OF MR. MATTHEWS?

Case 5:03-cv-00204-BO   Document 73   Filed 09/10/03   Page 80 of 109

1        MR. GALVIN: WE'RE A PARTY TO THIS CASE. AND I'D PREFER AN ANSWER,

2        UNLESS YOU'RE INSTRUCTING HIM NOT TO ANSWER THE

3        QUESTION. AND IF YOU ARE, I'M GOING TO THE JUDGE.

4        MR. STRATTON: WHAT'S – WHAT'S – WHAT'S THE BASIS? WHAT'S –

5        WHAT'S THE –

6        MR. GALVIN: I DON'T HAVE TO EXPLAIN THE BASIS FOR IT. ARE YOU

7        INSTRUCTING YOUR CLIENT NOT TO ANSWER?

8        MR. STRATTON: IS THIS – IS – IS THE BASIS – IS THE BASIS SOME DEAL

9        THAT YOU HAVE ON THE CRIMINAL SIDE THAT YOU'RE TRYING TO

10        GAIN AN ADVANTAGE IN THE CRIMINAL ACTION BY – BY PUTTING

11        MY CLIENT AT A DISADVANTAGE IN THE CIVIL ACTION, BECAUSE IF

12        THAT'S WHAT YOU'RE DOING, MR. GALVIN, YOU'RE GOING TO GET

13        GRIEVED. YOU UNDERSTAND ME?

14        MR. GALVIN: ARE YOU INSTRUCTING YOUR CLIENT NOT TO ANSWER?

15        MR. STRATTON: YOU ANSWER MY QUESTION, FIRST.

16        MR. GALVIN: NO. ARE YOU INSTRUCTING YOUR CLIENT NOT TO ANSWER?

17        MR. STRATTON: ARE YOU MOVING TO HAVE MR. MATTHEWS' CLAIM

18        DISMISSED?

19        MR. GALVIN: ARE YOU INSTRUCTING YOUR CLIENT NOT TO ANSWER THE

20        QUESTION?

21        MR. STRATTON: YES, I AM.

22        MR. GALVIN: OKAY. CAN WE – WELL, I'M GOING TO NOTE MY OBJECTION

```
 1              HERE.  WHY DON'T WE TAKE A BREAK AND I'LL COME BACK ON THE
 2              RECORD.
 3                      (THEREUPON, A BREAK WAS TAKEN
 4                      FROM 4:33 P.M. TO 4:39 P.M.)
 5      MR. GALVIN:  BACK ON THE RECORD.  I HAVE LOCAL COUNSEL WITH ME,
 6              HUGH STEVENS, WHO WOULD LIKE TO MAKE A STATEMENT.
 7      MR. STEVENS:  LET ME JUST SAY SOMETHING FOR THE RECORD,
 8              MR. STRATTON.  REALIZING THAT YOU ARE NOT FAMILIAR WITH
 9              THE RULES AND TRADITIONS AND PRACTICES IN THIS DISTRICT, I
10              WANT TO SAY FOR THE RECORD THAT THE KIND OF SPEAKING
11              OBJECTIONS, AND OBJECTIONS – INSTRUCTIONS CLOAKED IN THE
12              GUISE OF OBJECTIONS THAT YOU WERE MAKING BEFORE ARE
13              CLEARLY IMPROPER IN THIS DISTRICT.
14      IT'S ALSO CONSIDERED TO BE IMPROPER FOR A LAWYER TO CONSULT
15              WITH OR DISCUSS THE SUBSTANCE OF TESTIMONY WITH A
16              WITNESS WHILE A DEPOSITION IS IN PROGRESS.  AND FOR THAT
17              REASON, WE CONSIDER THAT THE OBJECTIONS THAT YOU MADE
18              BEFORE ARE NOT ONLY IMPROPER IN TERMS OF THEIR MERIT, BUT
19              ARE FRAMED IN A WAY THAT IS NOT CONSISTENT WITH THE
20              PRACTICE IN THIS DISTRICT.
21      AND IF YOU ARE GOING TO MAKE OBJECTIONS IN THE FUTURE, I WOULD
22              REQUEST THAT YOU MAKE THEM IN A PROPER, NEUTRAL FORM.
```

1        SO, THAT'S ALL I WANT TO SAY AS LOCAL COUNSEL. I THINK
2        EVERYONE WHO'S PRACTICED IN THIS DISTRICT IS FAMILIAR
3        WITH THE – THE WAY WE GENERALLY CONDUCT DEPOSITIONS
4        HERE.
5    MR. STRATTON: I'M RATHER SURPRISED BECAUSE I – I HAVEN'T HAD
6        ANYBODY COMPLAIN ABOUT MY OBJECTIONS UNTIL NOW. I – I
7        CERTAINLY WOULD HAVE TAKEN ANYBODY'S COMPLAINTS ABOUT
8        MY OBJECTIONS VERY SERIOUSLY, IF – IF – UP TO THIS POINT
9        IN THE DEPOSITION, AFTER AN HOUR AND A HALF, SOMEBODY HAD
10       SAID, MR. STRATTON, WE FIND YOUR CONDUCT TO BE IMPROPER, I
11       WOULD HAVE BEEN VERY THOUGHTFULLY – THOUGHTFULLY
12       CONSIDERED MY POSITION, AND – AND – AND PERHAPS DONE
13       SOMETHING DIFFERENT.
14   BUT I DON'T – I DON'T RECALL DOING ANYTHING IMPROPER OR IN
15       VIOLATION OF THE FEDERAL RULES OF CIVIL PROCEDURE. AND
16       THERE'S NO LOCAL RULES THAT ARE ANY DIFFERENT THAN THE
17       FEDERAL RULES OF CIVIL PROCEDURE IN THE EASTERN DISTRICT
18       OF NORTH CAROLINA, BECAUSE I'M VERY FAMILIAR WITH THOSE
19       RULES, AND I HAVE A COPY SITTING ON MY DESK.
20   SO MY ONLY OBJECTION THAT I THINK YOU OBJECT TO IS THE FACT I'M
21       NOT GOING TO ALLOW MR. GALVIN TO ASK QUESTIONS OF
22       MY CLIENT.

1     MR. STEVENS: NOW, LET ME SAY – LET ME SAY, IT'S NOT – IT'S NOT

2          THAT. IT – IT'S THE – IT IS THE – IT IS THE MANNER IN WHICH YOU

3          PROPOUNDED YOUR PROPOSED OBJECTIONS AND MADE OTHER

4          STATEMENTS ON THE RECORD, WHICH WE CONSIDER TO BE

5          IMPROPER AND NOT DONE IN – IN ACCORDANCE WITH THE

6          PRACTICE IN THIS DISTRICT.

7     MR. STRATTON: WHICH – WHICH ONES?

8     MR. GALVIN: WELL, LET – LET'S – LET'S BACK UP.

9     MR. STEVENS: LET'S GO AHEAD. LET'S—

10    MR. STRATTON: WELL, NEVER MIND. WHICH ONES?

11    WITNESS: WELL, WHATEVER YOU DID – WHATEVER, JUST – LET'S JUST

12         FINISH THIS CIVILLY AND—

13    MR. STRATTON: LET'S GO AHEAD, THEN.

14    MR. GALVIN: WHY DON'T WE START AGAIN.

15   <u>CROSS-EXAMINATION BY MR. GALVIN CONTINUES:</u>

16    Q.    THE BASIS FOR THE CLAIM THAT YOU'VE TAKEN IN YOUR VERIFIED

17  STATEMENT IS YOUR ALLEGED OWNERSHIP CLAIM IN THE DEFENDANT, IS THAT

18  RIGHT?

19    MR. STRATTON: OBJECTION. IT'S NOT BEEN ALLEGED IN THE – ON

20         THE VERIFIED STATEMENT OF INTEREST.

21    A.    I DON'T THINK THERE'S ANY QUESTION ABOUT I BOUGHT—

22    Q.    CAN YOU ANSWER THE QUESTION?

1    A.    --FIFTY PERCENT OF THE BILL OF RIGHTS. I DON'T -- REALLY DON'T

2    THINK IT'S A QUESTION. I MEAN, DID I -- WAS I INVESTOR WHEN I DID IT? YES.

3    DID I, YOU KNOW, RUN WITH THE DOCUMENT? DID I SIGN THE BILL OF SALE? DID

4    I DO ANY OF THAT? NO, JUST LIKE I NEVER DID ANY OF THE STUFF WITH WAYNE.

5    WHEN HE ASKED ME THE QUESTIONS, I MADE IT CLEAR. I MEAN, I'M -- I'M -- I'M A

6    PASSIVE INVESTOR IN THE SENSE THAT I INVESTED FIFTY PERCENT IN IT, BUT I

7    DIDN'T TELL WAYNE WHEN TO SELL IT OR WHO TO SHOW IT TO OR WHO AN

8    EXPERT IS OR ANYTHING LIKE THAT.

9    Q.    OKAY. AND PART OF YOUR CLAIM IS ALSO THAT YOU HAVE AN

10   OWNERSHIP INTEREST IN THE DOCUMENT AT THIS TIME?

11   A.    YES, BECAUSE WHEN WE DID THE DEAL, HE GAVE ME A PIECE OF --

12   THERE WAS A COMPUTER PAPER THAT SAID DOCUMENT, FIFTY PERCENT, BOB,

13   FIFTY PERCENT, WAYNE--

14   Q.    MY QUES -- THANK YOU.

15   A.    --SORRY.

16   Q.    HAVE YOU EVER TOLD ANYONE THAT YOU DON'T -- DO NOT HAVE

17   AN OWNERSHIP INTEREST IN THIS DOCUMENT?

18   A.    I TOLD WAYNE, AND I CAME DOWN HERE FURTHER WITH THIS

19   GENTLEMAN.

20   Q.    WHICH GENTLEMAN ARE YOU REFERRING TO?

21         (THEREUPON, WITNESS POINTS.)

22   Q.    MR. HIGDON?

Case 5:03-cv-00204-BO   Document 75   Filed 09/10/03   Page 85 of 109

1      A.      MR. HIGDON, SORRY.

2      Q.      THE RECORD SHOULD REFLECT THAT HE – THAT HE POINTED OUT—

3      A.      SORRY, BOB. IF IT'S MY NAME, I CAN REMEMBER.

4      Q.      —ROBERT HIGDON OF THE UNITED STATES ATTORNEY'S OFFICE

5   HERE IN RALEIGH.

6      A.      YES—

7   MR. STRATTON:  WITH THE CRIMINAL DIVISION.

8      A.      —AND I TOLD HIM – I BELIEVE WHAT I TOLD HIM TODAY, EVEN

9   THOUGH I KNOW MORE TODAY THAN I KNEW BACK THEN. I'VE LEARNED A LOT

10  SINCE I DID THE FIRST DEPOSITION.

11     Q.      WHAT DID YOU TELL MR. HIGDON?

12     A.      I TOLD HIM THAT I HAVE A FIFTY PERCENT INTEREST IN IT AND

13  THAT I INVESTED A HUNDRED AND FIFTY THOUSAND DOLLARS ($150,000.00), GOT

14  BACK FIFTY THOUSAND DOLLARS ($50,000.00), AND I HAVE HALF OF THE

15  DOCUMENT—

16     Q.      AND IS THAT—

17     A.      —BUT NOT THAT IT WAS IN MY NAME AND NOT THAT I RAN WITH

18  IT; COMPLETELY CONSISTENT WITH HOW I'VE DONE DEALS WITH WAYNE IN THE

19  PAST.

20     Q.      AND MY QUESTION IS, HAVE YOU TOLD PEOPLE SOMETHING

21  DIFFERENT OR THAT YOU ARE NOT AN OWNER OF THIS DOCUMENT?

22     A.      WELL, I THINK THAT'S FOR THE COURTS TO FIGURE OUT, IF I'M AN

1   OWNER. THERE'S A FINE LINE – I KNOW THAT WAYNE PRATT, INC., BOUGHT IT. I

2   MEAN, CONSCIOUSLY, I KNOW THAT. AND I'M NOT AN OWNER IN THAT SENSE,

3   THAT WAYNE PRATT, INC., BOUGHT IT WITH HIS CORPORATION AND I DIDN'T BUY

4   IT. IT DOESN'T SAY A BILL OF RIGHTS – I MEAN, EXCUSE MY PUN – IT DOESN'T

5   SAY A BILL OF SALE TO BOB MATTHEWS AND WAYNE PRATT. BUT I ALWAYS

6   KNEW FROM EVER THAT I GAVE A HUNDRED THOUSAND DOLLARS ($100,000.00)

7   AND THAT I HAD FIFTY PERCENT OF IT. I MEAN, THAT WAS ALWAYS THE CASE.

8        Q.    LET'S – LET'S SEE IF YOU CAN ANSWER THE QUESTION, THOUGH.

9   HAVE YOU TOLD PEOPLE THAT YOU ARE NOT AN OWNER OF THE DEFENDANT?

10       A.    I DON'T THINK I EVER SAID I DIDN'T OWN THE DEFENDANT.

11       Q.    OWN THE DOCUMENT, THE BILL OF RIGHTS?

12       A.    I THINK EVERYBODY THAT I'VE TALKED TO, I ALWAYS SAID, I HAVE

13   FIFTY PERCENT OF THE UP SIDE. I PUT UP A HUNDRED THOUSAND DOLLARS

14   ($100,000.00). I PUT UP A HUNDRED AND FIFTY. I GOT FIFTY BACK. THAT I HAD A

15   HUNDRED THOUSAND DOLLARS ($100,000.00) ON IT BUT THAT I DIDN'T LEGALLY

16   HAVE TITLE TO IT IN MY – YOU KNOW, IN MY NAME. I NEVER TOOK TITLE LIKE

17   THAT, JUST LIKE ANY OF THE OTHER THINGS WE DID.

18       Q.    DO YOU RECALL TELLING PEOPLE THAT YOU WERE NOT THE

19   OWNER?

20       A.    I DON'T – I – WAYNE AND I HAD AN ARGUMENT, AND MARY BETH,

21   AND I HAD AN ARGUMENT WHEN I WENT OVER ON THE SECOND DAY. AND I SAID,

22   "WHAT DID YOU GUYS GET ME INTO? I GET HALF A DOCUMENT. YOU DIDN'T

1    CHECK IT OUT?" AND I KNOW I SCREAMED AT THEM AND SAID, I'M NOT GOING

2    TO -- YOU KNOW, I DIDN'T DO ANYTHING WRONG. I'M A PASSIVE INVESTOR. YOU

3    GUYS HIRED THE LAWYER. YOU HIRED THE EXPERTS. I'VE DEPENDED ON YOU FOR

4    YOUR EXPERT OPINION ON WHAT IT IS. YOU KNOW, I DIDN'T KNOW, LIKE I SAID,

5    IT WAS EVEN ORIGINAL UNTIL THE THING GOT SEIZED.

6         Q.    AND DID YOU TELL MS. KEENE DURING THAT CONVERSATION THAT

7    YOU WERE NOT AN OWNER?

8         A.    I DON'T RECALL EVER SAYING I WASN'T AN OWNER. I ALWAYS

9    ADMITTED I WAS AN OWNER THROUGH MY INVESTMENT MONEY. I MEAN, I THINK

10   THAT WAS NEVER A QUESTION.

11        Q.    DO YOU RECALL TELLING MS. KEENE THAT YOU WERE NOT A

12   PARTNER IN THE DEAL?

13        A.    I DON'T KNOW IF I EVER TOLD HER THAT I WASN'T A PARTNER. I

14   MEAN, I THINK MARY BETH KNOWS. I TALKED TO MARY BETH FOUR DAYS AGO,

15   AND I SAID, "MARY BETH, THERE'S A DOCUMENT YOU HAVE. YOU MAKE SURE

16   YOU BRING IT DOWN THERE BECAUSE I DON'T HAVE A COPY OF IT." AND SHE

17   SAID, "OH, NO, BOB. I'LL BRING THAT DOCUMENT DOWN. DON'T WORRY." I GO,

18   "MARY BETH, IS THERE ANY QUESTION THAT I WON'T HAVE THE DOCUMENT?"

19   SHE SAID, "NO, THERE'S NO QUESTION THAT YOU WON'T HAVE THE

20   DOCUMENT, BOB."

21        Q.    AND WHEN WAS THIS CONVERSATION?

22        A.    IN THE LAST WEEK.

1       Q.      OKAY. LET'S BACK UP TO SHORTLY AFTER THE SEIZURE THAT

2   TOOK PLACE IN THIS CASE. DO YOU RECALL HAVING A CONVERSATION WITH

3   MS. KEENE?

4       A.      I RECALL YELLING, "WHAT DID YOU GUYS GET ME INTO," AND

5   BLAH, BLAH, BLAH -- THE CONVERSATION I JUST REPEATED.

6       Q.      AND DURING THAT CONVERSATION, DO YOU RECALL TELLING

7   MS. KEENE --

8       A.      I DON'T --

9       Q.      LET ME FINISH THE QUESTION --

10      A.      GO AHEAD.

11      Q.      -- AND THEN YOU CAN ANSWER. DO YOU RECALL TELLING

12  MS. KEENE THAT YOU WERE NOT A PARTNER IN THIS DEAL?

13      A.      I DON'T RECALL IF I EVER USED THOSE WORDS --

14      Q.      DO YOU --

15      A.      -- I THINK I ALWAYS -- WHEN I SPOKE TO HER, I ALWAYS SAID,

16  LOOK, I MEAN --

17      MR. STRATTON: IF THERE IS, YOU DON'T RECALL.

18      WITNESS: OKAY.

19      Q.      (BY MR. GALVIN) DO YOU RECALL TELLING HER THAT YOU WERE

20  ONLY AN INVESTOR IN THIS DEAL?

21      A.      WELL, I THINK I AM, TO THE BEST OF --

22      MR. STRATTON: DO YOU RECALL OR -- DO YOU RECALL?

Case 5:03-cv-00204-BO   Document 79   Filed 09/10/03   Page 89 of 109

1        A.     --I THINK -- I'M SURE I SAID I WAS AN INVESTOR IN THE DEAL,

2 ABSOLUTELY.

3        Q.     (BY MR. GALVIN) DO YOU RECALL TELLING HER THAT YOU WERE

4 ONLY AN INVESTOR AND NOT A PARTNER?

5        A.     NO. I THINK, IN MY MIND, IT ALWAYS WAS THE SAME. WAYNE

6 PRATT WAS IN A SENSE LIKE A GENERAL PARTNER WHERE HE RAN THE DEAL

7 AND I THINK THERE WAS NEVER ANY QUESTION -- IF YOU BROUGHT MARY BETH

8 IN HERE -- THAT I HAD HALF OF THE DOCUMENT. BUT DID I OWN IT? MAYBE I

9 DON'T OWN IT LEGALLY. I DON'T KNOW.

10        Q.     I'M JUST ASKING -- I'M JUST ASKING RIGHT NOW WHAT YOU

11 RECALL TODAY HAVING TOLD MARY BETH IN THIS INITIAL CONVERSATION WHEN

12 YOU WENT TO SEE HER SHORTLY AFTER THE SEIZURE TOOK PLACE. OKAY?

13        A.     RIGHT.

14        Q.     JUST IN THAT CONVERSATION, DO YOU RECALL TELLING MARY

15 BETH THAT YOU WERE NOT A PARTNER?

16        A.     I DON'T RECALL EXACT -- I DON'T RECALL WHAT I SAID.

17        MR. STRATTON: THAT'S ENOUGH.

18        Q.     (BY MR. GALVIN) DO YOU RECALL SPEAKING WITH WAYNE AT OR

19 ABOUT THAT -- MR. PRATT AT OR ABOUT THAT TIME?

20        A.     HE WAS OUT SKIING, SO I DIDN'T SPEAK TO HIM. I SPOKE TO HIM

21 LATER ON.

22        Q.     WHEN?

1       A.    I THINK THE TIME WHEN I TALKED TO YOU ON THE TELEPHONE

2       Q.    WHEN WAS THIS?

3       A.    HE WAS THERE, WHEN I TALKED TO YOU AND YOUR SENIOR

4 PARTNER.

5       Q.    AND DO YOU -- DO YOU RECALL HAVING A DISCUSSION WITH

6 MR. PRATT ABOUT YOUR POSITION WITH RESPECT TO YOUR ALLEGED OWNERSHIP

7 CLAIM?

8       A.    YEAH. AND WAYNE ALWAYS SAID, "BOB, YOU HAVE TO TELL THE

9 TRUTH." HE SAID THAT'S THE BIGGEST THING HE LEARNED ABOUT DEPOSITIONS,

10 MAKE SURE YOU TELL THE TRUTH.

11       Q.    AND DID -- DID YOU TELL HIM THAT YOU WERE NOT AN OWNER OF

12 THIS DOCUMENT?

13       A.    NO. I THINK WHAT I TOLD HIM WAS THAT, WAYNE, YOU DID THIS

14 DEAL. YOU BOUGHT IT. I GAVE YOU HALF THE MONEY. YOU WERE RUNNING WITH

15 THE DEAL. AND WHAT DID YOU DRAG ME INTO WITH THIS WHOLE MESS? THAT'S

16 WHAT -- THAT'S WHAT THE DISCUSSION WAS.

17       Q.    SO, IS THE ANSWER, NO, THAT YOU DIDN'T TELL WAYNE THAT YOU

18 WERE NOT AN OWNER?

19       A.    THE ANSWER IS, I DON'T REMEMBER SPECIFICALLY SAYING, "OH,

20 I'M NOT A PARTNER AND, NO, I DON'T OWN FIFTY PERCENT." I KNOW I NEVER

21 SAID I DON'T OWN FIFTY PERCENT OF IT. I KNOW THAT FOR A FACT.

22       Q.    YOU KNOW THAT YOU DID NOT SAY THOSE WORDS?

1    A.    I NEVER, EVER SAID, "I DO NOT OWN FIFTY PERCENT OF IT."

2    Q.    DID YOU EVER SAY THAT YOU – YOU'RE NOT A PARTNER IN THE

3    DEAL?

4    A.    I DON'T RECALL EVER SAYING I'M NOT A PARTNER IN THE SENSE

5    OF—

6    MR. STRATTON:  THAT'S ENOUGH.  YOU'VE ANSWERED.

7    Q.    (BY MR. GALVIN)  AT ANY OTHER POINT IN TIME, DO YOU RECALL

8    TELLING ANYONE ELSE THAT YOU WERE NOT A PARTNER OR AN OWNER OF THIS

9    DOCUMENT?

10   A.    NO, I DON'T THINK I EVER SAID I DIDN'T OWN HALF OF IT.  JUST

11   FOR THE RECORD, I ALWAYS MAINTAINED I PUT UP A HUNDRED THOUSAND

12   DOLLARS ($100,000.00) AND HAD HALF OF IT.

13   MR. STRATTON:  THAT'S ENOUGH.  YOU ANSWERED THE QUESTION.

14   Q.    (BY MR. GALVIN)  YOU MENTIONED A MEETING THAT YOU HAD

15   DOWN HERE WITH MR. HIGDON—

16   A.    RIGHT.

17   Q.    —DID YOU TELL MR. HIGDON IN THAT CONVERSATION THAT YOU

18   WERE NOT AN OWNER OF THIS DOCUMENT?

19   A.    I DON'T KNOW THE EXACT WORDS THAT I SAID TO MR. HIGDON

20   WHEN I CAME DOWN THE FIRST TIME

21   Q.    DO YOU REMEMBER TELLING MR. HIGDON THAT YOU WERE NOT A

22   PARTNER?

1      A.    I REMEMBER TELLING HIM THAT I HAD FIFTY PERCENT OF THE

2 UPSIDE, CLEARLY. I REMEMBER IN THE LAST TIME – THOSE SPECIFIC WORDS ON

3 THE DOCUMENT.

4      Q.    LET'S JUST – TRY TO FOCUS ON MY QUESTION. I'M JUST TRYING

5 TO FIND OUT IF YOU SAID THESE WORDS, THAT YOU WERE NOT A PARTNER IN THE

6 TRANSACTION THAT RESULTED IN THE PURCHASE.

7      MR. STRATTON: IF HE RECALLS SAYING HE WAS NOT A PARTNER—

8      MR. GALVIN: YES.

9      MR. STRATTON: —TO MR. HIGDON?

10      Q.    (BY MR. GALVIN) THAT'S RIGHT, IF YOU RECALL SAYING THIS?

11      A.    I DON'T KNOW IF I SAID I'M NOT A PARTNER OR NOT.

12      Q.    YOU JUST HAVE NO MEMORY OF THAT?

13      A.    I JUST DON'T REMEMBER THE EXACT WORDS, HOW I SAID IT. I

14 KNOW IT WAS CLEAR.

15      MR. STRATTON: FINE.

16      Q.    (BY MR. GALVIN) TO THE BEST OF YOUR MEMORY, WHAT DID YOU

17 SAY?

18      MR. STRATTON: TO MR. HIGDON DURING THE TWO-HOUR MEETING?

19      MR. GALVIN: YES.

20      MR. STRATTON: THAT – I OBJECT TO THE QUESTION.

21      A.    WELL, I TOLD HIM HOW I BOUGHT IT, WHAT I TOLD YOU GUYS

22 TODAY. I TOLD HIM THAT WAYNE ONCE WANTED TO SELL IT TO YALE. I TOLD HIM

1    ABOUT THAT. I TOLD HIM THAT HE ONCE WANTED TO SELL IT TO THE CHAIRMAN

2    OF FORD. THOSE WERE THE THREE TIMES THAT I KNEW HE WANTED TO -- TO SELL

3    IT.

4         Q.    WELL, MAYBE TURNING NOW JUST A LITTLE BIT. WHAT DID YOU

5    TELL HIM -- TELL MR. HIGDON WITH RESPECT TO YOUR ALLEGED OWNERSHIP OR

6    PARTNERSHIP INTEREST IN THE DOCUMENT?

7         A.    I TOLD HIM THAT I PLAYED A PASSIVE ROLE. THAT I DID NOT GO

8    AND HAVE POSSESSION OF THE DOCUMENT. THAT I DID NOT GO AND BRING IT TO

9    AN EXPERT. THAT I DID NOT TRY TO SELL IT. THAT WAYNE RAN THE DEAL, AND

10   THAT I WAS A PASSIVE INVESTOR, JUST LIKE I WAS WITH ANY OF THE OTHER

11   THINGS. JUST LIKE IF I BOUGHT A HIGHBOY, I WOULDN'T TELL WAYNE HOW TO

12   FIX THE HIGHBOY UP. I'M -- I -- THAT'S NOT MY -- THAT'S NOT MY FIELD OF

13   EXPERTISE

14        Q.    OKAY. BUT YOU -- YOU FILED THE -- FILED A VERIFIED STATEMENT

15   OF INTEREST IN THIS WHERE YOU TAKE THE POSITION THAT YOU HAVE AN

16   OWNERSHIP INTEREST IN IT?

17        MR. STRATTON: IS THAT A QUESTION?

18        A.    YES, THAT'S TRUE--

19        MR. STRATTON: OKAY.

20        A.    --AND IF YOU BROUGHT WAYNE PRATT IN HERE AND ASKED HIM,

21   HE'D TELL YOU I OWN HALF A DOCUMENT.

22        MR. STRATTON: JUST ANSWER THE QUESTION.

1          WITNESS: ALL RIGHT. I'M SORRY.

2          Q.    (BY MR. GALVIN) BEYOND THE THREE CONVERSATIONS THAT WE

3    HAVE GONE THROUGH, THE CONVERSATION WITH MARY BETH KEENE, THE

4    CONVERSATION WITH WAYNE PRATT, AND THE CONVERSATION WITH

5    MR. HIGDON, DO YOU RECALL DENYING EITHER AN OWNERSHIP INTEREST OR A

6    PARTNERSHIP INTEREST IN ANY OTHER CONVERSATION?

7          A.    I DON'T RECALL ANY OTHER CONVERSATIONS ABOUT IT.

8          Q.    I WANT TO TURN YOUR ATTENTION NOW TO THIS DOCUMENT

9    THAT YOU MENTIONED, THIS COMPUTER-GENERATED DOCUMENT THAT YOU

10   REFERRED TO DURING MR. NEWBY'S EXAMINATION.

11         A.    YES.

12         Q.    DO YOU REMEMBER THE -- THAT HE ASKED YOU AND YOU CLAIMED

13   THAT THERE WAS THIS DOCUMENT--

14         A.    ABSOLUTELY.

15         Q.    OKAY.

16         A.    I DON'T HAVE A COPY, THOUGH.

17         Q.    AND DURING THAT EXAMINATION, YOU EXPLAINED WHAT

18   MR. PRATT WAS GETTING OUT OF THIS PROPOSED OPTION AGREEMENT. DO YOU

19   RECALL THAT?

20         A.    WAIT, I'M CONFUSED. ARE YOU TALKING ABOUT--

21         Q.    THE TESTIMONY TODAY, THE--

22         MR. STRATTON: THE -- THE COMPUTER-GENERATED SHEET HAS GOT

Case 5:03-cv-00204-BO   Document 75   Filed 09/10/03   Page 95 of 109

1            NOTHING TO DO WITH OPTIONS.

2      A.     I DON'T HAVE A COMPUTER-GENERATED SHEET HERE.

3      MR. STRATTON: THIS IS—

4      Q.     (BY MR. GALVIN) YOU TALKED ABOUT AN – SOME SORT OF OPTION

5 AGREEMENT THAT YOU BELIEVE YOU HAVE

6      MR. STRATTON: THAT YOU NEGOTIATED—

7      A.     OH, OH, OH, OH, OH.

8            MR. GALVIN: DO YOU HAVE AN OBJECTION? I MEAN—

9      MR. STRATTON: OKAY. GO AHEAD AND ANSWER IT.

10      A.     YES.

11      Q.     (BY MR. GALVIN) OKAY. LET'S FOCUS ON—

12      A.     I THOUGHT YOU WERE TALKING ABOUT THE OPTION HE WAS

13 TALKING ABOUT BEFORE.

14      Q.     I WANT TO FOCUS ON THAT AGREEMENT. AND YOU TALKED

15 ABOUT WHAT WAYNE PRATT WAS GOING TO GET OUT OF THIS LEGAL FEES.

16      A.     UP TO A MILLION ONE—

17      Q.     OKAY.

18      A.     —BASIS AND LEGAL FEES.

19      Q.     WHAT ELSE WAS WAYNE PRATT GETTING OUT OF THIS?

20      A.     THE BASIS, WHATEVER HE PAID FOR THE DOCUMENT, WHATEVER

21 HE HAD IN, YOU KNOW, RESTORATION CHARGES, AND LEGAL FEES.

22      Q.     WHAT DO YOU MEAN BY BASIS?

Case 5:03-cv-00204-BO   Document 73   Filed 09/10/03   Page 96 of 109

1      A.      WELL, THE BASIS OF SOMETHING YOU BUY, THE BASIS, WHAT THE

2   COST IS, YOUR COST BASIS.

3      Q.      OKAY. SO IF THE DOCUMENT -- JUST SO I UNDERSTAND, IF THE

4   DOCUMENT COST TWO HUNDRED THOUSAND DOLLARS ($200,000.00), WAYNE

5   PRATT WOULD GET THE TWO HUNDRED THOUSAND DOLLARS ($200,000.00)?

6      MR. STRATTON: IS THAT A HYPOTHETICAL?

7      A.      NO--

8      MR. STRATTON: OBJECTION.

9      A.      --THE DOCUMENT -- NO. WAYNE'S BASIS.

10     Q.      OKAY.

11     A.      I HAVE A HUNDRED THOUSAND. HE'S GOT A HUNDRED.

12     Q.      OKAY.

13     A.      AND HE'S GOT TWENTY-FIVE HUNDRED IN CLEANING.

14     Q.      SO, WHAT WAYNE WOULD BE GETTING OUT IF THIS -- JUST SO I

15   UNDERSTAND THIS -- IS THE HUNDRED THOUSAND DOLLARS ($100,000.00) THAT

16   HE PUT IN FOR HIS SHARE?

17     A.      YES, AND THE TWENTY-FIVE HUNDRED FOR CLEANING.

18     Q.      AND -- AND LEGAL FEES?

19     A.      UP TO A MILLION ONE.

20     Q.      ANYTHING ELSE THAT WAYNE WAS GETTING OUT OF THIS?

21     A.      NO.

22     Q.      WHAT WERE YOU GETTING OUT OF THIS?

1        A.      IT WAS AN OPTION TO PURCHASE FOR UP TO A MILLION ONE TO –

2   IF – BUT IT – REMEMBER, THE OPTION WAS NO GOOD IF THERE WAS ANYTHING – I

3   MEAN, I EMAILED YOU A COPY OF IT SO YOU KNOW WHAT IT SAID.

4        MR. STRATTON:  WELL, YOU ARE – YOU'RE NOT ANSWERING THE

5                         QUESTION.  WHAT WAS YOUR BENEFIT WITHIN THE OPTION

6                         AGREEMENT?  WHAT WOULD YOU GET FROM MR. PRATT?

7        A.      I WOULD HELP WAYNE PAY HIS LEGAL FEES BECAUSE HE

8   APPARENTLY – THEY'RE RIDICULOUS.

9        MR. STRATTON:  BUT WHAT WOULD YOU GET?

10       A.      WELL, IF THERE WAS NO CRIMINAL CASE AGAINST HIM, AND WE

11  EITHER DID A DEAL WHERE WE DONATED THE DOCUMENT AND THERE WAS A TAX

12  BENEFIT, I WOULD GET A TAX BENEFIT OUT OF IT.

13       Q.      (BY MR. GALVIN)  WHAT WAS THIS TAX BENEFIT THAT YOU HOPED

14  TO GET OUT OF IT?

15       A.      IT WAS A WAY – WAYNE CAN'T USE THE LOSSES ON – IF THERE

16  WAS A WAY TO HAVE THIS SO IF AT THE END OF THE DAY THIS WAS DONATED TO

17  A NON-PROFIT –

18       Q.      OKAY.

19       A.      – THAT YOU AND I SPOKE ABOUT –

20       Q.      HOW –

21       A.      – IF IT WAS DONATED TO A NON-PROFIT, THAT I'D BE ABLE TO USE

22  THE DEDUCTIONS, AND WAYNE WOULD BE ABLE TO GET SOME MONEY OUT OF IT

1    TO PAY YOUR LEGAL FEES.

2          Q.    OKAY. SO, IF – HOW DID THIS – DID THIS AT ALL CHANGE SORT OF

3    THE UNDERLYING OWNERSHIP INTEREST IN THE DOCUMENT, IN YOUR VIEW?

4          MR. STRATTON:  IF YOU'RE ASKING MY CLIENT A LEGAL QUESTION, I

5                OBJECT.

6          A.    I DON'T KNOW. I MEAN, I – WHAT DO YOU MEAN, THE

7    UNDERLYING – WELL, I MEAN, I THINK IT WAS AN OPTION FOR

8    FORTY-FIVE PERCENT. HE WAS GOING TO KEEP FIVE, UP TO A MILLION ONE. IT

9    SPEAKS FOR ITSELF. I DON'T KNOW LEGALLY WHAT IT IS. I DON'T KNOW.

10         Q.    (BY MR. GALVIN)  BUT MY BASIC QUESTION IS, WHY DID YOU

11   WANT TO DO THIS?

12         A.    WELL, IT WAS TWOFOLD. IF WE WERE SUCCESSFUL WITH THE

13   CIVIL SUIT, THE DOCUMENT, (A), COULD BE WORTH FORTY MILLION DOLLARS, OR,

14   (B), WE COULD GET AN I.R.S. RULING AND HAVE A DEDUCTION FOR, I DON'T KNOW,

15   FIVE MILLION TO FIFTEEN OR TWENTY, OR WHATEVER IT IS. SO, I WOULD BE ABLE

16   TO HAVE DEDUCTIONS. IT WOULD GIVE WAYNE THE MONEY BECAUSE HE SAID HE

17   OWED YOU FOUR OR FIVE HUNDRED THOUSAND DOLLARS, AND HE NEEDED SOME

18   MONEY. AND I WAS TRYING TO – TWO THINGS. ONE, IT COULD HELP ME OUT AND,

19   (B), IT COULD HELP HIM OUT.

20         Q.    AND JUST SO I UNDERSTAND, HELP YOU OUT ON THE – ON SORT

21   OF TAX CONSEQUENCES OR TAX—

22         MR. STRATTON:  OBJECTION. IT'S BEEN ASKED AND ANSWERED. IT'S

1          BEEN ASKED AND ANSWERED.

2     A.     YEAH, FOR TAX REASONS, TO BE ABLE TO GET A DEDUCTION.

3     Q.     (BY MR. GALVIN) OKAY.  ANY – ANY OTHER BENEFIT TO YOU?

4     A.     I CAN'T THINK OF ANY.

5     Q.     OKAY.

6     MR. GALVIN:  JUST ONE SECOND.

7                    (THEREUPON, ATTORNEY REVIEWS NOTES.)

8     MR. GALVIN:  I HAVE NO FURTHER QUESTIONS AT THIS TIME.

9     MR. STRATTON:  JUST A FEW QUESTIONS, MR. MATTHEWS.

10    <u>CROSS-EXAMINATION BY MR. STRATTON:</u>

11    Q.     HAD THERE BEEN OTHER OCCASIONS WHERE YOU HAD JOINT

12    VENTURED WITH WAYNE PRATT IN THE PURCHASE OF ANTIQUES OR

13    ANTIQUITIES?

14    A.     YES.

15    Q.     MANY OTHER OCCASIONS?

16    A.     THREE TO SIX.

17    Q.     OKAY.  AND IN – ON ALL THOSE OTHER OCCASIONS, WOULD THE

18    DEAL BE THAT YOU WOULD PUT UP FIFTY PERCENT OF THE VALUE AND – AND

19    MR. PRATT WOULD PUT UP FIFTY PERCENT OF THE VALUE OF THE PURCHASE?

20    A.     YES.

21    Q.     AND WAS IT THE – THE UNDERSTANDING BETWEEN BOTH OF YOU

22    THAT UPON THE SALE OF THE ITEM, MR. PRATT WOULD TAKE HIS COSTS IN

1    TERMS OF BROKERING THE DEAL AND EACH OF YOU WOULD TAKE FIFTY PERCENT

2    OF THE REMAINDER?

3           A.     YES, BUT HE USUALLY DIDN'T HAVE TO PAY A BROKERAGE FEE.

4           Q.     OKAY.  AND IN ALL THOSE DEALS, WOULD YOU ACTUALLY SIGN

5    PURCHASE AND SALE AGREEMENTS?

6           A.     NO.

7           Q.     OKAY.  IN ALL OF THOSE DEALS, WOULD YOU HAVE SOME

8    ADVANCE WARNING FROM MR. PRATT AS TO – OR ADVANCE NOTICE FROM

9    MR. PRATT AS TO WHAT THE PROBABLE SALE PRICE WOULD BE?

10          A.     HE PROBABLY TALKED ABOUT THE VALUE THAT HE THOUGHT IT

11   WAS WHEN HE BOUGHT IT.  BUT HE DIDN'T CALL ME UP TO ASK ME, CAN I SELL A

12   HIGHBOY FOR A HUNDRED AND FIFTY THOUSAND DOLLARS ($150,000.00) INSTEAD

13   OF A HUNDRED AND SIXTY THOUSAND DOLLARS ($160,000.00) OR SOMETHING.

14          Q.     AND IN THOSE – IN THOSE DEALS, DID YOU HAVE THE – WAS – IN

15   A – THE JOINT VENTURE BETWEEN YOU AND MR. PRATT, DID YOU HAVE THE

16   AUTHORITY TO – TO SAY, LOOK, I DON'T THINK THAT'S A FAIR PRICE, OR I DON'T

17   WANT TO PURCHASE THAT ITEM ANYMORE, OR TO BE ABLE TO PUT THAT – THAT

18   KIND INPUT?

19          A.     I REALLY DIDN'T HAVE A LOT OF INPUT.  ON THE ANTIQUES, I

20   TRUSTED HIM BECAUSE HE WAS THE EXPERT ON IT.

21          Q.     OKAY.  NOW, THIS CHECK, WHICH HAS BEEN MARKED AS

22   MATTHEWS EXHIBIT 2, THAT'S YOUR PERSONAL MONEY – DOES THAT REPRESENT

1    YOUR PERSONAL MONEY?

2        A.    YES.

3        Q.    OKAY. SO, THAT'S A – THAT'S A PERSONAL DRAW FOR THE

4    PURCHASE OF THE BILL OF RIGHTS IN YOUR–

5        MR. NEWBY: OBJECTION. LEADING.

6        Q.    (BY MR. STRATTON) THAT'S A PERSONAL CHECK THAT

7    REPRESENTS A – THAT'S A – IT'S – IT'S – THIS CHECK REPRESENTS A DRAW OF

8    MONEY FROM THE COMPANY?

9        MR. NEWBY: OBJECTION. LEADING.

10       MR. STRATTON: IS THERE SOMETHING AGAINST LEADING ON A

11              CROSS-EXAMINATION THAT I'M NOT AWARE OF?

12      MR. NEWBY: IT'S YOUR WITNESS.

13      MR. STRATTON: YEAH. THERE'S NO–

14      MR. RENFER: HE'S YOUR WITNESS.

15      MR. STRATTON: HE'S YOUR WITNESS.

16      MR. NEWBY: SAY IT DIFFERENT.

17      MR. STRATTON: I UNDERSTAND.

18      MR. NEWBY: I MEAN, YOU CAN RELY ON IT AND LET THE JUDGE RULE.

19      MR. STRATTON: OKAY, THAT'S FINE.

20        Q.    (BY MR. STRATTON) THE CHECK THAT WE SEE IN HERE,

21    PLAINTIFF'S EXHIBIT 2, WHAT DOES THIS REPRESENT?

22        A.    IT REPRESENTS THE ORIGINAL, WHAT I THOUGHT WAS THE

1   FIFTY PERCENT PURCHASE OF THE BILL OF RIGHTS. IT WAS PUT AS A – UNDER

2   MY DRAW ACCOUNT, PROBABLY ON ACCOUNT TO WAYNE PRATT FOR THIS ITEM.

3          Q.     SO, DOES THAT REPRESENT THE USE OF YOUR PERSONAL FUNDS?

4          A.     YES, IT WAS A DRAW.

5          Q.     OKAY. NOW, DID YOU HAVE A FINANCIAL STAKE IN THE

6   DEFENDANT, THE BILL OF RIGHTS, PRIOR TO IT BEING SEIZED?

7          A.     OF COURSE. I HAD A HUNDRED THOUSAND DOLLARS ($100,000.00)

8   INVESTED.

9          Q.     DO YOU CONSIDER THAT A MINIMAL STAKE OR A SIGNIFICANT

10  FINANCIAL STAKE IN—

11         MR. NEWBY: OBJECTION.

12         Q.     —IN – FROM YOUR POINT OF VIEW?

13         MR. NEWBY: OBJECTION.

14         A.     WELL, FIVE YEARS AGO, A HUNDRED THOUSAND DOLLARS

15  ($100,000.00) WAS – WAS LESS MONEY ALMOST THAN IT IS TODAY AFTER GOING

16  THROUGH THE DOT-COM STUFF. BUT IT'S A HUNDRED THOUSAND DOLLARS

17  ($100,000.00). I MEAN, IT'S A – IT'S A LOT OF MONEY. IT'S NOT

18  FIFTY-NINE CENTS, BUT IT'S NOT A HUNDRED MILLION DOLLARS.

19         Q.     OKAY. SO, IT REPRESENTS A SIGNIFICANT FINANCIAL STAKE?

20         MR. NEWBY: OBJECTION.

21         Q.     (BY MR. STRATTON) IS THAT FAIR TO SAY?

22         A.     IT – IT—

1          MR. NEWBY: OBJECTION. LEADING.

2          A.      —IT REPRESENTS A HUNDRED THOUSAND DOLLARS ($100,000.00),

3    WHICH IS A – IS A LOT OF MONEY—

4          Q.      OKAY.

5          A.      —BUT IT'S NOT A HUGE AMOUNT OF MONEY.

6          Q.      (BY MR. STRATTON) IF THE BILL OF RIGHTS IS FORFEITED, WILL

7    YOU LOSE ANYTHING?

8          A.      IF IT'S FORFEITED, I'LL LOSE MY HUNDRED THOUSAND DOLLARS

9    ($100,000.00). AND IF IT ACTUALLY ENDED UP GETTING TITLE TO IT AND IT WAS

10   EVER PROVED IT WAS OURS, I COULD LOSE, AS THE PAPER'S SAYING, YOU KNOW,

11   IT'S PRICELESS. I DON'T KNOW WHAT IT'S REALLY WORTH IN THE REAL WORLD.

12   COULD BE THIRTY MILLION, TWENTY MILLION, FORTY MILLION. I HAVE NO IDEA.

13         Q.      AND HAVE YOU HIRED AN ATTORNEY TO REPRESENT YOU IN THIS

14   CASE?

15         A.      YES.

16         Q.      IN THE – IN THIS FORFEITURE CASE?

17         A.      YES.

18         Q.      AND HAVE YOU INSTRUCTED THAT ATTORNEY TO ZEALOUSLY

19   REPRESENT YOUR INTEREST? THERE'S A REASON FOR THESE QUESTIONS, BOB.

20   JUST ANSWER MY QUESTIONS.

21         A.      YES.

22         Q.      OKAY. AND DID YOU INTEND TO – TO FULLY ADJUDICATE THIS

1    MATTER SO THAT THE – BOTH SIDES – YOUR SIDE WILL BE – WILL BE PROPERLY

2    REPRESENTED?

3           MR. NEWBY: OBJECTION. THIS IS ALL OUTSIDE THE SCOPE OF DIRECT.

4           Q.    (BY MR. STRATTON) UNDER THE ARTICLE 3, CASE IN

5    CONTROVERSY REQUIREMENT, ONE OF THE CONCERNS IS THAT A LITIGANT WILL

6    FULLY ADJUDICATE A MATTER – HAS ENOUGH INTEREST TO FULLY ADJUDICATE A

7    MATTER. DO YOU INTEND TO FULLY ADJUDICATE THIS MATTER AND – AND SEE IT

8    THROUGH TO A FAIR RESULT?

9           A.    I WOULD HOPE SO, YES.

10          Q.    OKAY.

11          MR. STRATTON: NO OTHER QUESTIONS.

12    ————————————————                    (THEREUPON, THE DEPOSITION

13                              WAS CONCLUDED AT 5:02 P.M.)

14    ————————————————

15    /

16     /

17      /

18      /

19       /

20             /

21             /

22              /

1     /
2       /
3         /
4         /
5         /
6           /

STATE OF CONNECTICUT

COUNTY OF _____

     I, ROBERT VIRES MATTHEWS, HAVE READ THE FOREGOING TRANSCRIPT OF

MY DEPOSITION AND DO HEREBY CERTIFY THAT THE PRECEDING 101

PAGES CONSTITUTE A TRUE AND ACCURATE TRANSCRIPTION

OF MY TESTIMONY.  MY SIGNATURE IS SUBJECT TO CORRECTIONS, IF

ANY, LISTED ON THE ATTACHED ERRATA SHEET.

                         _____

                         ROBERT VIRES MATTHEWS

SWORN TO AND SUBSCRIBED

BEFORE ME, A NOTARY PUBLIC,

THIS THE _____ DAY OF SEPTEMBER,

2003.

_____

   NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____

*CAROLYN Y. HALL & ASSOCIATES*

NORTH CAROLINA

WAKE COUNTY

## CERTIFICATE

I, CAROLYN Y. HALL, A NOTARY PUBLIC, DO HEREBY CERTIFY THAT THE FOREGOING DEPOSITION OF ROBERT VIRES MATTHEWS, TAKEN BY KIMBERLY L. CRAWFORD, A NOTARY PUBLIC, WAS REPORTED AND TRANSCRIBED UNDER MY DIRECT SUPERVISION, AND THAT THE FOREGOING 101 PAGES CONSTITUTE A TRUE AND ACCURATE TRANSCRIPTION OF THE TESTIMONY OF THE SAID DEPONENT.

I DO FURTHER CERTIFY THAT THE PERSONS WERE PRESENT AS STATED IN THE CAPTION.

I DO FURTHER CERTIFY THAT I AM NOT OF COUNSEL FOR, OR IN THE EMPLOYMENT OF EITHER OF THE PARTIES TO THIS ACTION, NOR AM I INTERESTED IN THE RESULTS OF THIS ACTION.

IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED MY NAME, THIS THE 7TH DAY OF SEPTEMBER, 2003.

_____
CAROLYN Y. HALL
CAROLYN Y. HALL & ASSOCIATES
2551 ALBEMARLE AVENUE
RALEIGH, NORTH CAROLINA 27610

MY COMMISSION EXPIRES

FEBRUARY 28, 2006

*CAROLYN Y. HALL & ASSOCIATES*

(919) 231-4164